FILED
U.S. DISTRICT COURT
AUGUSTA DIV.

2019 JUN 21 PM 4: 13

CLERK M. Arno
SO. DIST. OF GA.

IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

REINALDO JAVIER RIVERA,          *
                                 *
        Petitioner,              *
                                 *
        v.                       *          CV 113-161
                                 *
ERIC SELLERS, Warden of the      *
Georgia Diagnostic and           *
Classification State Prison,     *
                                 *
        Respondent.              *

---

**O R D E R**

---

Before the Court is Petitioner Reinaldo Javier Rivera's motion to amend the Court's December 6, 2017 Order ("December 6th Order") to add a certificate permitting immediate appealability (Doc. 108) and motion to stay briefing schedule pending resolution of his motion to amend (Doc. 115). For the reasons set forth below, Petitioner's motion to amend is **DENIED** and his motion to stay briefing schedule is **DENIED AS MOOT**.

The Court has detailed the factual and procedural background of this case in prior Orders. (See Dec. 6th Order, Doc. 96, at 1-3; Order Denying Recons., Doc. 107, at 2-4.) In this Order, the Court only notes background details directly relevant.

## I. LEGAL STANDARDS

As an initial matter, the Court agrees with Petitioner that in the Court's reconsideration of its December 6th Order, it incorrectly construed the reconsideration request as under Rule 60(b) rather than Rule 54(b). Rule 60(b) applies to final orders only, and the December 6th Order was a non-final, interlocutory order.[1] This does not affect the validity of the reconsideration. See Charriez v. Sec'y, Fla. Dep't of Corr., 596 F. App'x 890, 896 n.6 (11th Cir. 2015) (per curiam) (stating district court did not err in denying motion for reconsideration even though analyzed under Rule 60(b) rather than Rule 54(b)); Kolawole, 863 F.3d at 1368-69, 1373-74 (affirming district court's denial of reconsideration under Rule 60(b) even though already decided reconsideration was not of a final order). The Court's logic in denying Petitioner's motion for reconsideration under Rule 60(b) applies equally to Rule 54(b).[2] QBE Ins. Corp. v. Whispering Pines

---

[1] A final order is "one which ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." Pitney Bowes, Inc. v. Mestre, 701 F.2d 1365, 1368 (11th Cir. 1983) (quoting Catlin v. United States, 324 U.S. 229, 233 (1945)). The Court's decision to apply Rule 60(b) does not convert the December 6th Order into a final judgment triggering an appeal timeline. Kolawole v. Sellers, 863 F.3d 1361, 1369, 1373 (11th Cir. 2017) (although court reconsidered under Rule 60(b), order reconsidered was not a final order; thus, appeal timeline did not begin until court entered a certification allowing appeal).

[2] Rule 54(b) does not provide specific grounds for reconsideration but recalls the Court's inherent power to revise its orders in the interest of justice. See FED. R. CIV. P. 54(b); CSX Transp., Inc. v. City of Pensacola, 936 F. Supp. 885, 890 (N.D. Fla. 1995) (denying motion for Rule 54(b) reconsideration when party "merely expanded those allegations contained in the dismissed claims"). "[T]he Eleventh Circuit advises 'district courts to exercise the limited discretion afforded by Rule 54(b) conservatively.'" Neibert v. Comput. Scis. Corp., No. 1:12-cv-02277-SCJ, 2014 WL 11460478, at *5 (N.D. Ga. May 16, 2014)

2

Cemetery, LLC, No. 12-0054-KD-C, 2014 WL 2921908, at *4 (S.D. Ala. June 27, 2014) ("Eleventh Circuit precedence indicates that the Court may follow the Rule 60(b) analysis when addressing a motion for relief from a non-final order."); see also Herman v. Hartford Life & Accident Ins. Co., 508 F. App'x 923 (Table), 927 n.1 (11th Cir. 2013) (per curiam) (citing Fernandez v. Bankers Nat'l Life Ins. Co., 906 F.2d 559, 569 (11th Cir. 1990) ("Although Rule 54(b) does not delineate the parameters of a district court's discretion to reconsider interlocutory orders, we have at least indicated that Rule 54(b) takes after Rule 60(b).").

Because the December 6th Order was a non-final order, Petitioner may only appeal it with the Court's permission under Rule 54(b) or 28 U.S.C. § 1292(b). For the following reasons, the Court finds this motion properly analyzed under section 1292(b), rather than Rule 54(b).

## A. Rule 54(b)

Rule 54(b) allows a court to "direct entry of a final judgment as to one or more, but fewer than all, claims . . . only if . . . there is no just reason for delay." Fed. R. Civ. P. 54(b). District courts must follow a two-step analysis to determine whether Rule 54(b) certification is proper. Lloyd Noland Found., Inc. v. Tenet Health Care Corp., 483 F.3d 773, 777 (11th Cir.

---

(quoting Ebrahimi v. City of Huntsville Bd. of Educ., 114 F.3d 162, 166 (11th Cir. 1997)).

2007). "First, the court must determine that its final judgement is, in fact, both 'final' and a 'judgment.'" Id. (citing Curtiss-Wright Corp. v. Gen. Elec. Co., 446 U.S. 1, 7 (1980)).

A court's decision is considered "final" only if that decision "disposes entirely of a separable claim." Id. at 779 (quoting In re Se. Banking Corp., 69 F.3d 1539, 1547 (11th Cir. 1995). Courts have often stated, "[T]he line between deciding one of several claims and deciding only part of a single claim is very obscure." In re Se. Banking Corp., 69 F.3d at 1547 (citing 10 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2657, at 67 (2d ed. 1983)). In determining whether a claim is separable, the Eleventh Circuit focuses on the relief requested, stating, "Claims are separable when there is more than one possible recovery . . . or if different sorts of relief are sought."[3] Id. (internal citations and quotation marks omitted). Therefore, "even if a district court has adjudicated one count of a complaint, but another count seeks substantially similar relief, the adjudication of the first count does not represent a 'final judgment' because both counts are functionally part of the same claim under Rule 54(b)." Barnett v. MacArthur, 715 F. App'x 894, 900 (11th Cir. 2017) (per curiam) (quoting Lloyd Noland Found., Inc., 483 F.3d at 780). A judgment is "a decision upon a cognizable

---

[3] For purposes of this Order, the Court refers to this as the "Separate-Recoveries Test."

4

claim for relief." Lloyd Noland Found., Inc., 483 F.3d at 777 (quoting Curtiss-Wright Corp., 446 U.S. at 7).

Second, if found to be a final judgment, "the district court must then determine that there is no 'just reason for delay' in certifying it as final and immediately appealable."[4] Id. (citing Curtiss-Wright Corp., 446 U.S. at 8).

Rule 54(b) is inapplicable here because the December 6th Order did not include a final judgment as to any claim. The Court focuses on the decisions in the December 6th Order Petitioner now challenges. The Court's decisions denying the addition of facts in support of Petitioner's Ineffective Assistance of Trial Counsel ("IATC") claim and denying the use of an exception to excuse procedural default were clearly not final judgments because they disposed of facts in support of a claim and a theory of excuse, not a claim itself. The only arguable final judgement as to a claim in the December 6th Order is the denial of Petitioner's freestanding actual innocence claim.

First, denying addition of Petitioner's actual innocence claim is not final. Although Petitioner presents many theories, his requested relief is the same under all: relief from his

---

[4] Only after the district court finds the decision is a final judgment must the court determine whether there is no just reason for delay. See Barnett, 715 F. App'x at 900 ("[W]e reach this inquiry only if we first determine that the order was a final judgment.").

conviction and sentence.[5] (Pet. for Writ of Habeas Corpus, at 39; Am. Pet. for Writ of Habeas Corpus, at 55.) Because Petitioner's claim of actual innocence "'substantially overlap[s]' with remedies being sought by the remaining claims pending in [this Court]," the Court's denial of Petitioner's request to add an actual innocence claim is not a final adjudication of a claim for purposes of Rule 54(b).[6] Lloyd Noland Found., Inc., 483 F.3d at 780 (quoting In re Se. Banking Corp., 69 F.3d at 1547).

Second, the decision to deny Petitioner's actual innocence claim is not a judgment. Having denied the actual innocence claim as not cognizable (see Dec. 6th Order, at 4), this Court's decision was not a decision upon a cognizable claim for relief.

The Court recognizes that use of the Separate-Recoveries Test may prove problematic in a habeas corpus petition because success on any theory results in the same relief. Andrew S. Pollis, *Civil Rule 54(b): Seventy-Five and Ready for Retirement*, 65 FLA. L. REV. 711, 743 (2013). Because the Eleventh Circuit uses the Separate-Recoveries Test, however, the Court must apply it here. Furthermore, in conjunction with the Separate-Recoveries Test, the Court finds persuasive the substantial overlap between the actual

---

[5] Specifically, Petitioner "prays that this Court: . . . Issue a Writ of Habeas Corpus to have Petitioner brought before it to the end that he may be discharged from his unconstitutional confinement and restraint, and/or be relieved from his unconstitutional sentence of death." (Pet. for Writ of Habeas Corpus, Doc. 1, at 39; Am. Pet. for Writ of Habeas Corpus, Doc. 71-1, at 55.)

[6] The Court's reasoning that denial of the actual innocence claim is not final applies equally to the Court's denial of the other theories of relief in its December 6th Order.

innocence claim and pending claims, factually and in relief sought, and that this Court's decision was denying the addition of a non-cognizable claim. Thus, the Court's decision to deny addition of Petitioner's actual innocence claim was not a final judgment under Rule 54(b).[7]

## B. Section 1292(b)

Having found Rule 54(b) inapplicable, the Court may only grant Petitioner permission for an interlocutory appeal of the December 6th Order under 28 U.S.C. § 1292(b). For the Court to authorize certification under section 1292(b), Petitioner has the burden to show the Court that the relevant order "involves [1] a controlling question of law[,] [2] as to which there is substantial ground for difference of opinion[,] and [3] that an immediate appeal . . . may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b).

First, a controlling question of law is one that is both controlling and purely legal. A question is controlling when it is "outcome determinative." E.A. Renfroe & Co. v. Rigsby, No. 06-AR-1752-S, 2008 WL 11375424, at *2 (N.D. Ala. Jan. 17, 2008). Compare Scoggins v. Floyd Healthcare Mgmt., No. 4:14-CV-0274-HLM-WEJ, 2016 WL 11544903, at *3 (N.D. Ga. Apr. 4, 2016) (discovery-related issue not controlling because "certainly not

---

[7] Because the decision was not a final judgment, the Court need not decide whether there is no just reason for delay.

dispositive"), with S.R. v. United States, 555 F. Supp. 2d 1350, 1360 (S.D. Fla. 2008) (controlling because the availability of equitable tolling "is wholly dispositive as to the viability of [plaintiff's] claims"). Distinct from "a question of fact or matter for the discretion of the trial court," a purely legal question is "more of an abstract legal issue" that "can [be] decide[d] quickly and cleanly without having to study the record"; it does not require the "application of settled law to fact." McFarlin v. Conseco Servs., LLC, 381 F.3d 1251, 1258 (11th Cir. 2004) (citations omitted).

Second, a difference of opinion is sufficient when "there is substantial dispute about the correctness of any of the pure law premises the district court actually applied in its reasoning leading to the order sought to be appealed." Id. at 1259. For example, there is substantial dispute when there is a circuit split over a question of law that the Eleventh Circuit has not addressed. Abner v. U.S. Pipe & Foundry, Co., No. 2:15-CV-02040-KOB, 2018 WL 3804188, at *2 (N.D. Ala. Feb. 21, 2018). However, "[n]either the mere lack of authority on the issue nor the claim that the district court's ruling is incorrect constitutes a substantial ground for difference of opinion." Flint Riverkeeper, Inc. v. S. Mills, Inc., 261 F. Supp. 3d 1345, 1347 (M.D. Ga. 2017) (citation omitted).

Third, an immediate appeal materially advances the ultimate termination of the litigation when the court of appeals' decision

"would serve to avoid a trial or otherwise substantially shorten the litigation." McFarlin, 381 F.3d at 1259 (citations omitted) (finding appeal immaterial because it would only resolve one of seven issues leaving open possibility that review may be appropriate in future cases where not all claims would be resolved); accord Cline v. Advanced Neuromodulation Sys., Inc., No. 1:11-CV-4064-AT, 2014 WL 11517833, at *2 (N.D. Ga. Apr. 15, 2014) ("[T]he resolution of these issues would not serve to avoid trial or otherwise substantially shorten the litigation because [p]laintiff's parallel negligent manufacturing claim is still viable . . . ."). Where the appeal would not dispose of the entire case, courts "weigh the disruptive effect of an immediate appeal on the . . . proceedings against the probability that resources will be wasted in allowing those proceedings to go forward." In re Pac. Forest Prods. Corp. v. Freeman, 335 B.R. 910, 924 (S.D. Fla. 2005) (Although "numerous other issues remain to be tried," an "immediate appeal would hasten the *ultimate* disposition of this case. The discovery period . . . is still open[] and trial is scheduled [to occur in six months].") (emphasis in original).

The Court also notes that section 1292(b) certification is "an extraordinary measure, which is permitted only in exceptional circumstances." Cline, 2014 WL 11517833, at *1 (citing McFarlin, 381 F.3d at 1256). "Because permitting piecemeal appeals is bad

policy, permitting liberal use of [section] 1292(b) interlocutory appeals is bad policy." McFarlin, 381 F.3d at 1259.

## II. DISCUSSION

In its December 6th Order, this Court, in part, denied Petitioner's (1) motion to amend his complaint adding a freestanding actual innocence claim and (2) motion for appointment of supplemental counsel to litigate whether undersigned counsel provided ineffective representation. (Dec. 6th Order, at 4.) Regarding his IATC claim, Petitioner recognized it was untimely under the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"). (Mot. for Suppl. Counsel, Doc. 78, at 54.) Petitioner argued this Court should excuse his procedural default using the actual innocence exceptions.[8] (Id. at 54-58.) In its December 6th Order, the Court denied addition of the actual innocence claim because neither the Supreme Court nor Eleventh Circuit had recognized such a claim in habeas corpus proceedings and denied addition of the IATC claim because no exception was met. (Dec. 6th Order, at 34-35.)

---

[8] The Court refers to the actual innocence gateway exception to procedural default and the actual innocence equitable exception together as the actual innocence exceptions.

Petitioner now asks the Court to amend its prior order to certify the following questions for immediate appeal[9] under section 1292(b):

(1) Whether new evidence used to establish the actual innocence exceptions can include evidence that was available to trial counsel but not used;

(2) Whether the Martinez-Trevino exception applies to federal habeas cases arising in Georgia state courts; and

(3) Whether a freestanding claim of actual innocence is cognizable in habeas corpus proceedings.

(Pet'r's Mot. to Amend Dec. 6th Order, Doc. 108, at 7; Pet'r's Reply Supp. Mot. to Amend Dec. 6th Order, Doc. 114, at 10–11.) The Court will address each question in turn to determine whether it should be certified.

A. Whether New Evidence Used to Establish the Actual Innocence Exceptions Can Include Evidence That Was Available to Trial Counsel but Not Used

Even if new evidence used to establish the actual innocence exceptions can include evidence that was available to trial counsel but not used, Petitioner fails to show the actual innocence

---

[9] The Court may amend its prior order under Federal Rule of Appellate Procedure 5(a)(3), which states:

> If a party cannot petition for appeal unless the district court first enters an order granting permission to do so or stating that the necessary conditions are met, the district court may amend its order, either on its own or in response to a party's motion, to include the required permission or statement. In that event, the time to petition runs from entry of the amended order.

exceptions have been met. Before the Court may find Petitioner meets an actual innocence exception, it must find Petitioner has demonstrated his actual innocence. See Rozzelle v. Sec'y, Fla. Dep't of Corr., 672 F.3d 1000, 1009 (11th Cir. 2012) (per curiam) ("Necessarily subsumed within th[e] question [of whether there is an actual innocence exception] is the threshold issue of whether the petitioner has demonstrated his actual innocence in the first place."). As discussed below, Petitioner has not made a claim of actual innocence. (See section II(C), *infra*.) Because the Eleventh Circuit's review of this issue would not alter the Court's decision that the actual innocence exceptions have not been met, the issue is not controlling and would not materially advance this litigation. Thus, this question is inappropriate for an interlocutory appeal.

**B. Whether the Martinez-Trevino Exception Applies to Federal Habeas Cases Arising in Georgia State Courts**

In the December 6th Order, this Court found that the Martinez-Trevino exception does not apply in federal habeas corpus cases in Georgia. Further, the Court found that even if the Martinez-Trevino exception applied, the claim would still be time barred by the AEDPA statute of limitations. Petitioner does not ask to appeal the Court's decision that the AEDPA statute of limitations bars the claim for supplemental counsel even if the Martinez-

_Trevino_ exception applies.[10]   The Court has already addressed the interplay between the _Martinez-Trevino_ exception and the AEDPA statute of limitations in its December 6th Order.   (<u>See</u> Dec. 6th Order, at 16-17 ("Because Petitioner's new claim is time barred by the AEDPA, it could not be heard by this Court even if it did meet the _Martinez-Trevino_ exception to procedural default.").)   The Court reiterates its conclusion that, in this case, the _Martinez-Trevino_ exception does not overcome the AEDPA's statute of limitations.   Thus, this issue is inappropriate for a section 1292(b) interlocutory appeal because resolution of it is not controlling and would not materially advance the ultimate termination of this litigation.

## C. Whether a Freestanding Claim of Actual Innocence is Cognizable in Habeas Corpus Proceedings

Petitioner sought leave to amend his petition "to add the claim that he is actually innocent of Marni Glista's murder and, accordingly, his murder conviction and death sentence must be vacated."   (Mot. to Am. Pet. for Writ of Habeas Corpus, Doc. 71, at 2.)   In its December 6th Order, this Court correctly noted that a freestanding claim of actual innocence has not been recognized

---

[10] Petitioner, in a footnote, states that the decision the Court relied on in determining that the _Martinez-Trevino_ exception does not overcome the AEDPA's statute of limitations is distinguishable.   (Pet'r's Mot. to Amend Dec. 6th Order, at 14-15 n.9.)   At no point, however, does Petitioner ask the Court to certify whether that decision was correct.   Petitioner argues that he overcomes the AEDPA's statute of limitations by his "colorable claim of actual innocence." (<u>Id.</u> at 7.)   The Court examines that argument separately.

in federal habeas corpus proceedings. (Dec. 6th Order, at 8.) Before determining whether the Court should certify that question for appeal, the Court first analyzes whether Petitioner has demonstrated his actual innocence in the first place. Cf. Rozzelle, 672 F.3d at 1009-10 (before Eleventh Circuit answered certified question of "whether there is an 'actual innocence' exception that will equitably toll the AEDPA statute of limitations period," it had to determine whether petitioner could meet actual innocence standard).

First, the Court outlines the actual innocence standard. Second, the Court analyzes the new evidence presented in conjunction with that presented at trial and finds Petitioner fails to show he is actually innocent. Thus, the question of whether Petitioner may raise a claim of actual innocence is inappropriate for an interlocutory appeal.

## 1. Actual Innocence Standard

To show actual innocence, Petitioner must present "new reliable evidence that was not presented at trial . . . to show that it is more likely than not that no reasonable juror would have found [him] guilty beyond a reasonable doubt in light of the new evidence." Id. at 1011 (internal citations and quotation marks omitted). The new evidence used to show actual innocence may include, but need not be limited to, "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical

14

evidence." Schlup v. Delo, 513 U.S. 298, 324 (1995); accord Rozzelle, 672 F.3d at 1017. Petitioner must do more than "counterbalance the evidence that sustained [his] conviction." Rozzelle, 672 F.3d at 1017-18. Compare Id. at 1017 (finding evidence insufficient to show actual innocence because "largely cumulative of what the jury heard"), with House v. Bell, 547 U.S. 518, 548-54 (2006) ("rare case" where petitioner made showing of actual innocence by presenting new evidence that "called into question" the "central forensic proof connecting [petitioner] to the crime" and new witness testimony that the victim's husband confessed to killing her). Furthermore, the evidence must show "factual innocence, not mere legal insufficiency." Bousley v. United States, 523 U.S. 614, 623 (1998); accord McKay v. United States, 657 F.3d 1190, 1198 (11th Cir. 2011) ("[N]ew evidence" only went to legal sufficiency of evidence showing that a previous crime was not a "'crime of violence' under the [sentencing] [g]uidelines," not "that he did not actually commit the crime of carrying a concealed weapon. In other words, he makes no claim of factual innocence of the predicate offense.") (emphasis omitted).

2. Evidence

Following a jury trial that took place January 13-23, 2004, Petitioner was convicted of one count of malice murder, three counts of rape, four counts of aggravated sodomy, four counts of aggravated assault, one count of possession of a knife during the

commission of a crime, and one count of burglary. (Doc. 29-9, at 26-27.) On January 26, 2004, the trial court sentenced Petitioner to death for the murder of Marni Glista and gave Petitioner consecutive sentences for the remaining offenses. (Doc. 29-9, at 28-29, 34-36; Doc. 29-10, at 29-31.) The Georgia Supreme Court unanimously affirmed Petitioner's convictions and death sentence on June 25, 2007. Rivera v. State, 647 S.E.2d 70 (Ga. 2007).

The evidence presented at trial supporting that Petitioner murdered Marni Glista consisted mostly of (1) interviews where Petitioner confessed to the murder and provided corroborating details of the murder and Ms. Glista's home and (2) Petitioner's testimony at trial confessing to the murder.[11] After the Georgia Supreme Court reviewed the evidence presented at trial, it stated:

> The jury was authorized to find that Rivera followed Marni Glista from the grocery store into her home, overpowered her, bound her neck and wrists with medical tape, raped her, sodomized her, and strangled her with her bathrobe. Rivera testified that, although "he knew Marni was still alive and could see her heart beating very quickly," he left her bound and helpless until she was discovered almost 24 hours later.

Id. at 80.

Petitioner argues the following new evidence shows he is actually innocent of the murder of Marni Glista:

(1)  No rape kit yielded DNA suitable for forensic testing

(Mot. for Suppl. Counsel, at 16);

---

[11] For a complete summary of the facts of the murder of Marni Glista see the Georgia Supreme Court's summary in Rivera, 647 S.E.2d at 73-74.

(2)  Officers ceased investigating two other leads after Petitioner's confession (id. at 18-19);

(3)  There were two circular patterned injuries on Ms. Glista's back, separated by about an inch, but the investigation reports did not indicate whether the tissue samples from these injuries were tested and, if so, what the tests determined (id. at 16-17);

(4)  Petitioner is innocent of the murder of Tiffaney Wilson, which was used as similar transaction evidence (id. at 30-53); and

(5)  Petitioner's recorded October 13, 2000 interview ("October 13th Interview") played at trial is unreliable because (a) a partially recorded interview of Petitioner on October 12, 2000 ("October 12th Interview"), was discovered[12] showing discrepancies in Petitioner's testimony and coaxing by the interviewers[13] (id. at 20-21) and (b) part of the facts included in Petitioner's testimony were publicly available (Reply Br. Supp. Mot. for Suppl. Counsel, Doc. 91, at 21).

---

[12] Although all parties knew of the October 12th Interview before trial, defense counsel was told there was no audio recording of the interview. (Mot. for Suppl. Counsel, at 19-21; Investigator Roundtree Trial Test., Doc. 29-30, at 9:4-16.)  After trial, however, a partial audio recording of the interview surfaced. (Adam Folk, 'Disarray' at Officer's Home Detailed, AUGUSTA CHRONICLE, Oct. 5, 2008, Doc. 32-1, at 202-03.)

[13] Investigators Roundtree and Bunton conducted the October 12th and 13th Interviews. (Mot. for Suppl. Counsel, at 19-20.)

The majority of this allegedly new evidence is insufficient to establish Petitioner's actual innocence of Ms. Glista's murder without much analysis from the Court. The evidence that no rape kit yielded results cannot possibly be used to show Petitioner's actual innocence. The facts that no evidence was presented regarding the circular marks or that the two other leads were dropped also fail to show Petitioner was actually innocent. Such speculative assertions do not present new reliable evidence to establish actual innocence. See Lloyd v. Jones, No. 2:14cv707-MHT, 2016 WL 7173883, at *7 (M.D. Ala. Oct. 20, 2016) (finding petitioner's claim "that DNA testing of the rape kit might reveal potentially exculpatory evidence" was not new reliable evidence because it was "speculative" only).

Regarding evidence that Petitioner is actually innocent of Tiffaney Wilson's murder, he argues that without this similar transaction evidence, the jury would not have found him guilty of murdering Ms. Glista. The Court, however, need not engage in an analysis of whether Petitioner has proven he was innocent of Ms. Wilson's murder. Even if a reasonable juror believed he was innocent of Ms. Wilson's murder given the new evidence, it is not more likely than not that no reasonable juror would have found Petitioner guilty of Ms. Glista's murder, as discussed below.

That brings the Court to the new evidence Petitioner argues shows his confessions to murdering Ms. Glista are unreliable. The

18

majority of the evidence against Petitioner at trial was his own statements about Ms. Glista's murder, which included details of the murder that only the perpetrator would know. Petitioner now presents evidence arguing that the details Petitioner apparently knew from first-hand knowledge may have come from secondary sources, namely the media and information the investigators provided in the October 12th Interview.[14]

The Court closely analyzes the articles cited by Petitioner to determine whether the details Petitioner provided of Ms. Glista's home and murder could have come from secondary sources. In his reply brief in support of his motion for supplemental counsel, Petitioner cites news articles arguing that the facts Petitioner knew in his initial interviews came from the media. (Reply Br. Supp. Mot. for Suppl. Counsel, at 21.) Specifically, Petitioner states he knew the following facts from news articles:

---

[14] Investigators intentionally kept details of the interior of Ms. Glista's home and details of the crime scene out of the media. (Investigator Bunton Trial Test., Doc. 29-14, at 167 ("[T]here had been quite a bit of publicity about the attack itself but no descriptive — nothing descriptive in reference to the inside of the home as he discussed.").) During the October 12th and 13th Interviews, the investigators sought answers to questions that Petitioner would not have known had he not been in Ms. Glista's home. Investigator Bunton conveyed this to Petitioner by stating:

> Some of the things I'm asking you, Rey, are things that someone who wouldn't have been in that home would not have known. Do you understand what I'm saying now? Law enforcement was in that house. Okay. If you hadn't been in the house, you couldn't tell me certain details about [t]he inside of the house. You follow me? . . . These are things that have not been in print; have not been publicized; that the media doesn't know.

(Oct. 13th Interview Tr., Doc. 29-29, at 180:6-15 (The Court cites to the PDF page numbers of the October 13th Interview Transcript as played during Investigator Roundtree's trial testimony.).)

(1) "Sgt. Glista['s] husband Jason 'had been deployed to Kuwait,'";

(2) "[H]er gray GMC Suburban was parked in the driveway with groceries she had purchased from Food Lion at about 11 a.m. Monday, according to neighbors"; and

(3) "Sgt. Glista was found unconscious and 'asphyxiated' in her home 'the day after Labor Day.'" (Id.)

The Court examined the articles cited by Petitioner and other articles found in the record. In doing so, the Court found the following additional information was publicly available before the October 12th Interview:

(1) Ms. Glista was in the military (Brandon Haddock, *Soldier Was Not Beaten*, Augusta Chronicle, Sept. 12, 2000, Doc. 32-7, at 88); and

(2) She had two pit bulls who recently had eight puppies (Johnny Edwards, *Officials Stay Mum on Attack*, Augusta Chronicle, Sept. 7, 2000, Doc. 32-7, at 94).

When Petitioner mentions in interviews any of the above facts cited in brief or found in the record, the Court assumes those facts originated from the media as opposed to Petitioner's experience.

After screening for information in the media and information the investigators could have provided to Petitioner, during the

October 12th Interview Petitioner provided investigators with the following first-hand details of Ms. Glista's home and murder[15]:

(1)  Ms. Glista's bedroom was "pretty trashy" having clothes "all over" it[16] (Oct. 12th Interview Tr. A, at 161; Oct. 12th Interview Tr. B, Doc. 32-1, at 172:6-10, 174:6-11);

(2)  There was "[n]othing to put the mattress on," but the bed frames were in the room[17] (Oct. 12th Interview Tr. B, at 175:17, 175:21-176:2);

(3)  Ms. Glista was strangled by her own clothing[18];

---

[15] The Court notes when Petitioner repeats or expands on any of these facts during the October 13th Interview. The Court also agrees with Petitioner that in the October 12th Interview he made a few assertions that do not comport with his statements in the October 13th Interview. Specifically, before potential leading from the investigators, Petitioner stated the victim's name was Marianna not Marni, stated the grocery store as Winn Dixie instead of Food Lion, and stated Ms. Glista and her husband had rottweilers instead of pit bulls. (Compare Oct. 12th Interview Tr. A., Doc. 34-7, at 157, 159, 162, with Oct. 13th Interview Tr., at 174:19, 178:2-3.)  Petitioner argues these discrepancies prove his innocence.  The Court, however, disagrees because the discrepancies are insignificant to the jury's verdict when compared with the details of the murder Petitioner provided from his first-hand knowledge, as discussed below.  Other relevant discrepancies are noted throughout the analysis.

[16] Petitioner expanded on this statement in the October 13th Interview by stating, "The room that we went to was a room that was full of clothes that needed to be washing [sic] or ironed or whatever." (Oct. 13th Interview Tr., at 178:24-179:1.)  Photographs of Ms. Glista's room support Petitioner's testimony.  (See Doc. 30-9, at 32, 49-53.)

[17] Petitioner expanded on this statement in the October 13th Interview by providing that the mattress was on the floor and the bed "rails or frame" were "[i]n the corner" of Ms. Glista's bedroom. (Oct. 13th Interview Tr., at 179:3-14.)  Petitioner's statements are accurate.  The mattress and bed rails were on the floor of Ms. Glista's bedroom when she was found.  (Officer Green Trial Test., Doc. 29-27, at 137:1-4, 138:18-23; Investigator Piper Trial Test., Doc. 29-27, at 155:14-15.)

[18] There is a discrepancy here because in the October 12th Interview, Petitioner stated he strangled Ms. Glista with her shirt (Oct. 12th Interview Tr. A, at 169-70), but in the October 13th Interview, he confessed to strangling her with her bathrobe (Oct. 13th Interview Tr., at 183:7-9).  The record reflects that Ms. Glista was strangled with her bathrobe.  See Rivera, 647 S.E.2d at 80.

(4) She was left with only her bra on[19] (Oct. 12th Interview Tr. A, at 174);

(5) Her bra was black[20] (id.); and

(6) Her hands were tied together.[21]

After continuing to screen for information originating from secondary sources, the Court finds Petitioner had first-hand knowledge of the following additional details provided in the October 13th Interview:

(1) Ms. Glista's body would be located "on the foot of the bed naked"[22] (Oct. 13th Interview Tr., at 180:19-22); and

(2) Petitioner "unplugged the telephone, the one in the wall," which was "right outside the kitchen"[23] (id. at 185:9-14).

---

[19] Petitioner repeats this fact in the October 13th Interview providing that he left her bra "hanging on." (Oct. 13th Interview Tr., at 181:3-4.) The record confirms the accuracy of Petitioner's testimony. Ms. Glista was found in a black lingerie outfit with her bra "pulled up over her breasts." (Officer Green Trial Test., at 136:20-22; Investigator Piper Trial Test., at 156:4-5.)

[20] In the October 12th Interview, when asking Petitioner what color Ms. Glista's outfit was, one investigator listed seven possible colors. (Oct. 12th Interview Tr. A, at 161.) The list included black but did not signal black as the correct answer. (Id.) In the October 13th Interview, Petitioner expanded on Ms. Glista's outfit by providing that he had her model for him in black lace underwear and a matching bra. (Oct. 13th Interview Tr., at 181:23-182:3.)

[21] There is a discrepancy here because in the October 12th Interview Petitioner stated he tied Ms. Glista's hands with a string. (Id. at 171.) In the October 13th Interview, Petitioner stated it was "white, sticky tape" that "you find in an EMT kit." (Oct. 13th Interview Tr., 184:2-5.) "Standard medical-type tape" was found in Ms. Glista's bathroom. (Investigator Piper Trial Test., Doc. 29-27, at 157:14-15.)

[22] Ms. Glista was found in this position. (Officer Green Trial Test., at 136:30-137:4; Oct. 13th Interview Tr., at 180:19-25.)

[23] At the crime scene, Investigator Piper noted the phone cord had been pulled from the base of the phone in the kitchen. (Investigator Piper Trial Test., at 153:15-23.)

Although the officer's asked a few leading questions and provided some information to Petitioner, Petitioner showed in the October 12th and 13th Interviews that he knew facts about Ms. Glista's murder and home that required his physical presence. It is not enough to simply offer competing evidence; Petitioner must show that with the new evidence it is more likely than not that no reasonable juror would have found him guilty. The Court also keeps in mind that this new evidence would still be offered in light of Petitioner confessing at trial to the rape and murder of Ms. Glista.

After examining the new evidence, the Court finds that Petitioner failed to meet his burden to show it more likely than not that no reasonable juror would have found Petitioner guilty. Thus, whether a freestanding claim of actual innocence is cognizable in habeas corpus proceedings is not controlling nor material to the termination of this litigation. The Court denies certification.[24]

### III. CONCLUSION

For the foregoing reasons, Petitioner's motion to amend the Court's December 6th Order to add a certificate permitting immediate appealability (Doc. 108) is **DENIED**, and his motion to

---

[24] Having failed to prove his actual innocence, the Court declines to certify the question of whether new evidence used to establish the actual innocence exceptions can include evidence that was available to trial counsel but not used. (See section II(A), *supra*.)

stay briefing schedule pending resolution of his motion to amend (Doc. 115) is **DENIED AS MOOT**.

**ORDER ENTERED** at Augusta, Georgia, this 21ST day of June, 2019.

_____
J. RANDAL HALL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA