IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

U.S. DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

REINALDO JAVIER RIVERA,          )
                                 )
            Petitioner,          )
                                 )
v.                               )         CV    113-161
                                 )
SHAWN EMMONS Warden of the       )
Georgia Diagnostic and           )
Classification State Prison,[1]  )
                                 )
            Respondent.          )

SEP 13 2024

FILED

## ORDER

Petitioner Reinaldo Rivera filed his Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 in September 2013, (doc. 1), and amended his Petition on October 20, 2014, (doc. 41). Before the Court is Petitioner's Amended Brief on Exhaustion and Procedural Defenses, filed in support of his Petition for Writ of Habeas Corpus. (Doc. 142.) The Respondent filed its Response, (doc. 145), and Petitioner replied, (doc. 150). The Court ordered additional briefing, (doc. 157), and the matter is due for resolution.

## I.   Facts and Procedural Background

On October 24, 2000, Reinaldo Rivera was indicted in Richmond County, Georgia on one count of malice murder, three counts of rape, four counts of aggravated sodomy, four counts of aggravated

---

[1] Shawn Emmons is now the Warden and has been substituted as the defendant. Fed. R. Civ. Pro. 25(d). The Clerk is **DIRECTED** to update the docket accordingly.

assault, one count of possession of a knife during the commission of a crime, and one count of burglary. (Doc. 29-1, pp. 11-19.) These charges arise out of Rivera assaulting, sodomizing, and raping Tabitha Bosdell, assaulting, sodomizing, raping, and murdering Marni Glista, and assaulting and raping Chrisilee Barton, the sole survivor of the three. (See docs. 29-1, pp. 11-19; 29-28, pp. 107-146.) He entered a plea of guilty but mentally ill, (doc. 29-6, p. 33), and at trial, the jury heard testimony from competing experts who interpreted diagnostic tests conducted on Rivera's brain after his arrest. (Docs. 30-1; 30-2; 30-3, pp. 1-101.) After receiving the evidence summarized below, the jury rejected the mentally ill defense, convicted Rivera, and sentenced him to death. (Doc. 29-9, p. 29.)

A. Rivera's Trial

The jury first heard the prosecution's case in chief which included audio recordings wherein Rivera confessed to and provided details of the crimes charged as well as other assaults. (Docs. 29-29, pp. 148, 154; 29-30, pp. 167, 256.) Barton, in fact, testified to harrowing details of her encounter, which occurred on October 10, 2000. (Doc. 29-28, pp. 107-138.) She recounted the statements Rivera made to her during her rape, (id. at 119), she showed the jury her scar from where he stabbed her in the neck, and she described the bodily disfigurement resulting therefrom, (id. at 136-37).

The failed attack on Barton led to Rivera's arrest. Investigators explained how they interviewed Barton's neighbor who described Rivera's appearance and vehicle, and how they immediately engaged a sketch artist to find Barton's attacker and alerted the media. (Doc. 29-28, pp. 160-65.) Rivera's coworker testified he called the police after seeing a description of the suspect's vehicle on television, and he recognized the artist's rendering of Rivera once he spoke with investigators. (Doc. 29-29, pp. 25-28.) Rivera's sister-in-law testified that, on this same day, she called the sheriff's department when she saw the description of Rivera's vehicle. (Doc. 29-29, p. 42.) She had been suspicious of Rivera previously because she caught him talking to girls, (id. at 48, 51), and observed how he randomly disappeared. (id. at 49), She even called "crime stoppers" after hearing a news story about Tiffaney Wilson, (id. at 57), who went missing on December 4, 1999, because on that same date Rivera was inexplicably late to a party. (Id. at 38.)

Investigators also described how, on the day after Barton's attack, Rivera attempted suicide and was taken to the same hospital where Barton was being treated. (See doc. 29-28, pp. 147-48; see also docs. 29-29, pp. 128; 29-14, p. 14.) From his hospital bed, Rivera made several inculpatory statements. The first was on October 12, 2000. (Doc. 29-13, pp. 189-99.) The trial judge suppressed this statement because Rivera was drowsy from the

effects of the suicide attempt, and the medication used to treat
him thereafter impacted his ability to speak coherently.  (Docs.
29-14, pp. 182-86; 32-1, pp. 165-190; Doc. 36-1, pp. 178, 183; but
see doc. 29-13, pp. 189-90.)  However, Rivera gave more statements
on October 13th, 14th, 20th, and 26th after being Mirandized, all
four of which were recorded and admitted as evidence at trial.
(See docs. 35-8, pp. 132-215; 36-1, pp.69-133, 136-59; 36-3, pp.
13-24 (Jackson-Denno Hearings.)  However, not all four were played
to the jury in their entirety.  (Docs. 29-29, pp. 148, 154-200
(October 13); 29-30, pp. 167-225 (October 26), 256-277 (October
14, in part); but see doc. 29-30, p. 251.)

Tabitha Bosdell's sister testified about Bosdell's activities
the day she went missing, (doc. 29-27, pp. 63-74), and an
investigator described finding Bosdell's body using a map provided
by Rivera,[2] (id. at 74-75).   A forensic dentist described the
procedure she used to identify Bosdell's remains based upon dental
records.  (Doc. 29-28, pp. 70-82.)  One of the recordings of Rivera
included specific details regarding Bosdell's death, such as the
type of bag she carried and clothes she wore, as well as where he
placed her body after he killed her.  (Doc. 29-30, pp. 269-74; see
also id. at 277 (investigator testifying to finding body); doc.

---

[2] Because Rivera admitted to slaying Bosdell in Columbia County, the Richmond
County indictment did not include a charge of her murder.  (Doc. 29-27 at 86.)
The jury found Rivera guilty of assaulting, sodomizing, and raping Bosdell in
Richmond County, doc. 30-5 at 74-75, and the jury considered her murder only as
similar transaction evidence.

29-27, p. 75 (investigator testifying as to map used).)

The jury heard testimony from the people who found Marni Glista in her home after she did not report for duty in the Army, (doc. 29-27, pp. 113-19), and a physician described the irreversible brain damage she suffered from limited or no blood flow to her brain, (doc. 29-28, pp. 17-24).  The jury heard the autopsy findings of bruising and scratching in a "near circumferential manner around the neck" which "correlated with the implication of some sort of ligature around the neck," (id. at 50), and the jury saw pictures of the injuries to her perianal region, (id. at 64).  Her cause of death was described as "delayed consequences of ligature strangulation which essentially mean[t] that this individual was assaulted, was strangled using an object" which was "applied to a degree where there was a disturbance of blood flow and oxygenation to the brain, but [it was] insufficient to kill her at the time." (Id. at 55.)  The forensic pathologist and medical examiner hypothesized that it took "a number of days before those delayed consequences ultimately resulted in her death." (Id.)  The jury also heard lengthy questioning from both the State and the defense concerning whether the extensive friction burns and other injuries to Glista's body were (1) consistent with involuntary, repetitive, and continuous movement which might have accompanied a prolonged semi-conscious state; or (2) incurred in an attempt to break free from her restraints during the assault.

5

(Id. at 64-69.)   The pathologist opined that, because the burns were localized, they likely occurred during the attack.   (Id. at 67; see also id. at 22.)   The jury heard audio recordings of Rivera's confession to Glista's murder.  (Doc. 29-29, pp. 174-86.)

The State presented similar transaction evidence including Rivera's recorded confessions to other murders and between 150 and 200 prior rapes.  (See generally, doc. 29-30.)[3]   The jury also considered testimony from a dentist and forensic pathologist who identified Melissa Dingess's remains, (Doc. 29-30, pp. 18-35), and testimony from her husband who stated she was seventeen years old the day she went missing (id. at 132-38).

A bystander and witness testified he found an abandoned infant at a welcome center on December 4, 1999.  (Id. at 87- 107.)   The jury heard an audio recording of Rivera recounting how he manipulated Tiffaney Wilson into entering his vehicle only to realize too late she had a baby with her.  (Id. at 169-70, 212.)   He tried not to think about the baby in the front of the van while assaulting her, (id. at 196-97) and he struggled to drag Wilson's postpartum body away from his van when he disposed of her body.  (Id. at 206-207.)   The jury heard Rivera explain how he first attempted to abandon Wilson's baby at a Dollar General store but

---

[3] The Court provided repeated instructions on the impact of similar transactions evidence, (see, e.g., doc. 29-30 at 15-16), and the defense sought a mistrial after the second recording of Rivera was played, arguing prejudice outweighed any probative value.  (Id., pp. 224-225.)   The trial judge denied the motion (Id. at 228.)

became afraid when the customers exited the store before he made his getaway, so he decided to leave the baby at the welcome center instead. (Id. at 171-72.)  Wilson's murder occurred on the same day that Rivera was late to his sister-in-law's aforementioned party: December 4, 1999.  (Id. at 216.)  Wilson, who was also seventeen years old, (id. at 142), had taken her child to see Santa Clause that day.  (Id. at 143.)  When the baby was returned to her grandmother after being found at the welcome center, she had to be hospitalized due to her RSV symptoms (id. at 158).  Needless to say, the evidence as to Rivera's involvement in the assaults and murders and the aggravating factors accompanying those murders was devastating.

Trial counsel relied on a guilty but mentally ill strategy to respond to the undeniable evidence of guilt.  (Doc. 31-28, pp. 122; 32-15, pp. 60-61.)  Their primary expert, Dr. Thomas Sachy, detailed how state-of-the-art technology, combined with the results of a study conducted by Dr. Adrian Raine, indicated that Rivera had brain abnormalities which explained or caused his compulsive actions.  (Doc. 30-2, pp. 13, 32-33, 43, 72-73.)  According to Dr. Sachy, the study conducted by Dr. Raine used position emission tomography (PET) scans which indicated that subjects with functional abnormalities in the pre-frontal cortex of their brain displayed increased rates of aggression and antisocial behavior.  (Id. at 21.)  These abnormalities in the

subjects' brains correlated to or even predisposed them to "behavior dis-control," which limited their ability to override compulsions. (Id. at 32, 43.) Dr. Sachy then displayed PET scan images of Rivera's brain which he claimed had been constructed using a protocol precisely mimicking Dr. Raine's test. (Id.; see also id. at 11-12; id. at 144.) Dr. Sachy pointed out what he perceived to be significant structural abnormalities in Rivera's brain. (Doc. 30-2, pp. 4-15; 20-140.)

Dr. Sachy admitted his own readings of the MRI and PET scans conflicted with the interpretations given by the radiologists who oversaw their production and interpreted them as substantially normal. (See doc. 30-2, p. 108; see also, e.g., id. at 148-49 (defense expert Dr. Einhorn testifying Rivera's neuropsychological tests were negative, meaning his brain function was not impaired).) Nevertheless, according to Dr. Sachy, the tests conducted on Rivera conclusively led to a finding that, like Dr. Raine's test subjects, Rivera too, was unable to control his compulsive ideations *because of* his brain abnormality, which he described as a loss of "meat." (Id. at 46-50.) On redirect, Dr. Sachy concluded Rivera's condition was one of "moral insanity." (Doc. 30-2, pp. 138-39.) and agreed this condition was "[s]omething that the law doesn't recognize" when defining mentally ill. (Id. at 139-40.)

Geral Blanchard, a psychologist and counselor, also testified regarding his own newly developed model of evaluation, called

8

"biopsychosocial model for assessing lust murderers," which he had used to assess Rivera, and he opined as to Rivera's sex addiction. (Doc. 30-3, pp. 45, 59.) Blanchard testified the biopsychosocial test results showed Rivera met the criteria for schizoid personality disorder, bipolar disorder, sadistic personality disorder, paraphilic disorder, and anxiety disorder. (Id. at 23.) Blanchard described in detail Rivera's sexual deviancy, including his childhood "imprinting" of his father's pornography and associated conflict-driven home, Rivera's first sexual experiences, how older men performed sex acts on him in exchange for money when he was a minor, his wrestling and military background, his history of raping between "175 and 200 women" in the Washington D.C. area, and progression of Rivera's deviancy into sadism and murder. (Id. at 46-58.) He discussed Rivera's lifelong, untreated sex addiction as a "level IV sex addict, the most severe type." (Id. at 59-60.) Based on these observations, he concluded Rivera was mentally ill. (Id. at 24.) However, Blanchard was not a medical doctor.

Rivera testified about his pervasive interest in sex and his continued sexual fantasies. (Doc. 30-3, pp. 102-67.) The defense strategy appeared to be the argument Rivera *must* be mentally ill because, otherwise, he would not have serially raped and murdered and would not continue to fantasize about rapes while on trial. (Id. at 120-21.) For example, the Defense suggested that, because

of uncontrollable compulsions caused by brain abnormality, Rivera had been kicked out of the navy, experienced great financial and emotional turmoil and was fired from jobs, and he now faced imprisonment or death. (Id. at 132-33.) Yet even now, Rivera testified, he did not believe he could stop. (Id. at 134.)

On cross examination, Rivera described murdering Melissa Dingess including details not previously heard in the recorded confessions. (Id. at 144-46; see also docs. 29-29, pp. 154-200; 29-30, pp. 167-224, 256-77.) He described calculating his decision to approach Tiffaney Wilson (Doc. 30-3, p. 146), noticing Tabatha Bosdell walking down the street near her work, (id. at 149), leaving Marni Glista because he "couldn't keep on strangling" her, and wondering whether she would be braindead because of the strangulation, (id. at 151). Finally, he recounted returning to Chrisilee Barton's home to make sure he did not leave evidence (id. at 151-52), finding she was still alive, and strangling her more until he "gave up" because it was "very hard, not just physically but when you start thinking about what you're doing," and so he "went and got a butcher knife," (id. at 152). When the prosecutor questioned him as to each count of the indictment, Rivera repeatedly responded he was "guilty" to each count. (Id. at 154-59.) On re-redirect, Rivera ended his testimony by confirming he killed them all and would do it "again, and again." (Id. at 166.)

During the State's rebuttal, Dr. Hayden Williams and other experts contradicted Dr. Sachy's diagnosis and conclusions. (Doc. 30-4, p. 6.)  Dr. Williams explained the protocol used on Rivera was faulty and did not, in fact, mimic the study on which Dr. Sachy relied, rendering Dr. Sachy's findings incomparable to Dr. Raine's study, and therefore, inconclusive. (Doc. 30-4, pp. 9-14.)  On redirect, he also explained the Defense experts had "manipulated the color intensities on the [PET] scan," (id. at 30), and the images showed only relative activity and not absolute activity, (id. at 35). In other words, he opined the images could not be directly correlated with the hypothesis relied upon by the defense team. (Id. at 37 ("You're comparing apples to oranges on this because the hottest areas on the scan are not the same.").)

Next, Dr. David Hess testified that Dr. Sachy had misinterpreted the very study he relied upon to form his conclusion about Rivera. (See doc. 30-4, pp. 59-60.) According to Dr. Hess, the Raine study did suggest some test subjects who experienced frontal cortex disfunction had a limited ability to premeditate and make decisions. (Id. at 59-61.) However, the test clearly indicated the abnormality would impact only "affective" or "rage" murderers—not predatory murderers such as Rivera. (Id. at 60.) Dr. Hess further explained that individuals with the type of brain damage described by Dr. Sachy would be unable to manipulate women in the manner Rivera did; they could not "plan the rest of the

11

day." (Id. at 61-62.)  He described Rivera as the "antithesis" of the "pre-frontal personality." (Id.)  Dr. Hess explained the results "actually disprove[d] the whole hypothesis set forward." (Id. at 60.)  In other words, the defense sought to defend Rivera's actions based on a study whose findings did not apply to his crime or his alleged brain abnormality which, if it existed at all, could not be relevant to or explain the violent assaults. (Id.)

B. Verdict and Sentencing

After closing arguments, the jury found Rivera guilty on all counts and rejected the mentally ill defense. (Doc. 30-5, pp. 74-75.)  The attorneys began debating admissibility of evidence for the sentencing phase. (Doc. 30-5, pp. 78-85.)  Rivera requested to exercise his right "to not present any mitigating circumstances or evidence on the part of the defense." (Id. at 86.)  He requested the trial continue in his absence and explained he would never seek appeal. (Id. at 86-87.)  Confounded by his request and how to resolve the conflict between his wishes and his attorneys' duties, the Court adjourned for the evening. (Id. at 103.)

The penalty phase of the trial began January 24, 2004.  On that day, the Court also held a hearing to determine whether Rivera could represent himself. (Doc. 30-6, p. 5.)  Rivera explained he did not wish to proceed *pro se* and simply did not want anyone to be "revictimized" by the mitigation stage, and any mitigation would actually be in conflict with his own intention to "ask the jury if

it would impose capital punishment." (Id. at 8-9.) Rivera and his attorneys "made an agreement," with the following terms: Rivera would not seek any right to be co-counsel; Rivera would testify in the mitigation phase; and his mother, mother-in-law, sister-in-law, and specified family friends would not testify on his behalf in mitigation. (Id. at 10-15.) Rivera permitted testimony from (1) Dr. Matthew Ciehan, a doctor with whom Rivera spoke regarding his sex addiction two days after Wilson's murder, (id. at 151); (2) Pastor Steve Hartman, who consoled Rivera regarding his emotional turmoil in December 1999, (id. at 153); (3) Dr. Amy Blanchard, who treated Rivera after his suicide attempt, (id. at 131); (4) Investigator Greg Newsome, who observed the scene of Rivera's suicide attempt, (id. at 3490); and (5) Dr. Nathan Pino, who testified Rivera cooperated in Dr. Pino's research for a journal article, (id. at 166). (See id. at 13-15.) The defense also presented documentary evidence in the form of correspondence between Rivera and his children, photographs of his family, poems Rivera wrote, and Rivera's various awards and certificates. (Id. at 17-19; see also docs. 30-12, pp. 36-55; 30-13, pp. 1- 55.) The trial court approved this agreement. (Id. at 20.)

At penalty phase closing arguments, the state argued three statutory aggravating circumstances were proven in regard to Marni Glista's murder, and therefore the death penalty was warranted. (Doc. 30-7, pp. 5-7.) Indeed, the jury found the alleged statutory

aggravating circumstances existed to impose the death penalty: (1) Rivera murdered Marni Glista while engaging in the commission of rape, another capital felony; (2) Rivera murdered Marni Glista while engaging in the commission of aggravated battery; and (3) Marni Glista's murder was outrageously or wantonly vile, horrible, or inhumane because it involved torture, depravity of mind, or an aggravated battery. (Doc. 29-9, pp. 28-29); see also Rivera v. State, 647 S.E.2d 70, 80 (Ga. 2007) (holding jury's finding of "torture, depravity of mind, *or* an aggravated battery to the victim," was erroneous because finding should have been in conjunctive to ensure unanimity of elements under § [17-10-30](b)(7), but death sentence was still valid based on other aggravating circumstances) (emphasis in original).)   The jury recommended a sentence of death, and the trial court sentenced Rivera to death plus life imprisonment for each count of rape and each count of aggravated sodomy, twenty years for each count of aggravated assault, twenty years for burglary and five years for possession of a knife during the commission of a crime, all to run consecutively.   (Doc. 29-10, pp. 29-31.)   Rivera filed a motion for new trial on February 19, 2004, which the trial court denied on July 11, 2006.   (Id. at 111.)

   C. Rivera's Direct Appeal

   Rivera filed a notice of appeal in the Georgia Supreme Court on July 25, 2006.   (Doc. 29-1, pp. 9-10.)   On appeal, Rivera

challenged the admission of his recorded confession made from his hospital bed on October 13th, and claimed he was forced into a form of hybrid "self-representation," among other claims. _Rivera_, 647 S.E.2d at 75-77.   The Georgia Supreme Court unanimously affirmed, holding (1) the trial evidence was sufficient to support Rivera's convictions and the trial court properly limited expert testimony; (2) the trial court acted within its discretion in admitting similar-transaction evidence; (3) the audiotaped statements by Rivera were voluntary and thus properly admitted; (4) the trial court properly limited the scope of Rivera's cross-examination of his ex-wife concerning their domestic life; (5) no reversible error occurred by admitting similar transaction evidence of a victim's husband identifying a photograph of the victim; (6) the trial court acted within its discretion in dismissing a tardy juror; (7) the trial court did not "transform" counsel into co-counsel by allowing Rivera to act as an involved client, rejecting Rivera's self-representation claim; (8) the trial court's jury instructions did not constitute unconstitutional burden-shifting; (9) the prosecutor's sentencing-phase argument was narrowly tailored to and logically based on the evidence; (10) the trial court did not err by denying Rivera an opportunity to argue the effectiveness of the death penalty as a general deterrent; (11) there was no error in the trial court's instruction to the jury regarding retiring for the evening; (12)

the death sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor; (13) the evidence was sufficient to authorize the jury to find the statutory aggravating circumstances to warrant a sentence of death; and (14) the death sentence was not excessive or disproportionate.  Id. at 74-80.

However, the Georgia Supreme Court found fault with the jury's wording in their return of the verdict concerning aggravating circumstances, which made a disjunctive finding of "torture, depravity of mind, or an aggravated battery to the victim." Id. at 79 (emphasis in the original).  The Georgia Supreme Court held "this finding should have been returned in the conjunctive to ensure unanimity concerning the necessary elements of the § [17-10-30](b)(7) circumstances. [Cit.]" Id.  Nevertheless, the death sentence was still valid based on other statutory aggravating circumstances.  Id.  The Georgia Supreme Court denied Rivera's motion for reconsideration on July 27, 2007.  (Doc. 30-21.) Rivera did not file a petition for writ of certiorari in the United States Supreme Court.

D. State Habeas

In the fall of 2008, it came to light that Rivera's October 12th statement had been recorded.  Doc. 32-19, pp. 11-15.  The trial court had suppressed officer testimony describing this first statement of five total from the hospital because Rivera was drowsy from the effects of his suicide attempt and the medication used to

treat him. The investigator's testimony in the suppression hearing
and the state's representation to the court was that the interview
had not been taped. (Docs. 29-14, p. 183; 32-1, pp. 165-90.)
Additionally, according to Rivera, the content differed from the
investigator's description of the interview during the suppression
hearing. The recording was found in an apartment recently vacated
by one of the investigators, Richard Roundtree. (See doc. 142, p.
241; compare doc. 32-1, pp. 165-90, with doc. 29-13, pp. 189-90.)
The discovery of this recording and the investigator's testimony
formed the foundation for Brady and Napue claims asserted in the
state habeas corpus petition.

Rivera's state habeas corpus petition was filed in the
Superior Court of Butts County, Georgia on November 7, 2008. (Doc.
30-25.) That court's operative scheduling order required Rivera
to furnish to the Respondent any affidavits he sought to introduce
at the evidentiary hearing by December 4, 2009. (Doc. 30-32, pp.
1-2.) Rivera did not file any affidavits prior to the close of
discovery. After conferring with the parties, the court set an
evidentiary hearing for May 24-26, 2010. (Doc. 31-14, p. 26.)
Two days later, Rivera's counsel informed the court that a defense
expert, Dr. David Lisak, could not attend the hearing in May due
to a scheduling conflict. They informally sought to schedule the
hearing either in July or August. (Id. at 28, 46.) The Court
declined the continuance but entered an order reopening discovery

17

for the limited purpose of deposing Dr. Lisak.  (Id. at 30.)  It then denied Rivera's formal motion on the matter.  (Doc. 31-14, pp. 30-35, 49.)  The court cited the fact that the previously scheduled time had been agreed upon by the parties.  Rivera appealed, seeking review of the trial court's "refusal to allow Dr. Lisak to testify live before the court," but the Georgia Supreme Court granted Respondent's motion to dismiss the appeal and declined to stay the habeas proceedings.  (Docs. 31-17; 31-24.)  The state habeas evidentiary hearing occurred as scheduled on May 24-25, 2010.  (See docs. 31-28 through Docs. 36-17.)  Dr. Lisak did not testify.  However, testimony was elicited from a victim of sexual abuse as a child by monks at a school.  (Doc. 31-28, pp. 81-85.)  One of the school's priests allegedly abused boys at the school's Puerto Rican counterpart, the school Rivera attended while he lived there.  A former coworker of Rivera's testified, as did Drs. Wu and Weker.  (Docs. 31-29, pp. 5-47; id. at 74-172.)

After the hearing, the state habeas court adopted Respondent's proposed order and denied relief.  (Doc. 37-16.)  The court held the following claims were *res judicata*: (1) that portion of Claim Two, wherein Rivera argued the prosecution made improper and prejudicial remarks in both phases of trial; (2) that portion of Claim Four wherein Rivera alleged the trial court erred in admitting similar transaction evidence; (3) that portion of Claim

18

Four wherein Rivera alleged the trial court erred in admitting similar transaction evidence; (4) that portion of Claim Four, wherein Rivera alleged the trial court erred by improperly limiting argument, cross examination, and direct examination of witnesses; (5) that portion of Claim Four wherein Rivera alleged the trial court improperly excluded admissible expert testimony; (6) that portion of Claim Four wherein Rivera alleged the trial court forced him to self-represent or engage in hybrid representation during portions of the trial; (7) that portion of Claim Four wherein Rivera alleged the trial court issued erroneous jury instructions that prejudiced Rivera during the guilt phase; (8) that portion of Claim Six wherein Rivera alleged his death sentence was imposed arbitrarily and capriciously, and pursuant to a pattern and practice of discrimination in the administration and imposition of the death penalty in Georgia; (9) that portion of Claim Six wherein Rivera argued his death sentence was disproportionate. (See doc. 37-16, pp. 3-4.)

The state habeas court held the following claims were procedurally defaulted: (1) those portions of Claim Two wherein Rivera alleged prosecutorial or other state actor misconduct in that state agents: (a) improperly interacted with jurors, (b) failed to disclose unspecified information favorable to the defense, (c) discouraged Rivera from seeking advice of counsel and using coercive tactics, (d) failed to disclose the predicate

evidence for Rivera's suppression claim, (e) failed to ensure a complete transcript was filed with the Superior Court after Rivera's conviction; and (f) mandated conditions of confinement that interfered with Rivera's relationship with trial counsel and deprived Rivera of his right to consult with consular officials from Spain; (2) Claim Three, wherein Rivera alleged juror misconduct, (3) that portion of Claim Four wherein Rivera alleged trial court error, including claims the trial court failed to transmit a complete transcript to the Georgia Supreme Court and failed to maintain an impartial judicial demeanor; (4) that portion of Claim Six, wherein Rivera alleged the proportionality review performed by the Georgia Supreme Court is constitutionally infirm in general and as applied; (5) that portion of Claim Six, wherein Rivera alleged execution by lethal injection was unconstitutional; (6) Claim I(C)(3) of Rivera's post-hearing brief where he alleged the State failed to secure, and the trial court failed to enforce, his right to speak with Spanish consular officials in violation of the Vienna Convention; (7) Rivera's Brady claim and associated Napue claim, wherein he argued the failure to disclose a recording of the October 12th interview, combined with the investigator's false testimony regarding same, resulted in an unconstitutional conviction; (8) Rivera's claim he was denied his right to appeal because the Georgia Supreme Court did not review the entire transcript of his trial proceedings; (9) Rivera's claim that,

20

because the trial transcript omitted a colloquy between Rivera and the trial court, the Georgia Supreme Court did not properly resolve his <u>Faretta</u> claim, wherein he argued he was forced into a pseudo self-representation; (10) Rivera's argument that missing portions of the transcript, including the State's penalty phase opening statement, denied him a fair direct appeal of his claim regarding the prosecution's closing argument; and (11) Rivera's argument he was entitled to a new proportionality review as a result of the Georgia Supreme Court not having 115 pages of the trial transcript, including testimony from his sister.  (Doc. 37-17, pp. 4-19.)

The state habeas court found Rivera's ineffective assistance claims were reviewable on the merits.  Those claims included arguments trial counsel were ineffective in both the guilt and sentencing phase because (1) they failed to conduct a thorough investigation; (2) they failed to seek a motion for change of venue; (3) they failed to challenge the admissibility of Rivera's statements;[4] (4) they failed to ensure the jury was sequestered during trial; (5) they failed to ensure Rivera was properly medicated while awaiting trial in jail; (6) they failed to seek a plea deal; and (7) they failed to investigate Rivera's mental health.  (Doc. 37-16, pp. 20-82.)  Finding no deficient performance or prejudice, the state habeas court denied Rivera's ineffective

---

[4] But, "to the extent [Rivera alleged] the trial court erred in admitting certain statements, that claim [was] barred from review under the doctrine of res judicata."  (Doc. 37-16, p. 10.)

assistance claims. (Id.) The state habeas court also reviewed Rivera's arguments regarding his "Motion to Allow Dr. David Lisak to Testify Before this Court," by construing it as a motion for reconsideration and denying it. (Id. at 82-84.) Finally, the state habeas court held that portions of Rivera's Claim Four and Claim Five regarding trial court error relevant to sentence phase jury instructions were reviewable on the merits but denied them. (Id. at 85.)

Rivera's application for a certificate of probable cause (CPC) to appeal was granted, and the Georgia Supreme Court remanded the case to the state habeas court with instructions to conduct a hearing on Rivera's motions to dismiss his counsel, proceed *pro se*, dismiss his habeas petition, and waive future appeals. (Docs. 37-24; 38-5 p. 1.) The habeas court was further instructed to conduct an inquiry into Rivera's mental competence if necessary and to enter a new final order containing the findings and conclusions supporting the ruling of the habeas court. (Id.) At the first remand hearing, the parties agreed to have Rivera evaluated to assess his competency because he continued to seek to dismiss counsel and his state habeas petition. (Doc. 38-9, pp. 17-38.) After receiving numerous evaluations conducted by experts hired on his behalf, Rivera withdrew his motion to waive his appeals and to proceed *pro se*. (Doc. 38-16, p. 11.) Rivera's counsel argued the issue of competency was moot due to the

withdrawal, but the state habeas court made findings on the record concerning Rivera's competency in compliance with the Georgia Supreme Court's remand order. (Doc. 38-20.) Specifically, the state habeas court found that there was "no bona fide doubt" as to Rivera's competence. (Doc. 38-20, p. 4.)

Rivera filed an application to expand the Georgia Supreme Court's prior grant of CPC, arguing the state habeas court improperly ruled on the moot issue of Rivera's competency, given Rivera had withdrawn the problematic requests to withdraw his petition. (Doc. 38-22, p. 7.) That application also reasserted the previously advanced claims of ineffective assistance of counsel, prosecutorial misconduct, violations of due process, and abuse of discretion. (Compare doc. 37-21 and 38-22.) This time, the Georgia Supreme Court touched on the merits of Rivera's application by disagreeing with a portion of the state habeas court's order regarding the prosecutorial misconduct claim. (Doc. 38-26.)

Specifically, the Georgia Supreme Court found the habeas court erred in applying the wrong materiality standard in considering the alleged prejudice caused by alleged Napue violations. Id. In support, the court cited Napue v. Illinois., 360 U.S. 264, 269, (1959), which held the knowing use of false testimony by a prosecutor in a criminal case violates the Due Process Clause. However, the Georgia Supreme Court agreed the

claim was procedurally defaulted. The Court also gave no consideration to Dr. Bushan S. Agharkar's affidavit, attached to Rivera's second Application for CPC to appeal, because it was not in the record, and it therefore denied Respondent's motion to strike that affidavit. (Id.; see also doc. 38-22, pp. 207-15.) The Georgia Supreme Court did not address any other ground asserted by Rivera. Rivera did not file a petition for writ of certiorari in the United States Supreme Court but immediately brought the instant petition.

D. Federal Habeas Proceeding

Rivera filed his original petition on September 9, 2013, asserting the following six claims:

1. Petitioner was deprived of his right to the effective assistance of counsel at trial and on appeal in violation of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, Strickland v. Washington, 466 U.S. 668 (1984) and related precedent.
2. Misconduct by the prosecution team and other state agents deprived Petitioner of his constitutional rights to due process, a fair trial, and a reliable and proportionate sentence, in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.
3. Juror misconduct violated Petitioner's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.
4. The trial court's improper rulings and other errors deprived petitioner of a fair trial and reliable sentencing, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments.
5. Petitioner was denied due process by the instructions given to the jury at both phases of his capital trial, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments.
6. The death penalty in Georgia is imposed arbitrarily

24

and capriciously and amounts to cruel and unusual
punishment, in violation of the Fifth, Sixth, Eighth,
and Fourteenth Amendments.

Rivera filed his First Amended Petition on October 20, 2014, (doc. 41), asserting additional claims of cumulative error and that execution by lethal injection constitutes cruel and unusual punishment. (See generally, doc. 41.) Rivera requested an evidentiary hearing on February 2, 2015, arguing the state court adjudicatory process was fundamentally flawed by the habeas court's preclusion of "highly relevant" testimony from a "critical fact and expert witness," Dr. Lisak. (Doc. 57, p. 21.) That Motion was denied pending the merits review of § 2254(d) requirements. (Doc. 66, pp. 24-25.) Then, on August 9, 2016, Rivera filed a Motion to Amend/Correct and attached his Second Amended Petition. (Doc. 71-1.) On December 6, 2017, the Court reviewed both Rivera's First and Second Amended Petition. (Doc. 96.) The Court denied three of the claims concerning execution by lethal injection and actual innocence, and part of Claim Two seeking to excuse procedural default by citing habeas and appellate counsel's ineffectiveness. (See generally doc. 96; see also id. at 15-24 (explaining that "in very limited circumstances" which do not apply here, ineffective assistance of counsel at the state habeas level may excuse procedurally defaulted ineffective assistance of trial counsel claims).)

The Court's ruling denying Rivera's Motion to Amend rendered

Rivera's Second Amended Petition defunct as no new claim asserted therein survived. (Id.) Accordingly, Rivera's Amended Petition, (doc. 41), is operative. After denying Rivera's Motion for Reconsideration, (doc. 98), of its Order dismissing those claims, the Court ordered Rivera to file his brief on procedural default, exhaustion, and the merits of the First Amended Petition's remaining claims, (doc. 107). Rivera filed the brief on October 17, 2019, (doc. 142), addressing viability of the remaining grounds for relief. Although Rivera initially brought other claims in his Petition and Amended Petitions, (docs. 1; 41, 71-1), which were initially contested by Respondent, (doc. 42 at 13, 21-24), Rivera's original Claim Three, parts of Claim Four, and Claim Five, which alleged juror misconduct, various trial court errors, and instructional errors, were not comprehensively briefed. (See generally docs. 142, 145, 150.) Respondent's brief countered the arguments asserted by Rivera in his brief without regard for, or in response to, the seemingly abandoned claims, contending that, pursuant to 28 U.S.C. § 2254, the state habeas court's decision is entitled to deference, and other claims were procedurally defaulted. (Doc. 145, pp. 41-250.)

Because Petitioner failed to brief Claim Three, parts of Claim Four, and Claim Five, they are abandoned and waived because Rivera was specifically ordered to brief his remaining claims. (Doc. 107, pp. 15-16.). Such claims are not discussed below except to

the extent they are relevant to Rivera's cumulative impact claim.

The following are thus the sole remaining claims:[5]

> **Claim One:** Ineffective Assistance of Trial Counsel
>
>> a. Trial counsel conducted an inadequate investigation into Rivera's mental health and misused the experts upon which they relied regarding his mental health and then presented an incoherent defense;
>> b. Trial counsel failed to "fully litigate" a motion for change of venue;
>> c. Trial counsel failed to request jury sequestration;
>> d. Trial counsel failed to object to the trial court's excessive involvement in the parties' presentation of the evidence;
>> e. Trial counsel failed to object to the prosecutor's improper arguments at both phases of the trial;
>> f. Trial counsel failed to ensure that Rivera received proper medication for bipolar disorder; and
>> g. Trial counsel failed to properly move for suppression of Rivera's custodial statements.
>
> **Claim Two:** Prosecutorial and Other State Agent Misconduct
>
>> a. Investigators hid the audio recording of the October 12, 2000 interrogation; and
>> b. Investigators committed perjury when they testified the October 12th statement was not recorded in any fashion, as well as when they testified Rivera was not "substantially medicated or similarly incapacitated" during the interview, leading to the trial court error in Claim Four regarding the subsequent statements which Rivera asserts should have been suppressed as "fruit of the poisonous tree."
>
> **Claim Four, in part:** Trial Court Error

---

[5] As explained below, portions of these claims are not properly before the Court because they were not alleged in the Amended Petition in compliance with the Rules governing § 2254 cases. By stating that these claims "survive" the Court by no means holds they are properly preserved.

      a. The trial court improperly admitted Rivera's confessions because Rivera's initial statement on October 12, 2000 was involuntary and illegal, and subsequent statements should have been suppressed as "fruit of the poisonous tree,"

      b. Rivera's self-representation claim;

      c. The trial court failed to ensure a complete transcript of the proceedings was transmitted to the Georgia Supreme Court resulting in direct appeal error.

**Claim Six:** Cumulative Error

      a. The court overlooked cumulative error, in that even if none of the many errors specifically addressed by Rivera individually prejudiced him, "the cumulative impact of the many errors rendered Mr. Rivera's death sentence unreliable and requires the grant of a new sentencing hearing."

(See doc. 142.)

Rivera also briefed the claims arising from his Second Amended Petition, which included more counts of trial counsel ineffectiveness. Though the Court previously rejected those claims, (doc. 96, pp. 15-24), Rivera again seeks to excuse procedural default by arguing he was denied effective assistance of post-conviction counsel, who failed to argue trial counsel error. His new arguments are addressed herein.

## II. Standards of Review

As is often the case when considering a state prisoner's habeas petition, the applicable standard of review is of critical importance. Williams v. Alabama, 791 F.3d 1267, 1272 (11th Cir. 2015). The Antiterrorism and Effective Death Penalty Act

("AEDPA"), which governs Rivera's petition, provides "[a] general framework of substantial deference [for] our review of every issue that the state courts have decided" *on the merits*. <u>Diaz v. Sec'y for the Dep't of Corr.</u>, 402 F.3d 1136, 1141 (11th Cir. 2005). Under that Act, a federal court shall not grant habeas relief on any claim "adjudicated on the merits" in state court unless the state court's decision denying relief was either "contrary to, or involved an unreasonable application of, clearly established [f]ederal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). The phrase "clearly established federal law" refers only "to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 660–61 (2004) (quoting <u>Williams v. Taylor</u>, 529 U.S. 362, 412 (2000)).

The decision of a state court is "contrary to" clearly established federal law when the state court "applied a rule in contradiction to governing Supreme Court case law" or "arrived at a result divergent from Supreme Court precedent despite materially indistinguishable facts." <u>Dill v. Allen</u>, 488 F.3d 1344, 1353 (11th Cir. 2007). And a state court's application of federal law is unreasonable "only if no 'fairminded jurist' could agree with the state court's determination or conclusion." <u>Holsey v. Warden, Ga. Diagnostic Prison</u>, 694 F.3d 1230, 1257 (11th Cir. 2012) (quoting <u>Harrington v. Richter</u>, 562 U.S. 86, 101 (2011)); <u>see also</u>

Harrington, 562 U.S. at 101 ("[A]n unreasonable application of federal law is different from an incorrect application of federal law."). Here, "the key word is 'unreasonable,' which is more than simply incorrect." Sealey v. Warden, Ga. Diagnostic Prison, 954 F.3d 1338, 1354 (11th Cir. 2020). To meet this standard, "a prisoner must show far more than that the state court's decision was merely wrong or even clear error." Pye v. Warden, Georgia Diagnostic Prison, 50 F.4th 1025, 1034 (11th Cir. 2022) (quoting Shinn v. Kayer, 592 U.S. 111, 118 (2020)). Furthermore, review of legal claims under § 2254(d)(1) is "limited to the record that was before the state court." Shoop v. Twyford, 596 U.S. 811, 819 (2022) (quoting Cullen v. Pinholster, 563 U.S. 170, 181 (2011).

Under § 2254 (d)(2), courts also must defer to a state court's determination of the facts unless the state-court decision "was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254 (d)(2). Section 2254(d)(2) works much like § 2254(d)(1) in that it requires federal courts to give state courts "substantial deference." Brumfield v. Cain, 576 U.S. 305, 314 (2015). "We may not characterize . . . state-court factual determinations as unreasonable 'merely because we would have reached a different conclusion in the first instance.'" Id. at 313-14 (quoting Wood v. Allen, 558 U.S. 290, 301 (2010)) (alteration adopted). District courts presume that the state court's factual determinations are

correct, absent clear and convincing evidence to the contrary. Pye, 50 F.4th at 1035; 28 U.S.C. § 2254 (e)(1). Review of factual determinations under § 2254(d)(2) is expressly limited to "the evidence presented in the State court proceeding." Shoop, 596 U.S. at 819.

In sum, AEDPA sets "a difficult to meet and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." Pinholster, 563 U.S. at 181 (internal quotation marks and citations omitted). Additionally, "when a state court on direct review has determined that the alleged constitutional error was harmless," a habeas petition cannot be successful unless it satisfies both AEDPA and Brecht v. Abrahamson, 507 U.S. 619, 637 (1993). Mansfield v. Sec'y, Dep't of Corr., 679 F.3d 1301, 1307 (11th Cir. 2012); see also Brown v. Davenport, 596 U.S. 118, 122 (2022) ("When a state court has ruled on the merits of a state prisoner's claim, a federal court cannot grant relief without first applying both the test this Court outlined in Brecht and the one Congress prescribed in AEDPA.").

A critical prerequisite for any state petitioner seeking federal habeas relief is the requirement that he first properly raise the federal constitutional claim in the state courts. See 28 U.S.C. § 2254(b). "The exhaustion requirement springs from principles of comity, which protect the state court's role in the

31

enforcement of federal law and prevent disruption of state court proceedings." Ward v. Hall, 592 F.3d 1144, 1156 (citing Rose v. Lundy, 455 U.S. 509, 518 (1982).  The statute provides that:

> (b)(1) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that—
>
>> (A) the applicant has exhausted the remedies available in the courts of the State; or
>> (B)(i) there is an absence of available State corrective process; or
>> (ii) circumstances exist that render such process ineffective to protect the rights of the applicant.
>
> (2) An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.
>
> (3) A State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement.

28 U.S.C. § 2254(b).  To exhaust state remedies, a petitioner must fairly present every issue raised in his federal petition to the state's highest court, either on direct appeal or on collateral review.  Ward, 592 F.3d at 1156 (citing Castille v. Peoples, 489 U.S. 346, 351 (1989).

"The teeth of the exhaustion requirement comes from its handmaiden, the procedural default doctrine." Smith v. Jones, 256 F.3d 1135, 1138 (11th Cir. 2001).  A claim is procedurally defaulted if the petitioner failed to exhaust his state remedies, and the court to which he would have to present his claims in order

to satisfy the exhaustion requirement would find the claims procedurally barred. Snowden v. Singletary, 135 F.3d 732, 736 (11th Cir. 1998). The doctrine of procedural default also dictates that "[a] state court's rejection of a petitioner's constitutional claim on state procedural grounds will generally preclude any subsequent federal habeas review of that claim." Judd v. Haley, 250 F.3d 1308, 1313 (11th Cir. 2001). However, a state court's rejection of a federal constitutional claim on procedural grounds may only preclude federal review if the state procedural ruling rests upon "adequate and independent" state grounds. Marek v. Singletary, 62 F.3d 1295, 1301 (11th Cir. 1995). This is because "[i]t is well established that federal courts will not review questions of federal law presented in a habeas petition when the state court's decision rests upon a state-law ground that is independent of the federal question and adequate to support the judgment." Id. (quotation marks omitted). In these cases, federal courts are not confined to the state-court record. See, e.g., Madison v. Comm'r, Ala. Dep't of Corr., 761 F.3d 1240, 1249-50 & n. 9 (11th Cir. 2014).

Even if the state court never had opportunity to review the claim and it is thereby procedurally defaulted at federal habeas, a petitioner may obtain federal review of that claim if he can show both "cause" for the default and actual "prejudice" resulting from the default. See Murray v. Carrier, 477 U.S. 478, 485 (1986);

Wainwright v. Sykes, 433 U.S. 72, 84-85 (1977). To show cause, the petitioner must demonstrate "some objective factor external to the defense" that impeded his effort to raise the claim properly in state court. Murray v. Carrier, 477 U.S. 478, 488, (1986). Once cause is established, the petitioner also must show actual prejudice from the alleged constitutional violation. See Sykes, 433 U.S. at 84. To show prejudice, a petitioner must demonstrate that "the errors at trial actually and substantially disadvantaged his defense so that he was denied fundamental fairness." McCoy v. Newsome, 953 F.2d 1252, 1261 (11th Cir. 1992). A federal court may also grant a habeas petition on a procedurally defaulted claim, without a showing of cause or prejudice, to correct a fundamental miscarriage of justice. Murray, 477 U.S. at 495-96. A "fundamental miscarriage of justice" occurs in an extraordinary case, where a constitutional violation has resulted in the conviction of someone who is actually innocent. Id.

### III. Rivera's Generalized Deference Arguments

Most of Rivera's claims were last evaluated by Georgia's state habeas court. In the state habeas court's order, some of Rivera's claims were rejected on the merits, some were procedurally barred or defaulted, and some were considered res judicata because they had last been ruled on the merits by the Georgia Supreme Court. (See generally, doc. 37-16.) Given the various bases, the standard of review, and which Court's opinion must be reviewed for deference

34

purposes, must be applied claim by claim. See Wilson v. Sellers, 584 U.S. 122 (2018) (holding that the last state court decision that provides relevant rationale is where the federal court should "train its attention."); see also Ylst v. Nunnemaker, 501 U.S. 797, 803-05 (1991). Specifically, Claim One, Rivera's ineffective assistance claims, were decided on the merits by the state habeas court and therefore deference is attributed to that court on those claims.

Next, the state habeas court reviewed Rivera's "subsequent statements" claim, asserted in Claim 2(a),(b) and Claim 4(a), which was presented on a different theory of relief from the one raised on direct appeal. (Compare Rivera, 647 S.E.2d 75 (considering admissibility of custodial statements made by Rivera on October 13, 2000, based on argument Rivera was incapacitated at time) with doc. 37-16, pp. 10-13 (considering subsequent statement claim on bases of nondisclosure of evidence.) However, because the state habeas court implemented a state procedural bar which precluded its review of those "subsequent statement" claims, deference is not in issue as to those claims. Rather, the Court, as explained below, must examine whether the state habeas court's procedural bar limits federal review as to Claims 2(a),(b), and Claim 4(a). Cone v. Bell, 556 U.S. 449, 452 (2009); Ake v. Oklahoma, 470 U.S. 68, 75 (1985). Additionally, the Georgia Supreme Court separately provided a summary opinion regarding one subsequent statement

35

claim, Rivera's <u>Napue</u> claim, after Rivera sought his second CPC, (<u>see</u> doc. 38-26), and thus it is referenced below in the Court's analysis.

Next, Rivera has repeatedly asserted that, although he did not waive his right to trial counsel, the trial court abused its discretion by "sua sponte forcing upon him, without making any inquiry as to whether he was competent to control his defense, a form of hybrid representation in which he represented himself as co-counsel." <u>See, e.g.</u>, <u>Rivera</u>, 647 S.E.2d 77. When Rivera brought his "self-representation" claim at the state habeas phase, the state habeas court held it was barred from reviewing it by *res judicata* because the Georgia Supreme Court found it meritless, and the claim was procedurally defaulted. (<u>See</u> doc. 37-16, pp. 14-17.) Therefore, as to this claim, asserted herein as Claim 4(b), there are two relevant state court opinions: the Georgia Supreme Court and the state habeas court.

Rivera asserts none of these prior determinations are entitled to deference — and that *de novo* review is required on all his claims — for several reasons. (<u>See, e.g.</u>, doc. 142, pp. 36-38 (arguing Georgia Supreme Court's opinion not entitled to deference); <u>see also</u> <u>id.</u> at 31-36 (arguing AEDPA deference does not apply to state habeas court).) First, Rivera takes issue with the state habeas court's verbatim adoption of Respondent's proposed order. (Doc. 142, pp. 30-36.) Though Rivera recognizes

36

Eleventh Circuit precedent "suggests" deference is required even in such a circumstance, he submits the adoption was "hasty," written "unilaterally," and he simply disagrees with a verbatim adoption in the death penalty context. (Id. at 36.)  Second, Rivera argues deference should not be accorded to the Georgia Supreme Court as to Claim 4(b) because the record was incomplete. The Court reviews the deference owed to the Georgia Supreme Court on this claim in section VI, infra.

Third, Rivera argues the state habeas court's adjudication of Rivera's ineffective assistance of counsel claims is not entitled to deference because the state habeas court refused to accommodate the scheduling conflict of a critical fact and expert witness, Dr. David Lisak. (Id. at 39-40.)  According to Rivera, the refusal constitutes an abuse of discretion, and thus, at minimum, the Court should not defer to the state habeas court's adjudication of that claim.  (Id.)  In that vein, Rivera renews his request for an evidentiary hearing before this Court, considering the state habeas court error. (Id. at 40.) He makes several other arguments regarding the deference owed to the state habeas court's decision on his ineffective assistance claims, and those more particularized attacks are discussed in the section pertaining to these respective claims.  However, before it reaches the specific claims, the Court dispels his first and third generalized attacks against the deference owed to the state habeas court's

adjudication.

A. AEDPA Deference to State Habeas Court: Verbatim Adoption

As to his first assertion deference is not owed to the state habeas court's decision, (doc. 37-6), that decision is operative notwithstanding it was adopted verbatim from the Respondent's proposed order submission.  See Anderson v. Bessemer City, 470 U.S. 564, 572 (1985) ("[E]ven when the trial judge adopts proposed findings verbatim, the findings are those of the court and may be reversed only if clearly erroneous.") (citing United States v. Marine Bancorporation, 418 U.S. 602, 615 n. 13 (1974); see also Jones v. GDCP Warden, 753 F.3d 1171, 1182 (11th Cir. 2014) ("[We] can discern no basis for saying that a state court's fuller explanation of its reasons—albeit reasons drafted for the court by the State—would not be entitled to AEDPA deference.") (citing Rhode v. Hall, 582 F.3d 1273, 1281 (11th Cir. 2009); see also In re: Colony Square Co., 819 F.2d 272, 276 (11th Cir. 1987) (no due process violation unless opponent can demonstrate process was fundamentally unfair and opponent had no opportunity to present arguments).  The state habeas court opinion was the "last related state-court decision" as to almost all of the claims asserted herein.  Thus, Rivera's argument this Court should not afford deference to the state habeas court because its opinion was drafted by the Respondent and then adopted verbatim, fails.

B. <u>Motion for Evidentiary Hearing and AEDPA Deference to State
Habeas Court: Dr. Lisak</u>

Rivera's third argument against affording AEDPA deference to
the state habeas court determinations is the state habeas court
did not accommodate Dr. David Lisak's live testimony. (Doc. 142,
p. 40.) Rivera sought live testimony of Dr. Lisak in support of
his claim defense counsel failed to fully investigate Rivera's
mental health background and uncover evidence of childhood sexual
abuse. (<u>Id.</u>) Tethered to this argument, Rivera asserts the state
habeas court incorrectly assumed Dr. Lisak could be subpoenaed and
improperly blamed Rivera's habeas counsel for their failure to do
so. (Doc. 150, p. 31.) According to Rivera, this denial and
misunderstanding of the subpoena law was an abuse of discretion so
egregious it renders the state habeas court's decision
unreasonable and a violation of due process. (<u>Id.</u> at 35-36.) He
seeks another bite at the apple in the form of an evidentiary
hearing in federal court so Dr. Lisak may be heard.

Rivera appears to assert two reasons for such a hearing:
first, he appears to argue Dr. Lisaks' testimony will show the
denial of continuance itself was unreasonable and therefore
deference is not owed, and second, he seeks to rehash the merits
of a substantive claim. Because the state court's docket
management decisions do not implicate federal law, deference under
§ 2254 is unaffected by the denial of continuance. <u>See</u> 28 U.S.C.

39

§ 2254 (d)(1) (mandating petition "shall not be granted . . . unless the adjudication of the claim . . . resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established *Federal* law.")(emphasis added). Therefore, Rivera's deference argument fails. Similarly, an evidentiary hearing to supplement the record and rehash his substantive claim is inappropriate.

       *i.*   *Deference to State Habeas Court is not Lessened on Docket Management Argument*

Rivera provides no support for the argument the state court impermissibly managed its docket. Moreover, he does not support his claim the federal habeas court may ever strip the state court of deference based upon its refusing to accommodate a witness's scheduling conflict. See <u>Davis v. Thomas</u>, 471 S.E.2d 202, 205 (1996) ("We recognize that the [state] habeas court has broad discretion in controlling its calendar . . . we admonish counsel who undertake representation in these matters that the trial court is vested with wide discretion in managing its court calendar."); see also <u>Sealey</u>, 954 F.3d at 1366 (citing <u>Morris v. Slappy</u>, 461 U.S. 1, 11-12 (1983)). Thus this Court must defer to the state habeas court's adjudication on this state law issue because "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." <u>Estelle v. McGuire</u>, 502 U.S. 62, 67-68 (1991); <u>see also</u> <u>Morris</u>, 461 at 11 ("[B]road

discretion must be granted trial courts on matters of continuances; only an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay violates the right to the assistance of counsel." (citations and quotation marks omitted)).

This Court is bound by the state court's interpretation of its own law. Jones, 753 F.3d at 1191. According to that law, the denial of a motion for a continuance in a civil case is a discretionary ruling which should not be reversed on appeal in the absence of a clear abuse by the trial court. McCorquodale v. Stynchcombe, 236 S.E.2d 486, 487 (Ga. 1977) (even where case's complexity was greatly increased by denied access to psychiatric examination into insanity of appellant, no abuse of discretion); see also Loyd v. State, 705 S.E.2d 616 (Ga. 2011) (concluding in death penalty case trial court had not abused its discretion in denying defendant's motion for continuance where counsel allegedly "had insufficient time to prepare for trial"). By finding no error, the Georgia Supreme Court effectively affirmed the state habeas court's decision to deny a continuance.

This Court must accept the Georgia Supreme Court's approval of the state habeas court's decision on the legality of its denial of continuance. Its holding on state law grounds is irrelevant to AEDPA deference standards because it did not apply federal law to deny the continuance. Moreover, Dr. Lisak's testimony is relevant

41

to Rivera's ineffective assistance claims, which the state habeas court adjudicated on the merits.  Thus, under AEDPA, the Court's review of that claim is limited to the record before the state habeas court, and an evidentiary hearing for the purpose of presenting evidence to show the state court's decision on the merits was objectively unreasonable under 28 U.S.C.A. § 2254 (d)(1) is not appropriate.  Pinholster, 563 U.S. at 185.

    *ii.  Rivera's Motion for Evidentiary Hearing is Denied*

    As to Rivera's second reason for seeking a hearing on Dr. Lisak, *i.e.,* to testify as to the merits of his claims, Rivera is barred from obtaining an evidentiary hearing if he did not diligently attempt to develop the factual basis of his claim.  "For state courts to have their rightful opportunity to adjudicate federal rights, the prisoner must be diligent in developing the record and presenting, if possible, all claims of constitutional error."  Williams v. Taylor, 529 U.S. 420, 437 (2000); 28 U.S.C.A. § 2254 (e)(2).

    As to diligence, Rivera argues that "clearly," his "repeated efforts to obtain an opportunity to present Dr. Lisak's testimony satisfies the diligence requirement."  (Doc. 57, p. 16.)  However, Rivera's repeated but belated efforts do not *obviously* establish diligence.  The state habeas court consulted Rivera's counsel before scheduling the evidentiary hearing, and the court accommodated the parties' requests when scheduling.  (Id., p. 35.)

Two days later, Rivera's habeas counsel reported that, although they already committed to the availability, Dr. Lisak was not available on the day of the evidentiary hearing. (Id., p. 37.) As noted previously, the state habeas court did not move the date, but instead gave Rivera the opportunity, by reopening discovery, to depose Dr. Lisak in lieu of his live testimony. (Doc. 31-14, p. 30.) Five days later, Rivera filed a "Motion to Allow Dr. David Lisak to Testify Before this Court," on March 30, 2010 (doc. 31-14, p. 32). That Motion was also denied on April 16, 2010, (id. at 49-50).

Respondent had already deposed Dr. Lisak on January 28, 2010, (see doc. 31-30, pp. 22-90), but Rivera did not depose Dr. Lisak then, or indeed during the expanded time frame either. (Doc. 37-8, p. 151.) As to the prior opportunity to question Dr. Lisak during Respondent's deposition of him, "[b]ecause Petitioner anticipated that Dr. Lisak would be a critical fact and expert witness at a later evidentiary hearing, [habeas] counsel did not elicit expansive testimony on cross-examination of Dr. Lisak at the deposition." (Id.) Consequently, according to Rivera, the testimony he needed to elicit from Dr. Lisak "in order to support his claims" was not elicited as of January 28, 2010. (Id. at 151.) Thus, habeas counsel was on notice they needed to "develop the record" on January 28, 2010, four months before they ran out of time. Williams v. Taylor, 529 U.S. at 437.

43

Nevertheless, Rivera also did not obtain and timely serve Dr. Lisak's affidavit. (Docs. 37-8, pp. 160-176; 37-12.) The state habeas court's reopened discovery period ran at least from March 25, 2010 until April 30, 2010. (Doc. 31-14, p. 30.) At the state habeas hearing, the court openly questioned why Rivera did not seek or obtain an affidavit from Dr. Lisak during the re-opened discovery period. (Doc. 31-29, pp. 213-14.) Habeas counsel explained they "were counting on having him in court," (doc. 31-29, pp. 214-15), *even though* the Court had already denied continuance of the hearing prior to the close of the extended discovery. (Doc. 31-14, pp. 49-50 (Order denying Motion to Allow Dr. David Lisak to Testify Before [State Habeas] Court, dated April 16, 2010); doc. 31-14, p. 30 (Order reopening discovery until April 30, 2010).)

After the hearing, the state habeas court entered a scheduling order requiring Rivera to file his post-hearing brief 60 days after "receipt of the evidentiary hearing record." (Doc. 36-19.) The court also ordered the parties to file proposed orders 30 days after Rivera filed his reply. (Id.) After receiving extensions of time to file, (docs. 37-5; 37-6), Rivera's counsel belatedly filed their post-hearing brief. (See doc. 37-7 (Respondent's Motion to Compel filing of Petitioner's Post-Hearing Brief, dated 10/7/10 and noting the brief was due 9/29/10).) In his untimely post-hearing brief, Rivera attached a 17-page affidavit of Dr.

44

Lisak, which he emphasized "[was] not a substitute for Dr. Lisak's live testimony." (Doc. 37-8, pp. 155, 159-76.)  The affidavit was excluded as untimely, (doc. 37-12); it had not been served "at least ten days in advance of the date set for" the hearing pursuant to O.C.G.A. § 9-14-48(c), and, as the state habeas court had previously suggested, should have been completed already.  (Id.; see also doc. 31-29, pp. 213-14).  Then, on Rivera's request, the court extended the deadline to file proposed orders until March 28, 2011.  (Doc. 37-20, p. 1.)  However, Rivera did not file his proposed order until around two weeks after the extended deadline, on April 13, 2011.  (Doc. 37-17, p. 96; see also doc. 37-20, p. 2.)  Meanwhile, the state habeas court adopted Respondent's proposed order and denied relief.  (Doc. 37-16.)  Simultaneous to belatedly filing the proposed order, Rivera objected to the adoption of Respondent's proposed order by the state habeas court, (doc. 37-18), and the next day he appealed.  (Doc. 37-19.)

As the state habeas court noted, "Petitioner had numerous vehicles with which to present Dr. Lisak's testimony" to the court, (doc. 37-16, p. 84), and it "never denied Petitioner the opportunity to present the testimony of Dr. Lisak, but only stated that it would not reschedule the evidentiary hearing dates, which all involved parties agreed upon, or keep the record open solely for the convenience of a paid expert." (Id.)  Thus, given that Rivera admittedly knew early on he intended to rely on Dr. Lisak,

45

the inadequacy in the record appears to be the result of faltering diligence.  See Shinn v. Ramirez, 596 U.S. 366, 382 (2022) (holding under AEDPA, state postconviction counsel's ineffective assistance in developing state-court record is attributed to prisoner); Holland v. Jackson, 542 U.S. 649, 653 (2004) (attorney negligence "is chargeable to the client and precludes relief unless the conditions of § 2254(e)(2) are satisfied."); see also Ward v. Hall, 592 F.3d 1144, 1160 (11th Cir. 2010) (affirming district court's holding movant was not diligent when he "simply chose not to pursue the affidavits [then] that [he] now seeks to present," while simultaneously failing to argue material was unavailable before state habeas court hearing.).

As such, to obtain an evidentiary hearing, Rivera is subject to § 2254(e)(2)(A) and (B)'s more exacting standard.  However, Rivera cannot establish subsection (B)'s requirement that "the facts underlying the claim would be sufficient to establish by clear and convincing evidence that, "but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense" by virtue of an evidentiary hearing.  28 U.S.C.A. § 2254(e)(2)(B).  The state habeas court had before it the testimony of trial counsel who explained their strategic reasons for not using Dr. Lisak at trial.  Dr. Lisak's expert report and deposition testimony were also considered.  (Doc. 37-16, pp. 35-86.)  The state habeas court determined those materials

were "entirely consistent" with the testimony Rivera anticipated would be elicited from Dr. Lisak. (Id.) The state habeas court also determined the testimony was not "material" to the ineffective assistance of counsel claim. (Id.) Therefore, the state habeas court reasonably determined the record before it contained sufficient information regarding the claim in question and the Georgia Supreme Court affirmed. Cf. United States v. Valladares, 544 F.3d 1257, 1262 (11th Cir. 2008) (to prevail on claim denial of continuance was so arbitrary as to violate due process "a defendant must show that the denial of the motion for continuance was an abuse of discretion which resulted in specific substantial prejudice" by "'identify[ing] relevant, noncumulative evidence that would have been presented if [her] request for a continuance had been granted'") (quoting United States v. Verderame, 51 F.3d 249.). Accordingly, it cannot be said Dr. Lisak's testimony would constitute "clear and convincing evidence" that but for trial counsel's failure to employ Dr. Lisak, "no reasonable factfinder would have found" Rivera guilty. 28 U.S.C.A. § 2254(e)(2)(B).

Finally, though the two issues are historically and continually intertwined in this case, "§ 2254(e)(2)(A) and (B) exceptions do not apply to issues relating to the sentencing phase of the trial." Ward, 592 F.3d at 1161. The record is clear that Rivera's trial attorneys sought a guilty but mentally ill verdict which, even if rejected, "would have carried some mitigating force

47

over into the sentencing phase so that the jury would have been .
. . primed to be merciful at sentencing." (Doc. 31-29, p. 225;
see also doc. 32-15, p. 61 (Hawk Depo.) ("The only reason for the
guilt/innocence phase and not pleading guilty was just to make
[the jury] get it all out, let them get angry, give them a chance
to get over it, hit them with some mitigation stuff, and then see
if they want to, you know, spare.").) Indeed, even at the state
habeas stage it appears Dr. Lisak's testimony was thought to be
vital to proving Rivera's trial attorneys improperly relied upon
Dr. Sachy's suggestion Rivera was incapable of recouperation.
(Doc. 31-29, p. 226 (State habeas counsel referencing Dr. Sachy's
opinion that Rivera was a "Frankenstein monster born from the
womb.").) Therefore, to the extent Dr. Lisak's testimony is sought
to shore up Rivera's attempts at sentence mitigation, his argument
fails on this basis alone. See In re Jones, 137 F.3d 1271, 1274
(11th Cir. 1998) (per curiam) ("As [we have] noted, and the statute
itself specifies, this exception applies only to claims going to
the question of whether or not the applicant is 'guilty of the
underlying offense'—not to claims related to sentence.").

As to the extent it is offered for any other reason, Rivera
has not met his burden under § 2254(e)(2). Federal courts sitting
in habeas are not an alternative forum for trying facts and issues
which a prisoner made insufficient effort to pursue in state
proceedings. Williams v. Taylor, 529 U.S. at 437. Thus, Rivera's

Renewed Motion for Evidentiary Hearing is **DENIED.**

**IV.  Ground One:  Rivera's Ineffective Assistance Claims**

  A. <u>AEDPA Requires Deference to State Court on its Application</u>
     <u>of Strickland Standard.</u>

To obtain relief on his claims of ineffective assistance of counsel, a petitioner must usually establish two elements. <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984).  First, he must prove that "his counsel's performance was deficient, which means that it 'fell below an objective standard of reasonableness' and was 'outside the wide range of professionally competent assistance.'" <u>Johnson v. Sec'y, Dep't of Corr.</u>, 643 F.3d 907, 928 (11th Cir. 2011) (quoting <u>Strickland</u>, 466 U.S. at 688, 690).  When considering whether counsel's performance was deficient, the Court "review[s] counsel's actions in a 'highly deferential' manner" and applies "a strong presumption . . . of reasonable professional assistance." <u>Id.</u> (quoting <u>Strickland</u>, 466 U.S. at 689).  Second, a petitioner must establish prejudice, which means that "but for his counsel's deficient performance, there is a reasonable probability that the result of the proceeding would have been different." <u>Id.</u> (quoting <u>Strickland</u>, 466 U.S. at 694).

As is required here, establishing that a state court's application of <u>Strickland</u> was unreasonable under § 2254 (d) is all the more difficult.  <u>Harrington</u>, 562 U.S. 86.  When § 2254(d)

applies, the question is not whether counsel's actions were reasonable. Id. at 105. The pivotal question is whether there is "any reasonable argument that counsel satisfied Strickland's deferential standard." Id. A state court must be granted a deference and latitude that are not in operation when the case involves review under the Strickland standard itself. Id. And moreover, for purposes of § 2254(d)(1), "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." Williams v. Taylor, 529 U.S. at 410. Here, the state court's determination that Rivera's ineffective assistance claim lacks merit precludes federal habeas relief so long as "fairminded jurists could disagree" on the correctness of the state court's decision. Id. (citing Yarborough, 541 U.S. at 664).

B. State Habeas Court's Findings Regarding Mental Health Investigation and Trial Presentation Constituted a Reasonable Determination of the Facts.

Rivera's first ineffective assistance claim argues trial counsels' pretrial mental health investigation was deficient, as was the mental health presentation during trial. (Doc. 142, pp. 142-165.) The state habeas court's examination of this issue filled sixty pages of its order. (Doc. 37-16, pp. 20-82.) Thirty pages are dedicated to describing, in detail, the opinions of the

doctors and other experts who were retained to assist the defense. (Doc. 37-16, pp. 20-51.)   The state habeas court held trial counsel's investigation was not deficient and Rivera failed to show prejudice.   (Id. at 67 (relying upon Strickland, 466 U.S. 668).)

   *i.   Experience of Trial Counsel*

   In determining whether trial counsel was deficient, the state habeas court first considered trial counsel's experience and background.   (Doc. 37-16, p. 22.)   Peter Johnson and Jacque Hawk represented Rivera throughout trial and sentencing.   Johnson, who was lead counsel, had worked as an assistant district attorney in Augusta, Georgia for four years.   (Doc. 31-28, p. 103; Doc. 32-15, p. 103.)   He then practiced law privately and primarily focused on criminal defense.   (Doc. 31-28, pp. 102-103; 32-15, pp. 103-104; 35-5, p. 7.)   He was counsel on more than twelve murder trials before Rivera, and he had represented a number of capital defendants whose cases resulted in a plea.   (Doc. 31-28, p. 104.) Johnson handled five death penalty trials prior to Rivera.   (Docs. 37-16, p. 22; 31-28, p. 104; 32-15, p. 104; 35-5, p. 6.)   Hawk, who served as co-counsel, had handled approximately fifteen non-capital murder cases and six or seven death penalty cases.   (Docs. 32-15, p. 47-48; 37-16, p. 22.)   The two received support from the Multi-County Public Defender's Office and attended death penalty

seminars that were presented by the Georgia Indigent Defense Council. (Docs. 37-16, p. 22; 31-28, p. 107; 32-15, p. 107.)

ii. *Trial Counsel's Initial Interviews of Defendant*

The state habeas court reviewed the events leading trial counsel to pursue their chosen mental health defense. (Doc. 37-16, pp. 24-67.) Rivera initially sought to plead guilty. (Docs. 37-16, p. 24; 31-28, pp. 121-22.) He eventually agreed to the presentation of evidence in support of a guilty but mentally ill verdict. Trial counsel conducted several interviews with Rivera where they learned about his social and family history and information regarding his sex addiction, (docs. 37-16, p. 26; 33-14, pp. 50-51), and they questioned Rivera's family about his upbringing. (Docs. 37-16, p. 27; 31-28, pp. 126-127; 32-15, pp. 72, 127-28; 33-14, pp. 52-53.). They also spoke with Rivera's wife, but she and Rivera refused to allow their children to have any involvement. (Doc. 37-16, p. 28; 32-15, p. 72.) Hawk testified during habeas proceedings that Rivera's mood changed in a noticeably cyclic way; he sometimes became inexplicably angry and difficult, but on other days he was amenable. (Doc. 32-15, p. 55-56, 111-12.) Counsel recognized a need for psychological testing to pursue the guilty but mentally ill verdict, but, as non-medical professionals, they did not claim to recognize Rivera's symptoms as being that of a bipolar person. (Doc. 37-16, p. 33.) They sought out the assistance of the following mental

health experts: Dr. David Lisak, Mr. Geral Blanchard, Dr. Thomas
Sachy, Dr. Marc Einhorn, and Dr. Joseph Wu.

### a. Dr. David Lisak

The state habeas court first reviewed trial counsels'
decision not to use Dr. Lisak. (Doc. 37-16, pp. 35-41.)  Shortly
after his appointment, Johnson contacted Dr. Lisak, a clinical
psychologist who specialized in sexual violence and the long-term
impact of child-abuse on men.  (See doc. 31-30, pp. 27-28; 33-19,
pp. 134-35.)  Dr. Lisak interviewed Rivera and his family members
between January 18 and January 21, 2001, spending around fifteen
hours interviewing Rivera specifically.  (Docs. 33-19, p. 174; 34-
7, p. 49.)  Dr. Lisak drafted a detailed memorandum noting two
initial findings.  First, his memorandum reflected his concerns
that Rivera exhibited "classic symptoms of childhood sexual
abuse," but also noted that Rivera had no memory of such sexual
abuse.  (Doc. 33-19, p. 175.)  He elaborated that "a large
proportion of male victims of such abuse in fact do lose their
memories of the abuse" and thus, "Rivera's lack of memories would
not be unusual."  (Id.)  Second, the memorandum noted Rivera's
behavior which was "characterized by profound cognitive
distortions and lack of empathy, and that Rivera's
"objectification of women, in the service of gratifying his sexual
impulses, is stunning in its depth and scope."  (Id.)  Dr. Lisak
observed that Rivera's motive for killing was pragmatic, to escape

detection, rather than to fulfil erotic fantasies.  (Id.)

Regarding Dr. Lisak's hypothesis of sexual abuse, Rivera's mother and sister reported to Dr. Lisak that Rivera's father was psychologically abusive towards his wife and children except for Rivera.  (Doc. 32-15, p. 172.)  The family reported that Rivera's father struggled with substance abuse and gambling, which impacted the finances of the family, who would have otherwise done well given his father's profession as a doctor.  (Id.)  Though he hypothesized that *if* Rivera was abused it likely occurred at one of the private religious schools he attended, Dr. Lisak "uncovered no other evidence of such abuse."  (Doc. 33-19, p. 174.)  His letter to Johnson concluded, "[u]nfortunately, my interviews with Mr. Rivera and his family yielded very little of value for the purpose of mitigation."  (Id.)

As to Rivera's behavior, like the other experts who came after him, Dr. Lisak found that Rivera's paraphilic tendencies began around the age of ten, and that they involved "voyeuristic behavior," and "compulsive use of pornography" which "gravitated into a form of fetishism." (Doc. 33-19, p. 176.)  He noted the pornography film series which provided inspiration to Rivera and "ultimately provided the core for the routine that he would use to lure young women to be raped, and in some cases murdered."  (Id., p. 178.)  According to Dr. Lisak, "Rivera found this simulated psychological control to be extremely sexually arousing."  (Id.)

Dr. Lisak discussed how Rivera encountered brothels in Mexicali after crashing his vehicle while high on methamphetamines, and how he hired a sex worker in New Orleans who was raped by someone else while Rivera waited for her to buy drugs. (Id.) The encounter further proved to Rivera "that it would be very easy to rape prostitutes." (Id.) Dr. Lisak reported that soon after the incident, Rivera arrived in Washington D.C., where he began raping sex workers and that "it wasn't long . . . before he became 'immune' to the rapes." (Id.) Rivera reportedly "lost all feelings [he] had for the women," and was soon raping them one to two times each week. (Id.) Though he was caught at least twice by the police, he was never charged. (Id. at 179.) It was during this time that Rivera created a "rape kit," and he began to notice his own increasing need for control, and how unlikely being caught would be. (Id.) Even though he referenced the women as his "prey," according to Dr. Lisak, Rivera claimed that at least some of them enjoyed it. (Id. at 181-82.)

Dr. Lisak's report notably found that Rivera described the murders he later committed as the opposite of losing control. He stated he went into "wrestling mode" where he would be "cool and calm so that he could 'take control.'"[6] (Id.) Rivera became very

---

[6] Rivera was a competitive wrestler, a sport which he took up after being bullied as a young person. He described the "enormous satisfaction he felt when he finally was able to turn the tables and physically overpower the peers who had for years tormented him." (Doc. 33-19 at 176.) The report noted that he "remains proud" of his apparently superior wrestling skills which he found

"practiced at compartmentalizing his life," and "adopted the killing of his victims as a conscious choice to solve his problem" (which was that he could not afford sex workers because of his financial problems). Murder provided him with "a source of potential victims he could prey upon under [the] more restrictive conditions" of living in smaller communities where he would not be protected by anonymity. (Id. at 182.) Dr. Lisak's last comment in the report is that "although Mr. Rivera described himself as extremely distraught after the first killing, in 1999, his subsequent pattern suggests that he was getting used to the killing and that, had he not been caught, the killings would have continued and likely accelerated." (Id.)

Johnson later testified that because no evidence of abuse was uncovered, he decided not to use Dr. Lisak as a testifying expert. (Doc. 37-16, p. 39; see also doc. 31-28, p. 143.) The state habeas court found Johnson made a "reasonable, strategic decision to not further utilize Dr. Lisak." (Doc. 37-16, p. 39.) The state habeas court also accepted Johnson's testimony regarding what Johnson perceived to be Dr. Lisak's reluctance to assist. According to Johnson, Dr. Lisak made clear that, given his expert opinion of Rivera, Johnson would not want Dr. Lisak "in the state of Georgia when [Rivera's] case comes to trial" as he diagnosed Rivera as a

---

"useful" in overpowering his female victims. (Id.)

"classic psychopath with no redeeming values." (Doc. 37-16, p. 39; see also doc. 31-28, pp. 143-44; doc. 33-19, p. 193.) The record also shows trial counsel informed the trial court that Dr. Lisak was "not a good fit for this case" because "he did not accept the idea that [] Rivera's very apparent sexual addiction could be seen as mitigating evidence." (Doc. 35-1, pp. 110-11.) Though Dr. Lisak's report is consistent with Johnson's conclusion, Rivera now claims Dr. Lisak told Johnson he "strongly suspected" Rivera was sexually abused and suggested they explore the abuse issue further. (Doc. 31-30, p. 39; see also 32-15, p. 208). Rivera contends Johnson's failure to do so, or to rely upon Dr. Lisak at all, constitutes ineffective assistance of counsel. (Doc. 142, p. 159-163).

### b. Geral Blanchard

Indeed, trial counsel declined Dr. Lisak's expertise and sought assistance from Geral Blanchard instead. (Doc. 31-28, p. 145.) Blanchard was not a Ph.D. and instead practiced as a licensed counselor in Wyoming. Rivera's sister located him while researching sex addiction, (doc. 31-28, p. 128), and he was hired to consider Rivera's sex addiction as a mitigating factor. According to Johnson, Blanchard "was describing Ray Rivera and his sexual addiction without having met the man" and "we are just so compatible with him in terms of our theory of mitigation." (Doc. 34-1, p. 75.) Defense counsel found Blanchard's "biopsychosocial

evaluation" and diagnoses of Rivera meaningful yet risky. (See doc. 33-19 at 186 (Johnson describing Blanchard's evaluation as more of a "white knuckle" report than Dr. Lisak's).) The report summarized that Rivera met the criteria of many mental health disorders, including "Antisocial Personality Disorder (Psychopathy)," "Paraphilic Disorder," and "Sexual Sadism." (Doc. 34-1, p. 91.) Blanchard noted Rivera's vindictive and hostile nature as a "Malevolent Antisocial" and a "Sexual Sadist." (Id., p. 93.) It reflected that Rivera's "crimes involved bondage, degradation, terrorism, torture, and murder by stabbing and strangulation." (Id. at 83.) Unlike Dr. Lisak, Blanchard described Rivera's assaults as "highly ritualistic." (Id. at 90.) He claimed the "rapes and murders constitute sexual sadism and serial murder." (Id.) He noted Rivera "described an extraordinary and insatiable urge to rape and kill that cyclically overtakes him, much like an addiction," and he claimed Rivera's "sexual fantasies . . . are still very much alive and consume his thoughts in jail." (Id.)

Blanchard's report also warned prison personnel would need protection from Rivera because his compulsion to act on his fantasies would be equally strong in prison as outside. (Doc. 34-1, p. 96.) Blanchard eventually altered his report to "indicate [Rivera's] adjustment in a prison setting could be enhanced by drug therapy." (Id. at 33.) Though Rivera is not explicit, he

complains that "some version" of this report was eventually disseminated to the prosecution. (Doc. 142, pp. 122-23 (citing 34-1, p. 35).) Despite reservations about Blanchard's approach, Johnson sought Blanchard's help instead of Dr. Lisak. (Doc. 34-1, pp. 10-11.) Johnson believed Blanchard's "'psychobiosocial' [sic] report" reflected that "all the horrific disorders" found by Blanchard were "really mitigating in the sense of diminished responsibility." (Doc. 33-19, pp. 193-94.)

### c. Dr. Thomas Sachy

Next, the state habeas court reviewed trial counsels' decision to engage Dr. Sachy. Soon after Blanchard's analysis was performed, Dr. Thomas Sachy, M.D., a neuropsychiatrist, contacted Johnson to offer his services. (Doc. 33-19, p. 192.) He urged Johnson to consider whether Rivera was competent to stand trial, especially given Rivera's desire to plead guilty. (Id.)

Dr. Sachy requested reports and medical records and claimed that he, an M.D., could offer a more substantial perspective than Blanchard. (Doc. 33-19, p. 193.) He claimed that Rivera's behavior was "100% due to his brain and it's [sic] inate [sic] neurological quirks," and also noted that "[o]ne day, this will be accepted in court." (Doc. 142 at 130 (citing doc. 33-19, p. 193).) Rivera argues that the latter comment should have made Dr. Sachy's faulty premise obvious, and that Johnson knew Dr. Sachy's theories were "junk science." (Id.) He claims that Johnson was ineffective

because Dr. Sachy's theory spoke only to psychopathy, a diagnosis which would not support a guilty but mentally ill conviction under Georgia law. (Id.)

Following Dr. Sachy's directives and with the assistance of the trial court's funding authorizations, the defense directed an array of tests on Rivera. (Doc. 34-1, pp. 141-52.) Dr. Sachy theorized psychopathy could be indicated in brain imaging, and he hypothesized Rivera's deviant criminal behavior was the result of abnormal brain functioning, described by Rivera as a "hardwired defect." (See Doc. 34-1, p. 64; see also doc. 142, p. 131.) Johnson accepted the premise despite his own concerns and the concerns of other doctors. (See doc. 36-4, p. 49 (Johnson speaking at a pretrial hearing held on September 5, 2003) ("[A]s I pointed out to Mr. Craig earlier, we are doing something here that I don't think has been attempted in the State of Georgia."); see also doc. 31-29, p. 22 (Dr. Wu testifying that "I expressed this to the attorney, that I was kind of baffled and alarmed by what seemed to be an almost exclusive focus on psychopathic or antisocial personality disorder as the basis for the PET scan abnormality and the lack of . . . collateral family histories or other kinds of tests to determine whether or not there were other causes for the frontal lobe defect, such as mood disorder, brain injury."); and doc. 34-1, p. 151 (trial counsel file memo referencing Dr. Wu's "puzzlement.").)

Following the completion of testing, Dr. Sachy prepared a report of his findings. (Docs. 34-1, pp. 63-65; 33-19, pp. 231-38.) In his final report, Dr. Sachy stated the PET scans performed on Rivera, both while he was on medication and off medication, showed Rivera's brain function was abnormal. (Doc. 34-1, p. 64.) Specifically, Dr. Sachy opined the scans revealed hypo frontality which was consistent with the brain profiles of other violent offenders. (Id.) Dr. Sachy explained frontal lobe dysfunction can be the "root cause for the predilection to commit criminal acts or acts of violence," and he opined Rivera's psychopathy was largely due to his frontal lobe dysfunction. (Id.) However, Dr. Sachy's report clearly indicates his opinion was that Rivera was criminally responsible for his actions because he was capable of distinguishing between right and wrong, and further testing was necessary "for the purposes of mitigation." (Id.; see also doc. 33-19, pp. 236-37.)

Nevertheless, Johnson testified, he "always believed, especially in trial work, that a picture is word that thousand words," and that is why he believed Dr. Sachy's theory would be helpful. (Doc. 31-28, pp. 157-58.) Dr. Sachy stated to trial counsel he could show the jury Rivera was "damaged for various reasons," and Johnson believed they "did show, that [Rivera] was laboring under a handicap, a disability, a disease." (Id.) Again, though it did not make a finding the decision to rely upon Dr.

Sachy, specifically, was reasonable, the state habeas court ultimately held trial counsels' mental health investigation and presentation was not deficient. (Doc. 37-16, p. 51.)

d. *Dr. Marc Einhorn*

The state habeas court next reviewed trial counsel's utilization of Dr. Einhorn, who "administered a battery of neuropsychological tests and was present during the PET scans." (Doc. 37-16, p. 48.) The state habeas court noted "Dr. Einhorn reported that Rivera's results were "pathological and indicated severe, chronic, psychological maladjustment." (Docs. 37-16, p. 48; 34-1, p. 141; see also 33-19, p. 5.) According to the state habeas court, Dr. Einhorn also noted Rivera expressed remorse and "did not attempt to excuse his behavior." (Id.) The results of Dr. Einhorn's tests showed Rivera knew his "behaviors were criminal acts and that he was able to scheme and get away with the behavior for a time." (Doc. 33-19, p. 6.) Rivera reported he "found his offenses highly pleasurable as he anticipated the acts." (Id.) Dr. Einhorn directed the continuous performance test administered immediately before Rivera's PET scan. (Doc. 34-1, p. 142.) He and Dr. Sachy sought to comply with the testing protocol required to compare Rivera's brain function to other individuals' brains for the purpose of explaining Rivera's brain activity as it related to Dr. Raine's study. (Docs. 30-2, pp. 32-33; 89-90, 107, 145-46.)

e. *Dr. Joseph Wu and Dr. Nathan Pino*

Dr. Joseph Wu was also retained to review PET scans performed on Rivera. (Doc. 35-1, p. 142.) Dr. Wu stated Rivera's PET scans showed hypo frontality, which is a state of decreased cerebral blood flow in the prefrontal cortex of the brain. (Doc. 34-1, p. 168.) Dr. Wu explained the abnormal frontal lobe functioning observed in Rivera's brain would result in impaired executive functioning. (Id. at 168- 70.) Dr. Wu never met Rivera, though. (Doc. 31-29, p. 54.)

Though counsel relied upon Dr. Nathan Pino, a sociologist who conducted research on Rivera, his testimony was not entered as evidence of Rivera's mental illness. (Docs. 31-28, p. 163; 33-19, pp. 92-129.) Dr. Pino's trial testimony during the sentencing phase attributed value to Rivera's continued life; counsel sought to show the jury that Rivera could be a "valuable learning tool" who could "contribute to the field of sociology." (Doc. 31-28, p. 163.)

iii. *State Habeas Court's Treatment of Experts Was Reasonable.*

Dr. Jonathan Weker and Dr. Wu were later retained as experts for Rivera's state collateral appeal. At the state habeas court evidentiary hearing, Dr. Weker opined Rivera's "bipolar disorder is linked with his reckless behavior and hypersexual behavior." (Doc. 37-16, p. 68.) The state habeas court reviewed and compared

Dr. Weker's habeas testimony with Blanchard's trial testimony his "clinical judgment was that, amongst other things, we were dealing with a bipolar disorder here, which is the type of depression that has its origins in your biochemistry, particularly your brain chemistry."   (Id.)   The state habeas court then reviewed Dr. Sachy's testimony regarding what Dr. Sachy described as a "'menstrual cycle' of sorts" that Rivera suffered, which "impacted his moods."   (Id.)   The state habeas court found "[a]ll of the experiences which Dr. Weker testified about during the evidentiary hearing were the same as those described by [Rivera] during his testimony," and thus decided to give little weight to his evidentiary hearing testimony because it was merely cumulative of similar evidence offered at trial.

The state habeas court recounted that "Dr. Wu also testified at the evidentiary hearing that he opined that Rivera suffers from bipolar disorder."   (Doc. 37-16, p. 69.)   The court also noted that, prior to trial, Dr. Wu had read and interpreted Rivera's PET scans and discussed his impressions at that time.   (Id.)   Dr. Wu acknowledged during his state habeas testimony "no other documentation is necessary in order to describe the pattern of a PET scan," (id.), and therefore, the state habeas court rejected Rivera's argument Dr. Wu did not have ample information from trial counsel before trial.

The state habeas court also rejected Dr. Wu's latently

expressed concerns over what he perceived to be an over-reliance on the anti-social diagnosis.  As the state habeas explained, Dr. Wu's admitted assumption that Dr. Sachy focused only on anti-social personality disorder was based solely on his brief conversation with Dr. Sachy, and Dr. Wu had no actual knowledge of what took place during trial strategy meetings.  (Id.)  The state habeas court found additional information provided by Dr. Wu during state habeas proceedings was largely cumulative, and "a jury would likely question the credibility of Dr. Wu's habeas testimony as he made psychological findings without ever having met with [Rivera]."  (Id.)

Ultimately, the state habeas court gave little weight to both Dr. Weker and Dr. Wu's state habeas court testimony, finding none of the testimony established ineffective assistance. Consequently, the state habeas court found, trial counsel was reasonable in relying on the "evaluation, diagnosis, and testimony of all the mental health experts as none of them informed trial counsel that his opinion was incomplete or that he needed more information." (Doc. 37-16, p. 70.)

    *iv.  Factual Discrepancy Was Not Unreasonable Determination of Facts.*

The only identification of a factual error asserted in Rivera's brief is argued in a footnote to his point of contention regarding Dr. Weker's and Dr. Wu's testimony, (doc. 142, pp. 137-

138, n.73). Rivera asserts the state habeas court mistakenly noted Dr. Sachy reported Rivera's bipolar behavior, even though it was actually Blanchard who described Rivera as bipolar. (Id. ("Dr. Sachy did not discuss bipolar disorder or cycles at all . . ..").) Even conceding this factual error, Rivera does not meet his burden under § 2254(d)(2). Pye, 50 F.4th at 1035. "Depending on the importance of the factual error to the state court's ultimate 'decision,' that decision might still be reasonable . . . so long as the decision, taken as a whole, doesn't constitute an 'unreasonable determination of the facts' and isn't 'based on' any such determination." Id. (quoting Hayes v. Sec'y, Fla. Dep't of Corr., 10 F.4th 1203, 1224-25 (11th Cir. 2021) (citations omitted)); see also Miller-El v. Cockrell, 537 U.S. 322, 341 (2003) (noting that subsections (e)(1) and (d)(2) are "independent requirements"). Rivera's argument does not explicitly establish the post-conviction diagnosis of bipolar disorder would not be cumulative of Blanchard's diagnosis of bipolar disorder and others' diagnoses of other mental illness. Therefore, this factual error does not render the state habeas court decision unreasonable.

   *C.* The State Habeas Court's Application of Strickland is
        Entitled to AEDPA Deference.

Before arguing the merits of Claims 1(a) through 1(g), Rivera argues the state habeas court's holding was unreasonable, and thus not entitled to deference, because it: (1) did not consider trial

counsel's mental health presentation was more aggravating than mitigating; (2) "discounted much" of Rivera's state habeas evidence "to irrelevance;" (3) "ignored the fact that the chosen" mental health defense did not meet the definition of guilty but mentally ill; (4) "misconstrued the prejudice standard to require proof that 'the outcome of the proceedings would have been different, but for counsel's errors'" and should have used the "one juror" standard; (5) unreasonably refused to move the state habeas hearing to accommodate Dr. Lisak, excluded the admission of Dr. Lisak's affidavit, and unreasonably credited trial counsel's testimony over Dr. Lisak's; and (6) unreasonably found trial counsel's investigation was not deficient based upon the allegedly "unsupported ground that 'habeas counsel, years later with greater resources, were still unable to uncover anything more than trial counsel discovered.'" (Doc. 142, pp. 135-142 (quoting Doc. 37-16, pp. 21, 41).) The Court rejects all six arguments for the reasons expressed below and thus reaffirms the rightful application of AEDPA deference to the ineffective assistance claims asserted in Ground One. See 28 U.S.C. § 2254(d)(1); Harrington, 562 U.S. at 104 (reversing Court of Appeals for failing to attribute AEDPA deference to state court's Strickland analysis).

     *i.   The State Habeas Court Did Not "Completely Ignore"*
          *Rivera's Habeas Claim that the Defense Presented a*
          *"Highly Aggravating" Defense.*

As to Rivera's first point, though he argues the mental health presentation offered was aggravating, he does not support his own conclusion the decision to choose Dr. Sachy was worse than any other possible avenue. Rivera has not shown there was evidence before the habeas court suggesting Rivera was abused, rendering Dr. Lisak's report virtually unhelpful now and during the pretrial investigation. Precedent is replete with holdings that "[a]n attorney does not render ineffective assistance by failing to discover and develop childhood abuse that his client does not mention to him." Williams v. Head, 185 F.3d 1223, 1237 (11th Cir. 1999); see also Stewart v. Sec'y, Dep't of Corrs., 476 F.3d 1193, 1210-11 (11th Cir. 2007) ("The Constitution imposes no burden on counsel to scour a defendant's background for potential abuse given the defendant's contrary representations or failure to mention the abuse.") The Court thus gives due deference to the state habeas court's determination trial counsel's mental health investigation and trial presentation was neither deficient nor prejudicial.

     *ii.   The State Habeas Court Properly Considered Medical*
          *Expert Evidence.*

Rivera complains the state habeas court decided to give little weight to Dr. Wu's opinion that Rivera does not have an anti-social disorder. (Id.) He is also disgruntled the state habeas

court similarly found Dr. Jonathan Weker's testimony to be "largely cumulative of that presented." (Doc. 37-16, p. 68.) But Rivera does not argue why the testimony of Dr. Wu, who never met with Rivera, deserves more weight, and he does not explain why Dr. Weker's testimony is not "largely cumulative." In other words, he does not explain why the post-conviction evidence should take priority, and therefore why the legal determination to discredit it is faulty.

The state habeas court's restrained consideration of Dr. Weker and Dr. Wu's evidence was reasonable. The state habeas court already considered the conclusions Rivera intends to present currently via Dr. Weker and Dr. Wu: that Rivera was mentally ill and therefore his attorneys were ineffective for not proving it. The state habeas court found it notable that, at trial, Dr. Sachy testified Rivera met the definition of guilty but mentally ill—not only because he had anti-social tendencies which he believed could be physiologically explained—but because he met the criteria for obsessive compulsive disorder and paraphilic disorder as well. (Doc. 37-16, p. 54.) Thus, it properly found that Dr. Weker's testimony was "largely cumulative" of expert testimony presented during the trial. (Id. at 68.) The state habeas court also noted that the habeas expert testimony recounting Rivera's experiences were the same as those described by Rivera himself during his testimony in the guilt phase of the trial, and thus were also

69

"largely cumulative" of what had already been recounted to the jury. (Id.) Therefore, it found, Rivera failed to point to non-cumulative evidence which the trial attorneys should have found or to demonstrate there is a reasonable probability that, had Dr. Weker or Dr. Wu's opinions been introduced at trial, there would be a different outcome. Such a finding mandated a denial of relief.

These findings and conclusions are supported by the evidence, consistent with the law, and thus entitled to the full deference afforded by AEDPA. See Holsey v. Warden, Georgia Diagnostic Prison, 694 F.3d 1230, 1260-61 (11th Cir. 2012) (collecting cases and noting, "the United States Supreme Court, this Court, and other circuit courts of appeals generally hold that evidence presented in postconviction proceedings is 'cumulative' or 'largely cumulative' to or 'duplicative' of that presented at trial when it tells a more detailed version of the same story told at trial or provides more or better examples or amplifies the themes presented to the jury.").

iii. *The State Habeas Court Did Not "Ignore" Rivera's Habeas Argument That the Chosen Defense was "Wholly Incompatible" with Governing Law.*

Rivera next argues the state habeas court unreasonably "ignored the fact" trial counsel's chosen mental health defense "was wholly incompatible with the law governing the guilty but mentally ill verdict (as well as science and reality) given that

the statutory definition of 'guilty but mentally ill' was precluded
by the primary diagnosis of sociopathy given by Drs. Sachy and
Einhorn, and the only support for the defense came from a 'licensed
counselor [*i.e.*, Blanchard]/ who was not competent to diagnose Mr.
Rivera's severe mental illness." (Doc. 142, p. 138.) The Georgia
statute provides the following definition for "mentally ill:"

> "Mentally ill" means having a disorder of thought or
> mood which significantly impairs judgment, behavior,
> capacity to recognize reality, or ability to cope with
> the ordinary demands of life. However, the term "mental
> illness" shall not include a mental state manifested
> only by repeated unlawful or antisocial conduct.

O.C.G.A. § 17-7-131 (a)(3).

Dr. Sachy testified that, given the composition of Rivera's
brain, he was "at the top of the aberrancy when it comes to the
stuff that his frontal lobes should be doing in behavior that is
violent, and impulsively violent, and you know, psychopathic."
(Doc. 30-2, p. 78.)  And Dr. Einhorn later explained that there
are "many" anti-social personality disorders and that "the next
level of severity" from anti-social personality disorder is
psychopathy or sociopathy, which he described as being "the same
thing." (Doc. 30-2, p. 149.)  He testified that Rivera met the
criteria to be considered a "level higher to psychopathic sexual
sadist." (Id.)  When asked on cross-examination, he agreed that
the terms "anti-social personality disorder" and "psychopathy"
were used interchangeably, but he said it was incorrect to do so.

(Id. at 160).  He stated, "a psychopath will always be anti-social, but an anti-social will not always be a psychopath necessarily." (Id.)  Thus, some of the testimony suggested that Rivera fell under the ambit of the "mentally ill" statute's exception because the experts, in effect, described his mental state as one which was "manifested . . . by repeated unlawful or antisocial conduct." O.C.G.A. § 17-7-131 (a)(3).

However, Dr. Sachy also concluded that Rivera met the criteria for "two other psychiatric disorders" that contributed to his behavior:  "obsessive-compulsive  disorder"  and  "paraphilic disorder." (Doc. 30-2, pp. 81-82.)  Additionally, Blanchard, the so-called "licensed counselor," testified that results of testing conducted on Rivera indicated, among other things, "concerns in the  area  of  schizoid  behavior,  meaning  someone  who  is  not interested  or  desiring  social  contact,"  that  there  were "elevations on different measures of depression, including bipolar disorder," that "there was indication of an elevation on post-traumatic stress," and that there "was also elevation on, near elevation on anti-social scale." (Doc. 30-3, pp. 17-18.) On the other hand, Dr. Lisak's report did not provide any diagnoses, but in an email to Dr. Sachy, Johnson stated that, "[p]rivately, Lisak told me that Rey is a 'classic psychopath.'" (Doc. 33-19, p. 193.)

Rivera argues his psychopathy diagnosis, which as explained by Dr. Einhorn, "will always be anti-social," precluded the guilty

but mentally ill defense given the exception contained in the statute regarding "antisocial conduct." (Doc. 142, p. 138.) However, Georgia law is not explicit concerning whether such a diagnosis precludes a jury finding he was mentally ill. See Worthy v. State, 324 S.E.2d 431, 436 (Ga. 1985) ("While this definition, particularly the latter part, is not a model of specificity, the area is certainly one in which a precise definition would be difficult. Moreover, we are dealing here with a possible finding by the jury, *not the definition of a crime*.") (emphasis added). Furthermore, the statute clearly mandates that the mental state must be "manifested *only* by repeated unlawful or antisocial conduct." O.C.G.A. § 17-7-131 (a)(3) (emphasis added). As the state habeas court noted, Dr. Sachy and others claimed Rivera was mentally ill in ways unrelated to antisocial diagnoses. Thus, the state habeas court did not "ignore" this point. It also rightly found that, "[t]here was no denying the antisocial nature" of Rivera's history." (Doc. 37-16, p. 67.)

Additionally, as concluded by the Court in response to his first averment of error above, there was no other or better defense available, given Rivera's admissions regarding his own behavior, and Johnson's characterization of Dr. Lisak's opinion, which was that Rivera was a "classic psychopath." (Doc. 33-19, p. 193.) Therefore, the state habeas court's determination was not an unreasonable determination of fact or application of law on these

grounds. See, e.g., Heidler v. Warden, GDCP, 2023 WL 4927253, at *39 (11th Cir. Aug. 2, 2023) ("Heidler contends that trial counsel 'failed to reasonably . . . present . . . evidence' that he 'suffered from depression and/or psychoses,' instead painting ~~Heidlers~~Hiedler's issues as being "limited to personality disorders marked by antisocial conduct.' But that's just not true.").

      *iv. The State habeas Court Did not Apply the Wrong Prejudice Standard in the Guilt Phase.*

Rivera next argues the state habeas court improperly relied on Smith v. Francis, 325 S.E.2d 362 (Ga. 1985) for its definition of what constitutes prejudice, requiring Rivera to offer "proof that the outcome of the proceedings would have been different, but for counsel's errors." (Doc. 142, p. 138.) He argues Strickland "expressly rejected an outcome determinative test," and thus, the state habeas court, in reliance on Smith, applied the wrong Strickland prejudice standard. (See id. at 138-139 (citing Strickland, 466 U.S. at 694).)

Relying on Smith, the state habeas court explained "[t]he prejudice prong requires that a petitioner establish that the outcome of the proceedings would have been different, but for counsel's errors." (Doc. 37-16, p. 21 (citing Smith, 253 Ga. at 783).) The cited portion of Smith specifically states:

    the defendant must show that there is a reasonable
    probability (i.e., a probability sufficient to undermine

> confidence in the outcome) that, but for counsel's
> unprofessional errors, the result of the proceeding
> would have been different. Regarding death penalties,
> the question is whether there is a reasonable
> probability that, absent the errors, the sentencer would
> have concluded that the balance of aggravating and
> mitigating circumstances did not warrant death.

Smith, 325 S.E.2d at 363 (internal citations omitted). The state

habeas court next noted Strickland prejudice occurs when a

petitioner demonstrates "there is a reasonable probability (i.e.,

a probability sufficient to undermine the confidence in the

outcome) that, but for counsel's unprofessional errors, the result

of the proceeding would have been different." (Doc. 37-16, p. 21

citing Smith, supra; Strickland, supra at 694; Head v. Carr, 544

S.E.2d 409, 413 (Ga. 2001); and Hall v. Terrell, 679 S.E.2d 17, 20

(Ga. 2009). It next articulated the Georgia Supreme Court's

holding that "in order to establish that trial counsel's

performance was so defective as to require a new trial," Rivera

must show "absent counsel's errors, the outcome of the trial would

have been different." (Doc. 37-16, p. 21 (quoting Roberts v.

State, 439 S.E.2d 911, 912 (Ga. 1994). However, the state habeas

court later applied the Strickland standard by finding Rivera

failed to show prejudice because he "failed to show that any new

evidence of bipolar disorder so prejudiced him that there [was] a

reasonable likelihood that the outcome of [Rivera's] guilt-

innocence phase would have been different." (Id. at 67.)

An identical argument to Rivera's argument that the state

habeas court improperly required a heavier prejudice burden was recently examined by the Eleventh Circuit.  See Calhoun v. Warden, Baldwin State Prison, 92 F.4th 1338, 1348 (11th Cir. 2024).  There, the Eleventh Circuit held the Georgia Supreme Court improperly articulated the ineffective assistance prejudice standard as "versions of the preponderance standard" when it found Calhoun's motion failed because "nothing presented . . . *would have* established . . .," when it required a showing that "a reasonable jury *would have* reached a different verdict," and when it required Calhoun to show counsel's error "*likely affected* the outcome of trial."  Id. at 1347.  Accordingly, it found the Georgia Supreme Court's decision was contrary to clearly established federal law and therefore held AEDPA deference was not due.  Id. at 1348-49.  Even in revoking deference on this point, the Eleventh Circuit made clear their treatment of this issue is "not to be misread to mean that a state court decision isn't entitled to AEDPA deference unless the opinion quotes with precision, without shorthand references, and with flawless consistency the proper federal standard of reasonable probability of a different result."  Id. at 1348; see also Harrington, 562 U.S. at 112 (quoting Strickland, 466 U.S. at 697) ("The difference between the reasonable probability standard 'and a more-probable-than-not standard is slight and matters 'only in the rarest case.'").

In the instant case, the state habeas court used terminology

in its opinion which failed to include specific language, *i.e.*, it stated Rivera would be required to establish the outcome of the proceedings "would have" been different. (See doc. 37-16, p. 21.) However, this semantics-based attack on deference fails because the state habeas court recited and applied the Strickland standard elsewhere.  (Doc. 37-16, p. 67 (resting prejudice holding on conclusion Rivera "failed to show that any new evidence of bipolar disorder so prejudiced him that there [was] a reasonable likelihood that the outcome of [Rivera's] guilt-innocence phase would have been different")); see also Calhoun, 92 F.4th at 1348 (citing Holland v. Jackson, 542 U.S. 649, 654-55 (2004) ("The statement [in the state court opinion] that respondent had 'failed to carry his burden of proving that the outcome of the trial would probably have been different but for those errors' . . . is permissible shorthand *when the complete* Strickland *standard is elsewhere recited*.") (emphasis in original).)  Furthermore, by applying the Strickland standards, the state habeas court never required "proof" or an inappropriate "outcome determinative" test, or even a "preponderance" test, but rather applied the proper standard, which, as quoted by the state habeas court, mandates "a reasonable probability" the result of the proceeding would have been different. (Doc. 37-16, p. 21.) Thus, Rivera's attack on deference owed to the state habeas court fails on this point because he has not shown the state habeas court's holding he was not prejudiced

by his counsel's alleged deficient performance was based on an unreasonable application of clearly established federal law.  To restate, Rivera has not shown the evidence on the prejudice question is so one-sided in his favor that the answer is, as the Supreme Court has phrased it, and as was explained above "beyond any possibility for fairminded disagreement."  Harrington, 562 U.S. at 103.

> v.   *The State Habeas Court Did Not Apply the Wrong Prejudice Standard to the Penalty Phase.*

Rivera next complains the state habeas court, also in reliance upon Smith, determined prejudice during the penalty phase could be shown only when, "absent the errors, the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."  (Doc. 142, p. 139 (citing doc. 37-16, p.21 and quoting Smith, 253 at 783-84).)  Rivera argues the Supreme Court has "made clear in the years since Smith, in a state such as Georgia, where the vote of a single juror in favor of a sentence less than death requires imposition of a sentence less than death, a petitioner need only show that there is a reasonable probability that at least one juror would have voted against the death penalty."  (See doc. 142, p. 139 (citing Wiggins v. Smith, 539 U.S. 510, 537 (2003) ("Had the jury been able to place petitioner's excruciating life history on the mitigating side of the scale, there is a reasonable probability that at least

one juror would have struck a different balance.")).

   "When a defendant challenges a death sentence . . . the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Strickland, 466 U.S. at 695.  "The likelihood of a different result must be substantial, not just conceivable." Harrington, 562 U.S. at 112.  Thus, while Rivera need establish only "a reasonable probability that at least one juror would have struck a different balance" between life and death, Wiggins, 539 U.S. at 537, a "reasonable probability," as used here, "is a probability sufficient to undermine confidence in the *outcome*." Strickland, 466 U.S. at 694 (emphasis added); see also Jenkins v. Commr., Alabama Dept. of Corrections, 963 F.3d 1248, 1270 (11th Cir. 2020).  In measuring that probability, courts "evaluate the totality of the available mitigation evidence — both that adduced at trial, and the evidence adduced in the habeas proceeding in reweighing it against the evidence in aggravation." Williams v. Taylor, 529 U.S. at 397-98; see also Wiggins, 539 U.S. at 534 ("In assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence.")

   In this case, not only is much of the evidence in aggravation undisputed, but also the depravity of the crime itself is evident. In addition, the jury heard the gruesome details of several rapes

and murders from Petitioner's own mouth.  The Court cannot hold that the mostly cumulative habeas evidence in favor of mitigation outweighs the trial court evidence in aggravation.  It is simply not likely the jury would have concluded death was not the appropriate punishment if it had heard the proposed evidence. Thus, even if Rivera showed deficient performance, he "cannot [and did not] prove that 'absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'" Sealey, 954 F.3d at 1357 (citing Johnson, 643 F.3d at 935.  Thus, in light of the Court's deferential standard of review, the determination Rivera failed to establish prejudice was not contrary to, or an unreasonable application of, Strickland.

>    vi. *The State Habeas Court Properly Managed its Docket Regarding Dr. Lisak.*

Rivera's next attack on deference is the state habeas court, "in addition to wrongfully preventing Rivera from presenting the testimony of Dr. Lisak or from proffering an affidavit, unquestioningly endorsed trial counsel's representations about their decision not to use Dr. Lisak's recollection of his interactions with trial counsel." (Doc. 142, p. 140.)  First, the Court rejected the argument concerning continuation of the habeas hearing in section III(B)(i), supra.  Second, the state habeas court properly considered available evidence before it, including,

as noted above, correspondence from Dr. Lisak himself, Dr. Lisak's deposition, and Johnson's own observations about Dr. Lisak, when it reasonably concluded trial counsel was not ineffective.

> *vii. The State Habeas Court's Reasoning Regarding Comparative Resources Does Not Render its Decision Unreasonable.*

Rivera next argues the state habeas court found the attorneys not deficient based upon the allegedly "unsupported ground that 'habeas counsel, years later with greater resources, were still unable to uncover anything more than trial counsel discovered.'" (Doc. 142, pp. 141-142 (quoting Doc. 37-16, p. 41).) Rivera claims this conclusion is indefensible considering the state habeas court "rapidly moved Mr. Rivera's case through state habeas proceedings" without providing Rivera with a five-month extension of the discovery period but gave a three-month one instead. (Doc. 142, p. 141.)

It is unclear what the state habeas court intended when it noted habeas counsel had "greater resources" than the trial counsel. But the state habeas court's ultimate conclusion is unaffected by the distinction. Moreover, this argument does not strike at the heart of the reasonableness of the state habeas court's determination Hawk and Johnson were effective. It simply constitutes a frustration with state procedural decisions which limited the habeas counsel's ability to do extensive investigation in Puerto Rico, an investigation which, even if fruitful would not

have resulted in a finding trial counsel was ineffective.   (Doc.
142, p. 141 (additionally complaining of state habeas court's
denial of a "five-month extension of the discovery period, in part
to permit 'a necessary and substantial investigation in Puerto
Rico . . ..,'").)   A defense attorney "preparing for the sentencing
phase of a capital trial," is not required "to scour the globe on
the off chance something will turn up." Rompilla v. Beard, 545
U.S. 374, 380-83 (2005).   Rather, "reasonably diligent counsel may
draw a line when they have good reason to think that further
investigation would be a waste." Id. at 383.

Rivera's complaint he did not receive enough time—a five-
month extension of discovery—to investigate the theory of abuse
denied by Rivera and requiring extensive travel—falls short
because there is no new substantial evidence, thus no prejudice,
and thus no reason to consider trial counsel's performance
ineffective. See Burt v. Titlow, 571 U.S. 12, 17 (2013) (quoting
Strickland, 466 U.S. at 669) ("It should go without saying that
the absence of evidence cannot overcome the 'strong presumption
that counsel's conduct fell within the wide range of reasonable
professional assistance.'").   "[T]o be effective a lawyer is not
required to 'pursue every path until it bears fruit or until all
hope withers.'" Williams v. Head, 185 F.3d at 1237 (quoting Foster
v. Dugger, 823 F.2d 402, 405 (11th Cir. 1987)).   Therefore, trial
counsels' decision to limit the investigation is "accorded a strong

presumption of reasonableness." <u>Mills v. Singletary</u>, 63 F.3d 999, 1021 (11th Cir. 1995) (internal quotation marks omitted).  The state habeas court's entitlement to deference is not diminished on the basis it assumed the state habeas counsel had more resources than trial counsel.  Even if state habeas counsel had been given more time and resources, it would not have resulted in a finding of ineffective assistance as Rivera continues to deny he was abused.

D. <u>Trial   Counsel's   Mental   Health   Investigation   and Presentation Did Not Constitute Ineffective Assistance.</u>

Rivera has made three arguments on the deficient performance <u>Strickland</u> prong regarding the investigation and presentation of the mental health defense.  (Doc. 142, p. 135.)  First he argues trial counsel presented an "incoherent defense that depicted Mr. Rivera as a sexually sadistic monster beyond redemption," (<u>id.</u> at 147); second, that trial counsel performed deficiently in failing to investigate and present evidence that Rivera suffered from untreated bipolar disorder, (<u>id.</u> at 156-59), and, third, that trial counsel performed deficiently in "dumping" Dr. Lisak "simply because he stressed the necessity of conducting a thorough investigation" of Rivera's childhood and background, (<u>id.</u> at 159-63).  Further, Rivera argues the second <u>Strickland</u> prong, that he was prejudiced by the "incoherent" defense and trial counsel's

failure to investigate and present evidence of Rivera's "severe mental illness and childhood sexual abuse." (Id. at 163-65.)   In support of his prejudice argument, he claims that "[b]y contrast, the extensive and compelling evidence submitted in the state habeas proceedings provided a mitigating rubric through which to understand that Mr. Rivera's horrific actions were the product of the synergy between his untreated (and/or improperly treated) psychiatric disorders and the continuing effects of his traumatized and discordant childhood, including sexual abuse he suffered as a young boy and a teenager, and the warping impact of his father's virulent misogyny." (Id. at 164.)

  *i.   Trial Counsel's Performance was Not Deficient.*

"Judicial scrutiny of counsel's performance must be highly deferential." Strickland, 466 U.S. at 689.   Additionally, AEDPA, by its terms, requires the federal court to apply deference to state-court decisions.   Consequently, federal review of the state habeas court's resolution of the deficient-performance prong of Strickland requires "double deference."   Humphreys v. Warden, Georgia Diagnostic Prison, 2024 WL 2945070, at *26 (11th Cir. June 11, 2024) (citing Pinholster, 563 U.S. at 202.   Thus, at federal habeas review, "the question [becomes] whether there is any reasonable argument that counsel satisfied Strickland's deferential standard."   Premo v. Moore, 562 U.S. 115, 123 (2011) (citation and internal quotation marks omitted).

84

Rivera's most resounding complaint is that his attorneys were swayed from further investigations of abuse by a physician who, at best, misinterpreted data, and at worst, was corrupt. (See doc. 142, p. 115 (describing Dr. Sachy as a "slick talking charlatan of a psychiatrist"); see also id., n.37 (recounting indictment and arrest of Dr. Sachy in 2018 on charges related to controlled substance distribution, money laundering, and conspiracy, and assessing Dr. Sachy's own propensity for psychopathy).) Rivera claims trial counsel failed to investigate and develop Rivera's thought and mood disorders and abusive childhood, preferring Dr. Sachy's "questionable" defense which rested on a theory which was logically inapposite to mitigation over Dr. Lisak's theory. (Doc. 142, pp. 142-63.) Though Rivera seeks to bootstrap this contention into an argument that the state habeas court's determination was unreasonable, the issues are discrete. As noted, at this stage, the Court reviews the state habeas court's decision regarding the mental health investigation merely to determine if it applied Strickland unreasonably. See Harrington, 562 U.S. at 86. If it did not, the Court attributes AEDPA deference as required by 28 U.S.C. § 2254 (d)(1). The Court has already determined Rivera's arguments that the state habeas court applied the law unreasonably are meritless. Thus, in attributing deference to the state habeas court's holdings on these discreet allegations, it applies deference to the state habeas court. However, even in considering

the claim's merits, the Court finds trial counsel's performance was not deficient when investigating and presenting the mental health defense.

### a. Trial Counsel did not Perform Deficiently in Committing to an "Incoherent" Defense or Failing to Investigate and Present Bipolar Disorder.

Rivera's first argument is "trial counsel performed deficiently in committing themselves to an incoherent defense that depicted Mr. Rivera as a sexually sadistic monster beyond redemption." (Doc. 142, p. 147.) The state habeas court found trial counsels' mental health defense, including its consideration of Rivera's bipolar disorder was not ineffective. On the first Strickland prong, the state habeas court found that "trial counsel investigated and presented a reasonable theory for the guilt phase of trial" because they presented experts and Rivera himself to make the argument that his "background had a profound impact on [him] to the point where, while he was aware that the crimes were wrong, he was unable to control his actions as a result of biological forces." (Doc. 37-16, p. 67.) The state habeas court also held that trial counsel's strategic choice to rely on those experts and testimony to suggest Rivera's actions were the result of heredity outside of his control was a reasonable strategic choice. (Id.) It noted the defense included a "valid case for a guilty but mentally ill verdict based on Rivera's bipolar disorder" and "[t]here was no denying the antisocial nature" of Rivera's

history.  (Id.)  In summation, it found that by "attempt[ing] to embrace the history in effect to explain the behavior," trial counsel's mental health investigation and defense was based on strategy and based on the evidence, and therefore not deficient. (Id.)

Rivera asserts counsel's strategy was "incoherent" by comparing this case to three out-of-circuit cases which involved "dubious" experts. (See doc. 142, pp. 147-56.) In the first one, Stevens v. McBride, 489 F.3d 883 (7th Cir. 2007), the expert was asked not to write a report but wrote one anyway. Id. at 888. The report contained "numerous statements that were extremely detrimental" to the defense, including several admissions. Id. The expert also "subscribed to an unusual psychological theory known as the 'myth of mental illness,'" which was highly irregular. Id. Nevertheless, trial counsel enlisted the expert, who's testimony Rivera describes as "disastrous." (Doc. 142, p. 148.) Rivera argues that, "[l]ike the trial expert in Stevens, Mr. Rivera's experts—most especially Sachy—advocated theories that any meaningful scrutiny would have revealed were scientifically dubious at best and internally inconsistent." (Id. at 152.) He claims, "these theories were advanced in language and diagnoses that were inherently damaging to Mr. Rivera's case and, indeed, more aggravating than anything the prosecutor could have presented or argued." (Id.)

The next case Rivera relies upon is Skaggs v. Parker, 235 F.3d 261 (6th Cir. 2000). There, the expert, whose testimony was "rambling, confusing, and at times, incoherent to the point of being comical," id. at 264, turned out to be no expert at all; he lied about his credentials and had no training. Even still, the Sixth Circuit held "counsel's failure to conduct a full-blown investigation into [the expert's] academic history, or to verify his credentials any further than had been done, did not fall below an objective standard of reasonableness under Strickland." Id. at 268. But counsel's decision to recall the expert at retrial of the penalty phase, despite "having had the advantage of witnessing [the expert's] previous bizarre performance and, more importantly, counsel's complete failure to present other mitigating evidence on Skaggs's behalf, fell below an objective standard of reasonableness." Id. at 270. Rivera draws a comparison between the Skaggs expert's poor courtroom performance and that of Dr. Sachy. Rivera then relies on Richey v. Bradshaw, 498 F.3d 344 (6th Cir. 2007) for the proposition that "the mere hiring of an expert is meaningless if counsel does not consult with that expert to make an informed decision about whether a particular defense is viable." Id. at 362.

None of these cases are analogous. Stevens involved:

an emotionally disturbed young man who had been abused and raped as a child, was sentenced to death in Indiana state court for the molestation and brutal murder of 10-

year-old Zachary Snider. At Stevens's trial, **the only evidence presented by the defense concerning his mental state at the time of the killing was the testimony of a psychologist who believes that mental illness is a myth.**

Stevens, 489 F.3d at 886. Unlike Stevens, Dr. Sachy's diagnosis was not invalidated by his own disbelief in its existence. Instead, the value of his analysis was diminished after another expert disagreed with his interpretation of highly complex PET scan data.

Next, Skaggs involved a fraudulent expert who failed, but he was rehired despite this failure "primarily because counsel waited until the eleventh hour to prepare for the penalty phase and to line up a psychiatric expert to testify on Skaggs's behalf," and could not be replaced. Skaggs, 235 F.3d at 270. The Sixth Circuit held "[t]he case before us is not one of a mere disagreement between experts, or a case in which the expert for the petitioner did not testify as favorably as the petitioner had hoped—both circumstances in which the granting of a habeas petition would be inappropriate." Id. at 272. Instead, the jury never heard "marginally competent" evidence of Skaggs' "borderline mental retardation," id. at 273, evidence which represents an entirely different type of mental incapacity from Rivera's bipolar disorder. Compare O.C.G.A. § 17-7-131(a)(2) (intellectual disability) with O.C.G.A. § 17-7-131(a)(3) (mental illness). Indeed, Rivera's case represents the exact case contemplated by

the Sixth Circuit here—a "mere disagreement between experts, or a case in which the expert . . . did not testify as favorably as the petitioner had hoped—both circumstances in which the granting of a habeas petition would be inappropriate." Skaggs, 235 F.3d at 272.

Additionally, Rivera's reliance on Richey to argue trial counsel failed to confirm that Dr. Sachy made an informed decision about whether the defense was viable is completely unsupported. Instead, Rivera provides merely his own opinion trial counsel "failed to subject the experts' theory to rational scrutiny that would have shown that [the defense] not only was aggravating, but also internally inconsistent and fatally flawed from an analytical perspective." (Doc. 142, p. 155.) Instead of pointing to facts in the record to support this point, he cites the unrelated case of Buck v. Davis, 580 U.S. 100 (2017), where counsel was "ineffective in presenting expert testimony that defendant was more likely to be a future danger due to his race," and he claims trial counsel failed by ascribing to Dr. Sachy's theory, "despite substantial grounds to support meaningful investigation of Mr. Rivera's bipolar disorder and history of childhood abuses." (Doc. 142, p. 155.) As explained in the next section IV (D)(i)(b), the argument counsel failed to investigate the bipolar disorder diagnosis fails. Additionally, Rivera has always denied childhood abuse.

In applying deference to the state habeas court's decision,

the Court agrees trial counsel's reliance on Dr. Sachy and his theory was not deficient performance. Trial counsel's investigation into Rivera's mental health was comprehensive, and the theory presented by Dr. Sachy was not incoherent. In analogous cases, the Eleventh Circuit has found similar mental health investigations sufficient. See, e.g., Gissendaner v. Seaboldt, 735 F.3d 1311, 1331 (11th Cir. 2013) ("The state habeas court's finding of no deficient performance was also reasonable with respect to trial counsel's mental health investigation, which included obtaining [the petitioner's] mental health records and consulting with [an expert]."); Raheem v. GDCP Warden, 995 F.3d 895, 919 (11th Cir. 2021) (finding trial counsel "conducted an extensive [and adequate] investigation into [the petitioner's] mental health before trial" where trial counsel "consulted with four different mental health experts," "spoke with [one of the experts] often," and "me[t] with [the petitioner's] family"). Rivera's failure to show trial counsel's reliance upon Dr. Sachy was unreasonable mandates the Court find counsel was not ineffective. See Chandler v. United States, 218 F.3d 1305, 1318 (11th Cir. 2000)("[C]ounsel's reliance on particular lines of defense to the exclusion of others—whether or not he investigated those other defenses—is a matter of strategy and is not ineffective unless the petitioner can prove the chosen course, in itself, was unreasonable.").

b. Trial Counsel Was Not Deficient by Failing to Investigate and Present Evidence Rivera Suffered from Untreated Bipolar Disorder.

Rivera next argues that "even though the definition of 'mental illness' under O.C.G.A. § 17-7-131(a)(3) precludes 'a mental state manifested only by repeated unlawful or antisocial conduct,' and, accordingly, the primary diagnosis advanced at trial of antisocial personality disorder could not, by definition, satisfy the statute, counsel nonetheless moved forward with Dr. Sachy's plan to prove that Mr. Rivera was hardwired, as a sociopath, to commit his crimes." (Doc. 142, p. 156.) This argument repeats the logic behind Rivera's argument that the state habeas court's decision was unreasonable, dispelled in section IV(C)(iii), supra. Specifically, the Georgia statute mandates that mental states manifested only by repeated antisocial conduct, such as that conduct which many experts testified occurred in Rivera's case, are not considered "mentally ill" mental states. O.C.G.A. § 17-7-131 (a)(3). As applied to the performance prong of Strickland, however, Rivera directs the Court to consider the mitigating effect of a bipolar diagnosis as compared to that of psychopathic. However, at least three doctors conducted tests and analyses on Rivera and only the licensed counselor noted his bipolar disorder. Therefore, trial counsel, by not presenting further evidence of Rivera's bipolar disorder, could not have been deficient in failing to pursue it. Furthermore, trial counsel did

not fail to present the evidence that was available to them regarding Rivera's bipolar disorder. (See, e.g., Doc. 30-3, pp. 17-18.)

### c. Trial Counsel was not Deficient in "Dumping" Dr. Lisak Because He Stressed Investigation.

Rivera next argues trial counsel performed deficiently in "dumping" Dr. Lisak as an expert "simply because he stressed the necessity of conducting a thorough investigation of Mr. Rivera's childhood and background." (Doc. 142, p. 159.) On this claim, the state habeas court found Rivera's arguments regarding the choice to "dump" Dr. Lisak and "refusing" to undertake an investigation into childhood sexual abuse failed. (Doc. 37-16, p. 41.) As to performance, the habeas court found trial counsel "did investigate this theory" and therefore was not deficient. (Id. at 40.) Furthermore, it found Rivera's habeas evidence consisted of nothing more than speculation, noting that no further evidence had been uncovered. (Id.) Therefore, trial counsel was not deficient in failing to uncover evidence or relying on the doctor who suggested the evidence might exist, because the evidence does not appear to exist. (Id.)

The Court agrees with and gives deference to the state habeas court on this claim as well. Rivera claims "[h]ad counsel undertaken the type of investigation suggested by Dr. Lisak . . ., they would have unearthed evidence supporting not only a

mitigating defense of bipolar disorder, but sufficient corroboration of childhood sexual abuse that an expert such as Dr. Lisak could have testified to the pernicious effects such abuse has on male development in general and Mr. Rivera in particular." (Doc. 142, p. 161.) This assertion is merely speculative considering no evidence exists that Rivera was abused as a child.

Moreover, as noted, Dr. Lisak did not suggest Rivera was bipolar in his report, and while he suspected Rivera may have suffered abuse as a child, Rivera denied such abuse occurred. Thus, trial counsel's supposed "failure to engage in any meaningful investigation of Mr. Rivera's childhood abuse" (id. at 163) after hearing from Dr. Lisak is a misnomer. This case is not, as Rivera asserts, one where counsel failed to conduct further investigations in the face of clear signs of mitigation. See Newland v. Hall, 527 F.3d 1162, 1202 (11th Cir. 2008) (noting "because information about childhood abuse supplied by a defendant is extremely important in determining reasonable performance, 'when a petitioner . . . does not mention a history of physical abuse, a lawyer is not ineffective for failing to discover or to offer evidence of abuse as mitigation'" (alterations in original) (additional internal quotation marks omitted)); Puiatti v. Sec'y, Fla. Dep't of Corr., 732 F.3d 1255, 1281 (11th Cir. 2013) (same). Trial counsel did not perform deficiently in failing to investigate evidence which did not exist. Nor did they perform deficiently in

failing to investigate a disorder which they did consider and then presented to the jury.

> ii. *Rivera was not Prejudiced by Deficient Performance of Trial Counsel.*

The state habeas court found that, even if there were any deficiencies in the presentation of the mental health evidence, Rivera could not show prejudice, the second Strickland prong. (See id. at 67-68 (holding Rivera failed to show "any new evidence of bipolar disorder so prejudiced him that there is a reasonable likelihood that the outcome of petitioner's guilt innocence phase would have been different").) It found the habeas evidence was cumulative of that which was already presented at trial, and Rivera continued to adamantly deny being sexually abused. Therefore, Rivera could not have been prejudiced by his trial counsel's failure to obtain this evidence because it would not have been meaningful. (Id. at 67-71.) It held, Rivera "failed to prove prejudice as he has not provided any evidence to suggest a reasonable likelihood that the outcome would have been different with the 'new' evidence he presented in habeas, as there is not any new evidence of abuse." (Id. at 41.) The Court wholly agrees with the state habeas court's determination of this issue.

Precedent, including Strickland itself "places a demanding burden on a convicted defendant to show that he was prejudiced by his counsel's deficient performance." Pye, 50 F.4th at 1041.

Rivera did not meet this burden at state habeas, and, because the state habeas court reasonably applied Strickland, the Court defers to the state habeas court's holding on that claim. But even on a direct review examination, Rivera cannot show he was prejudiced by his counsel's failure to investigate or pursue potentially mitigating mental health avenues which were nonexistent, such as supposed childhood abuse, or which were pursued, such as bipolar disorder.

Even if trial counsel had presented evidence from a medical doctor unequivocally indicating Rivera was bipolar, the jury would have additionally heard evidence that Rivera manifested antisocial tendencies as well. Rivera's recorded confessions were properly admitted and they included Rivera's own descriptions of his obviously manipulative and antisocial tendencies, (see, e.g., doc. 29-30, p. 176 (recording of Rivera describing strategy for pursuing girls who drove older vehicles as it suggested she would be without common sense and therefore, more "forthcoming.").) Chrisilee Barton described to the jury being brutally attacked, sodomized, and raped, and she identified Rivera as her attacker. (Doc. 29-28, pp. 107-38.) The jury heard doctors describe how long Marni Glista suffered, and Rivera admitted killing her on the stand. (Docs. 29-28, pp. 17-24; 30-3, p. 155.) Family members and a friend testified as to their suspicions of Rivera. (Doc. 29-29, pp. 36-57; id. at 25.) Rivera gave in-court admissions of

committing other heinous crimes all the while simultaneously self-aggrandizing and pitying himself. (See doc. 30-3, p. 132 ("I had no intention of being arrested. . . . My intention would be to be dead. But I screwed that up, like everything else."); see also id. at 132-33 ("Because after all, without my confessions, nobody would have known about Tabatha and Mellissa. Nobody would have known about Tiffany and Marni."). These are merely a few of the multitudes of examples of the evidence showing Rivera manifested antisocial tendencies, as well as being overwhelming evidence against him, generally. In other words, the jury heard more than enough aggravating evidence to convict Rivera without Dr. Sachy's testimony. Thus, Rivera's three arguments that counsel performed deficiently in the trial phase by relying upon Dr. Sachy and not Dr. Lisak and by not emphasizing Rivera's bipolar disorder, choosing instead to pursue the PET scan defense, fail, and Rivera has not shown he was prejudiced by any supposed deficiency.

> iii. *Trial Counsel was not Ineffective During Penalty Phase.*

Rivera argues trial counsel's performance in the sentencing phase was deficient in the same ways it failed in the guilt phase. As to trial counsel's effectiveness during the sentencing phase, the state habeas court found that trial counsel's attempt to create sympathy for Rivera while highlighting the good things he had done and attempting to show that he was remorseful was a reasonable

strategy.  (Doc. 37-16, p. 72.)  It noted the limitations placed upon trial counsel by Rivera, and that, despite this, they presented multiple witnesses.  (Id. at 73.)  It also noted trial counsel informed the trial court they disagreed with Rivera's decision to testify during the sentencing phase of the trial, but the trial court allowed Rivera to testify because "the law afforded Petitioner the right to control his case." (Id. at 75.)  The state habeas court then acknowledged trial counsel's sentencing phase closing arguments, where trial counsel argued to the jury they should spare Rivera's life.  (Id. at 79.)  The state habeas court relied on the admonition that "[t]he fact that [Petitioner] and his present counsel now disagree with the difficult decisions regarding trial tactics and strategy made by trial counsel does not require a finding that [Petitioner] received representation amounting to ineffective assistance of counsel." (Doc. 37-16, p. 71 (quoting Stewart v. State, 440 S.E.2d 452, 455-56 (Ga. 1994).

Presently, Rivera argues, given trial counsel's "descriptions of [Rivera] as a psychopathic killer," . . . "[t]hat the jury nonetheless deliberated over sentence for over eight hours is astonishing." (Doc. 142, p. 164.)  However, that the jury deliberated for so long is a testament to the difficulty of their decision, given the complicated scientific evidence before them. Moreover, the sanctity of their choice should not be questioned on the unsupported grounds provided by Rivera herein, such as the

98

elusive child abuse or Rivera's bipolar disorder (which was presented). During sentencing, trial counsel sought to show Rivera was human, and he had children (doc. 30-6, p. 21) and redeemable qualities, such as his intelligence and acumen for poetry (doc. 30-6, p. 208). His sister's testimony attempted to garner sympathy for Rivera's childhood. She testified about their father and his pornographic magazines, how he once became incapacitated due to "pills," his big ego, his penchant for humiliating people "with his mind," and his gambling addiction. (Doc. 30-6, pp. 49-52.) She said he was verbally abusive but overall, she said her childhood was "normal." (Id. at 49-53.) She testified as to Rivera's relationship with his children, which she described as "very, very sweet, more than sweet." (Id. at 56.)

In an apparent attempt to dispel concerns from the guilt phase, and against trial counsel's advice, Rivera testified in a rambling soliloquy about how everyone involved was attempting to manipulate the jury, not just him. (Doc. 30-6, p. 123.) ("My lawyers have been trying to manipulate the trial throughout . . . the whole trial."); id. ("And I have, also. Everybody has.") He asked the jury to give him the death penalty, opined about the state's expert witness's expertise, and claimed that he still fantasized about hurting people. (Id. at 125-30.) He warned "if [he] got life without the possibility [] and five, ten years down the road my slickness—all of a sudden I change[] my mind, and I

start thinking well, hold on a second, I think, I think I'm tired of being in prison, I think I'm going to get myself some slick lawyer and try to get it changed and get an appeal." (Id. at 128-29.)   Then, Rivera's emergency doctor testified as to his attempt to commit suicide, (id. at 133-36), as well as the investigator who found him just after he did so, (id. at 137-47.)   Whether or not the jury believed him and the witnesses regarding Rivera's inner conflict, this portion of testimony was obviously intended to indicate Rivera was contrite and alarmed by his own impulses, that he was not an oblivious monster.

The next witnesses testified Rivera tried to seek help just after he murdered Tiffany Wilson.   Matthew Ciechan, M.D. testified that on December 6, 1999, Rivera sought his assistance with sex addiction, but he also noted Rivera never followed up on his treatment.   (Id. at 147-50.)   On cross-examination, he was asked whether Rivera admitted he "raped, sodomized, and murdered Tiffany Wilson in Aiken County" two days prior to his appointment with Dr. Ciechan, and Dr. Ciechan responded he did not.   (Id. at 151.) Similarly, Steve Hartman, a pastor, testified Rivera sought his assistance in the same month.   (Id. at 152-59.)   Rivera was concerned with whether he would be forgiven for sexual addiction. (Id. at 156.)   Pastor Hartman noted Rivera had to make a phone call during their conversation, and Rivera abruptly went from being distraught to "casual and normal," even "joking." (Id. at 158.)

When Pastor Hartman followed up a few weeks later, Rivera responded he was doing well.  (Id.)  Finally, Dr. Pino's testimony that Rivera willingly participated in an anonymous research study on homicides conveyed Rivera wished to offer more understanding to society as a whole and he sought no fame from his deeds.  (Id. at 164-65.)

The Court agrees with the state habeas court; trial counsel did not perform deficiently in the sentencing phase.  Trial counsel did what they could with what Rivera allowed them to present, and it was impactful, as indicated by the eight-hour jury deliberation.  Moreover, Rivera did not show he was prejudiced by trial counsel's supposed deficiency in the sentencing phase.  As noted above, when assessing prejudice in the capital sentence context, "the question is whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."  Strickland, 466 U.S. at 695.  In determining whether there is a reasonable probability of a different result, a court must "consider 'the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding'—and 'reweig[h] it against the evidence in aggravation.'"  Porter v. McCollum, 558 U.S. 30, 41 (2009) (quoting Williams v. Taylor, 529 U.S. at 397-98).

The state habeas court properly followed this law when it found "with no evidence to support his allegations of sexual abuse, besides mere conjecture and speculation, and additional mental health opinions, mostly consistent with those presented at trial, it is not reasonably likely that the jury would have returned a different verdict as to [the] sentence had Petitioner presented the weak evidence that he presented in the habeas hearing." (See doc. 37-16, p. 81 (acknowledging "[a] verdict 'with overwhelming record support' is less likely to have been affected by errors than one 'only weakly supported' by the record.") (quoting Strickland, 466 U.S. at 696)). And, while prejudice can indeed be proven if "there is a reasonable probability that at least one juror would have struck a different balance," see Wiggins v. Smith, 539 U.S. 510, 537 (2003), the state habeas court reasonably concluded that no juror would have been swayed by Dr. Lisak's weak testimony.

Rivera simply cannot show "no fairminded jurist" would have done as the state habeas court did in denying his claim. See Raulerson, 928 F.3d at 995-96 (quotation omitted); see also Morrow v. Warden, 886 F.3d 1138, 1152 (11th Cir. 2018) (holding state court "reasonably concluded" petitioner's "new evidence would not have shifted 'the balance of aggravating and mitigating circumstances'") (citation omitted). In addition, "because the Strickland standard is a general standard, a state court has even

more latitude to reasonably determine a defendant has not satisfied that standard." Knowles v. Mirzayance, 556 U.S. 111, 123 (2009); see also Renico, 559 U.S. at 776, ("Because AEDPA authorizes federal courts to grant relief only when state courts act unreasonably, it follows that '[t]he more general the rule' at issue—and thus the greater the potential for reasoned disagreement among fair-minded judges—'the more leeway [state] courts have in reaching outcomes in case-by-case determinations.'" (quoting Yarborough, 541 U.S. at 664)). Therefore, in giving the state habeas court its due latitude, the Court must defer to its decision.

After considering the evidence presented throughout the record, this Court finds Rivera was not prejudiced in the sentencing phase. The jury sentenced Rivera to death based on finding him guilty of brutally murdering, sodomizing, raping, and assaulting Marni Glista, as well as committing heinous crimes against three other women. (Doc. 29-1, pp. 11-19.) The scant habeas evidence that Rivera might have been in the proximity of abusers while in school (doc. 31-28, pp. 81-85) and the cumulative evidence that he is bipolar, when weighed against Rivera's own denial of abuse, confessions and detailed descriptions of crimes, the testimony of a surviving victim and family members, and aggravating similar transaction evidence, simply do not create a "substantial" likelihood of a different result. Harrington, 562

U.S. at 112 ("The likelihood of a different result must be substantial, not just conceivable."). Rivera's Claim 1(a), that trial counsel conducted an inadequate investigation into Rivera's mental health and misused the experts upon which they relied regarding his mental health and then presented an incoherent defense fails and so is **DENIED**.

E. Respondent Did Not Waive the Exhaustion Defense to Claims 1((b), (c), (e), or (g) by Merely Listing Claims in Its Answer as Properly Before The Court

Rivera asserts other various ineffective counsel claims in Claim One, and some of them were not exhausted. Respondent's operative and most recent Answer, (doc. 42), contains a section entitled "Claims Properly Before this Court for Review," with the subtitle "Allegations of this Petition that are Reviewable Under § 2254(d)," under which many of Rivera's ineffective counsel assertions are listed. (See doc. 42, p. 19 ("aa) trial counsel failed to fully litigate a motion for change of venue and failed to protect Petitioner's right to be tried in an impartial forum."); see also id. ("bb) trial counsel failed to demand and/or improperly waived Petitioner's right to demand that the jurors be sequestered and sheltered from press coverage of the trial"); id. at 18; ("q) "trial counsel failed adequately to litigate the suppression of Petitioner's pretrial statements to police;"); ("w) trial counsel

failed to make adequate or timely objections to the prosecutor .
. ."); and ("x) trial counsel failed to object to improper and
prejudicial mischaracterizations of evidence.").)[7]  Upon this
Court's Order to brief "procedural default, exhaustion and the
merits of the claims before the Court," (doc. 107), the parties
briefed their assertions and defenses.  In his responsive brief,
Respondent argued certain ineffective counsel claims were not
exhausted, including many listed under the section of its Answer
entitled "properly before the court."  (See doc. 145, pp. 208-15,
226-28.)  Rivera replied that Respondent waived the exhaustion
argument in his Answers by placing them within a section purporting
to list claims properly before the Court.  (See doc. 150, pp. 51-
52.)

     The Court directed further briefing as to the claim trial
counsel failed to object to inappropriate comments by the
prosecutor.  (Doc. 157.)  The Court noted (1) Respondent only
asserted failure to exhaust and did not argue the merits of this
claims; and (2) Rivera did not fully brief whether the Court should
excuse the alleged failure to exhaust but instead relied only upon
their waiver argument.  (Id. at 1-2.)  Briefing ensued as to that
single claim, and Rivera re-asserted his argument that, by
including the claim in a section purporting to list claims as

---

[7] The above is similarly stated in the corresponding section of Respondent's
Answer to the Original Writ.  (Doc. 28 at 19.)

properly before this Court for review, Respondent expressly waived the exhaustion defense as to all Rivera's ineffective assistance claims.    (Doc. 158, pp. 5-6.)   Respondent argued the general claims asserted in Rivera's state habeas petition and re-alleged in the federal petition are distinct from those asserted in the briefing, and therefore, it never waived exhaustion as to the claim presently at issue.  (See doc. 159, 5-6.)  Before the Court reaches the issue of whether Rivera has exhausted these claims and whether the Respondent waived its argument that Rivera failed to exhaust these claims, a discussion of waiver in the § 2254 context is necessary.

Rivera's    initial    argument    that    Respondent    waived    the exhaustion defense primarily relies on an Eleventh Circuit opinion incorporating law which predates AEDPA.  (Doc. 150, p. 52 (citing King v. Chase, 384 F. App'x 972, 974 (11th Cir. 2010) (unpublished) ("[T]he state either may waive exhaustion expressly, or impliedly by failing to raise the issue or arguing that exhaustion would be futile.") (relying on Thompson v. Wainwright, 714 F.2d 1495, 1503-04 (11th Cir. 1983)).)   Prior to AEDPA's enactment, the Eleventh Circuit  indeed  held  "the  State  may  waive  exhaustion  either expressly or impliedly," but even then, a failure to initially assert waiver appeared to be redeemable on appeal.  Atkins v. Att't Gen. of State of Ala., 932 F.2d 1430, 1431 (11th Cir. 1991); see also id. (explaining such waiver occurs "[w]hen the State has not

raised lack of exhaustion in the district court *or on appeal*")
(emphasis added) (citations omitted).

Where AEDPA applies, though, states will not be deemed to
have waived the exhaustion requirement unless they indicate their
intention to waive the requirement *expressly*. See <u>Kelley v. Sec'y</u>
<u>for Dep't of Corr.</u>, 377 F.3d 1317, 1351 n. 33 (11th Cir. 2004)
(emphasis added) (citing 28 U.S.C. § 2254 (b)(3) ("A State shall
not be deemed to have waived the exhaustion requirement or be
estopped from reliance upon the requirement unless the State,
through counsel, expressly waives the requirement.")).    A
respondent properly waives its argument via its Response when it
does so in compliance with Rule 5 of the Rules Governing Section
2254 Cases in the United States District Courts.  Rules Governing
Section 2254, Rule 5.  In his supplemental reply brief, Rivera
claims Respondent "could not have steered this Court towards the
merits of these allegations much more explicitly," but it certainly
did not state a waiver in terms compliant with Rule 5.  (Doc. 160,
p. 8.)

In § 2254 cases, "[t]he state's waiver of exhaustion is, in
essence, a statement that the federal court's entertainment of the
petitioner's unexhausted claim will not offend any state interest,
or disserve the interests of comity and federalism, and that, as
a matter of justice, the claim should be heard and disposed of
forthwith and on the merits without further state court

litigation." Esslinger v. Davis, 44 F.3d 1515, 1525 (11th Cir. 1995). The Supreme Court has treated the forfeiture of affirmative defenses such as this in § 2254 cases differently than other civil cases because the habeas "exhaustion doctrine . . . is founded on concerns broader than those of the parties; in particular, the doctrine fosters respectful, harmonious relations between the state and federal judiciaries." Wood v. Milyard, 566 U.S. 463, 471 (2012). See, e.g., Granberry v. Greer, 481 U.S. 129, 133–34 (1987) (holding courts have discretion to consider nonexhaustion argument *inadvertently* overlooked by State in district court and instructing lower courts to consider "whether the interests of comity and federalism will be better served by addressing the merits forthwith or by requiring a series of additional state and district court proceedings before reviewing the merits of the petitioner's claim."); Day v. McDonough, 547 U.S. 198, 201–205 (2006) (holding "district courts are permitted, but not obliged, to consider, *sua sponte,* the timeliness of a state prisoner's habeas petition" because AEDPA's statute of limitations, like the exhaustion doctrine, "implicate[s] values beyond the concerns of the parties."); see also Esslinger, 44 F.3d at 1524 ("But this is a habeas corpus case, and in these cases circumstances may counsel that the district court raise *sua sponte* a procedural bar to relief that the state has 'waived.'").

The Supreme Court has clarified it would be "an abuse of

discretion" for a court "to override a State's *deliberate* waiver of a limitations defense." Day, 547 U.S., at 202 (emphasis added). Further explanation through Wood v. Milyard elaborates. 566 U.S. 463, 466 (2012). There, the state "*deliberately* steered the District Court away from the question and towards the merits of Wood's petition," knowing it had an "arguable" statute of limitations defense. Id. at 474. Yet it chose, "in no uncertain terms, to refrain from interposing a timeliness 'challenge' to Wood's petition." Id. In that case, the State twice informed the district court that it "will not challenge, but [was] not conceding" the timeliness of Wood's petition. Id. The Supreme Court found the Court of Appeals abused its discretion by *sua sponte* considering the timeliness issue where there was a "deliberate decision to proceed straightaway to the merits." Id. at 473. In other words, unless the waiver is deliberate, the Court may *sua sponte* consider a procedural defense or even a belatedly asserted defense. Kontrick v. Ryan, 540 U.S. 443, 458, n.13, (2004)(quoting United States v. Olano, 507 U.S. 725, 733 (1993)) ("Waiver is the 'intentional relinquishment or abandonment of a known right.'")

Here, there is no indication the "state was aware of the exhaustion arguments and communicated to the court its intention not to pursue them." Vazquez v. Sec'y, Fla. Dep't of Corr., 827 F.3d 964, 967 (11th Cir. 2016). Instead, the state merely failed

to place them in their proper delineated category as claims not subject to merits review.   A twice-made statement that a party "will not challenge" (as in <u>Wood</u>), or a concession that claims were "fairly presented to the state court and are exhausted" (as in <u>Vazquez</u>), are hardly similar to listing a claim within a subheading entitled "Claims Properly Before This Court for Review" without explicit statement as to the status of exhaustion.   <u>But see</u>, <u>Esslinger</u>, 44 F.3d at 1520 (where Respondent claimed "Petitioner has exhausted his State remedies for purposes of federal habeas review and he has not procedurally defaulted on any of his claims," exhaustion defense was waived).   Therefore, Respondent here did not deliberately steer the Court toward the merits of Rivera's miscellaneous ineffective assistance claims in the manner required to waive the exhaustion defense.

Respondent's additional argument is that some of Rivera's claims are inherently different than the ones he brought in state court and also different from those which he pleaded in the Amended Petition.   In an instance much like the one before this Court, the Eleventh Circuit in <u>Kelley v. Sec'y for Dept. of Corrections</u>, 377 F.3d 1317 (11th Cir. 2004) held that, where the petitioner's federal habeas petition "assumed a strikingly different hue" from the theories for relief asserted in his state petition, the claims were unexhausted. <u>Id.</u> at 1348.   There, Kelley's state claims were considered "broad" and concerned a generalized claim that counsel

was ineffective for "failure to develop defense theories." Id. at 1344-48 ("This ineffective assistance claim was not merely a clarified rendition of an exhausted claim, but a new claim altogether."). Kelley's federal petition expended almost seventeen pages arguing a single point arguably within the confines of that generalized claim, but the specifics of which went unaddressed by the Florida courts. The Eleventh Circuit refused to "recharacterize" the claim at the late hour because it would "fundamentally alter the legal claim[s] already considered by the state courts" such that [it] could not consider the restated claim as exhausted. Id. at 1350 (citing Vasquez v. Hillery, 474 U.S. 254, 260 (1986). It further held "concerns for comity, judicial efficiency, and fairness to the respondent preclude us from finding that the ineffective assistance claim . . . was properly exhausted." Id. Contemporaneously, the Court rejected the petitioner's argument that the state waived the requirement of exhaustion. Id.

Similarly, in this case, there are several instances where Rivera has, through briefing, implicitly amended his own Petition by broadening his claim to the extent it is either wholly new from the claims presented to the Georgia courts or is simply violative of the Rules Governing § 2254 cases, pleading standards, and the applicable statutes. Accordingly, Respondent's additional argument that the claims are unexhausted not merely because they

were not raised previously, but because they are new or
impermissibly broadened claims altogether, is convincing. (See
doc. 159, pp. 5-6.) Thus, acknowledging the federal court's
interests in comity and federalism, the Court finds Respondent did
not waive the exhaustion defense, both because it has not done so
deliberately, and because Rivera has impermissibly attempted to
bring new claims in certain instances, as specified below.[8]
Kelley, 377 F.3d 1317. Rivera's requested hearing on the issue is
unnecessary and therefore overruled. (See doc. 150, pp. 56-60.)

F. Rivera's Miscellaneous Ineffective Assistance Claims Fail.

Upon this backdrop, and accepting Respondent's exhaustion
defense, the Court addresses each of Rivera's remaining
miscellaneous ineffective counsel claims in turn.

  i.   Petitioner Failed to Exhaust Claims 1(b) and (c), and
       They Were Properly and Reasonably Decided by the State
       Habeas Court.

Rivera contends in Claim 1(b) that trial counsel was
ineffective in failing to fully litigate the change of venue
motion, and in 1(c) he claims their failure to pursue jury
sequestration was similarly ineffective. (Doc. 142, p. 165.)
Respondent argues Rivera failed to appeal these claims from the

---

[8] In so holding, the Court is mindful of the factors discussed in Thompson v.
Wainright, which guide courts on whether to accept waivers. 714 F.2d at 1509
(holding district court in its discretion may either accept or reject an
exhaustion waiver as to one or more issues). That the Court may decline to
accept a waiver at all strengthens Respondent's position, but the Thompson
factors are not in issue because there has been no express waiver in the first
place.

state habeas court to the Georgia Supreme Court, and they are thus unexhausted. In the alternate, Respondent asserts that, even assuming the arguments were exhausted, the claims were properly and reasonably decided by the state habeas court. (Doc. 145 p., 211-215.) Rivera retorts that Respondent waived its procedural default arguments in its answers to Rivera's original and amended petitions, and that he did exhaust. (See Doc. 150, p. 51 (citing docs. 1, pp. 8-19; 28, pp. 15-20; 41, pp. 8-19, 42, pp. 16-21).)

In his Application to Expand the Georgia Supreme Court's Prior Grant of CPC to Appeal, Rivera included what Respondent references as a "catch-all" footnote claiming to incorporate all his claims raised in the state habeas court. (See doc. 38-22, p. 1, n.1.) It was also present in Rivera's original CPC Application. (Doc. 37-21, p. 4, n.1.) The footnote contained in the Application to Expand attempts to incorporate by reference Rivera's state habeas arguments into his expanded CPC appeal to the Georgia Supreme Court, as well as his prior CPC arguments into the latter CPC expansion. Respondent asserts that, pursuant to Georgia Supreme Court Rule 22, titled "Briefs: Argument and Authority," allegations of error which are not supported by argument or citation of authority are deemed abandoned, and therefore, the footnote did not preserve the argument for exhaustion purposes. (Doc. 145, pp. 42-46.)

First, the Court notes that:

113

> "the exhaustion doctrine requires a habeas applicant to
> do more than scatter some makeshift needles in the
> haystack of the state court record. The ground relied
> upon must be presented face-up and squarely; the federal
> question must be plainly defined. Oblique references
> which hint that a theory may be lurking in the woodwork
> will not turn the trick."

Kelley, 377 F.3d at 1345 (quoting Martens v. Shannon, 836 F.2d

715, 717 (1st Cir. 1988; see also McNair v. Campbell, 416 F.3d

1291, 1302 (11th Cir. 2005) ("In order to be exhausted, a federal

claim must be fairly presented to the state courts."). Thus, such

a catch-all footnote fails to properly present and clearly define

a claim for exhaustion purposes.

Second, Rivera's arguments which rely upon Whatley v. Terry,

(see doc. 150, p. 54), for the premise that Rule 22 has no bearing

on "how CPC applications must be written" is inapposite. 668 S.E.

2d 6514, 664 (Ga. 2008). There, the Georgia Supreme Court

addressed claims not included in a CPC application, but which were

theoretically preserved in a footnote. Id. One of those preserved

claims was later fully briefed to the CPC appellate court, however,

and the CPC court addressed it, finding it meritless. Id. at 660-

61. All other claims emanating from the footnote were held to be

abandoned. Id. at 664. Rivera cites no instance where the claims

he seeks to put before the federal court were pursued in the same

manner, but he asserts the footnote alone constitutes exhaustion,

given the Whatley Court's CPC review of the matters originally

asserted in a similar footnote which were later briefed. The fact

that Rivera did not brief some of his claims at any stage of the CPC process distinguishes this case from Whatley for exhaustion purposes, notwithstanding the Whatley Court's supposed passive treatment of Rule 22 in the CPC context.  This claim is unexhausted and thus it is not properly before the Court.  Pope v. Rich, 358 F.3d 852, 853 (11th Cir. 2004) (holding Georgia prisoner who did not apply for certificate of probable cause to appeal failed to exhaust state court remedies as required by § 2254(b)(1)); see also O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999) ("State prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process.").

Respondent also prevails on the merits.  See § 2254 (b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."); see also Snowden v. Singletary, 135 F.3d 732, 736 (11th Cir. 1998) (holding "when it is obvious that the unexhausted claims would be procedurally barred in state court due to a state-law procedural default, we can forego the needless "judicial ping-pong" and just treat those claims now barred by state law as no basis for federal habeas relief.").  Rivera asserts trial counsel was incompetent because they "apparently labored under the misapprehension that the only way to qualify for a change of venue was through evidence

adduced about the jury pool during voir dire." (Doc. 142, p. 267.)
He then asserts trial counsel was incompetent for failing to
request jury sequestration because jury sequestration is "the
default position in Georgia" in death penalty cases. (Id. at 178.)
He claims he was prejudiced by this incompetence, noting the "flood
of media coverage" which "deprived him of his right to an impartial
fact-finder." (Id. at 171-77.)

However, because the court applies AEDPA deference, examining
this question on a direct Strickland test is improper. Instead,
the Court must determine whether the state habeas court's
determination that trial counsel's failure to pursue change of
venue and sequestration was effective assistance constituted a
reasonable application of law. Harrington, 562 U.S. at 105. The
question remains the same as the prior claim: whether there is any
"reasonable argument that counsel satisfied Strickland's
deferential standard." Id.

The state habeas court's examination of these claims was
straightforward. (See doc. 37-16, pp. 28, 30.) It noted trial
counsel testified that, after conducting extensive research, they
determined they could not meet the legal threshold for a change of
venue, and thus there was no basis for the motion. (Id.; see also
doc. 29-4, pp. 41-47 & cont'd 29-5, pp. 1-6 (Motion for Change of
Venue filed 12/5/2000).) It then found, as to prejudice, "there
was no reasonable probability that a change of venue would have

116

been granted ultimately resulting in a different outcome." (Id.)
Likewise, as to the sequestration issue, the state habeas court
held, "counsel were not ineffective in failing to ensure that the
jury was sequestered during Petitioner's capital trial." (Doc.
37-16, p. 30.)  Because it was Rivera's decision not to sequester
the jury, the state habeas court found the trial court properly
abided by Georgia law, which allows even a death penalty defendant
to consent to a jury dispersing, foregoing sequestration. (Id.
(citing O.C.G.A. § 15-12-142(a), Lamar v. State, 598 S.E.2d 488,
155-56 (Ga. 2004), and (Jones v. State, 256 S.E.2d 907, 911 (Ga.
1979)).)  It also found Rivera failed to establish the jury's
decision in either phase of the trial was impacted by the exposure
to allegedly "pervasive pretrial publicity," and that, "therefore,
Petitioner has failed to establish any deficiency on the part of
trial counsel or any prejudice for not having the jury
sequestered." (Id.)

The state habeas court's holding that trial counsel made a
strategic decision not to pursue the change of venue motion which
they believed to be meritless, based on their professional
judgement, constitutes a "reasonable argument that counsel
satisfied Strickland's deferential standard." Harrington, 562
U.S. at 105; see also Baldwin v. Johnson, 152 F.3d 1304, 1313 (11th
Cir. 1998) (where counsel made tactical decision not to pursue
change of venue, no deficient performance) (citing Strickland, 466

U.S. at 681 ("[S]trategic choices must be respected . . . if they are based on professional judgment.")). Their professional judgment is no less deserving of Strickland deference even considering Rivera's disagreement as to the best approach to obtaining a change of venue. Moreover, as Respondent has noted, Rivera failed to demonstrate he suffered any prejudice. Therefore, the state habeas court's finding of no prejudice was a reasonable application of clearly established law which was determinative of this Strickland claim. The Court defers to this reasonable application of law and a reasonable interpretation of facts under AEDPA and denies relief to him on that portion of Claim 1(b) which argued trial counsel was ineffective for failing to pursue a change of venue motion.

Next, as the state habeas court pointed out, sequestration can be waived by even a capital defendant. (Doc. 37-16, p. 30.) During the discussion of sequestration, Rivera focused his concerns on one juror, claiming "she was going to have an anxiety attack" if she was not excused. (Doc. 29-24, p. 300.) He declined to require the jury to sequester. (Id. at 299.) Therefore, the state habeas court's determination that trial counsel was not ineffective in failing to request sequestration was reasonable, both in its interpretation of facts and application of law. The Court denies relief to him on that portion of Claim One arguing trial counsel was ineffective for failing to pursue sequestration.

118

Claims 1(b) and (c) are, therefore, **DENIED**.

    *ii.   Rivera Did Not Properly Plead Claim 1(d) in His Petition, He Failed to Exhaust It, and it Fails on the Merits.*

In claim 1(d), Rivera argues trial counsel was ineffective in failing to object to repeated biased statements made before the jury by the trial court judge. (Doc. 142, p. 179-184.) Respondent counters this claim is not exhausted, and Rivera again argues that Respondent waived the exhaustion argument. (Doc. 150, p. 51.; Doc. 145, p. 228.) As explained below, the claim fails because Rivera failed to assert it properly in the federal petition, the claim is unexhausted, and the claim fails on the merits.

In his Amended Petition, Rivera asserted this claim within a footnote to the underlying substantive claim alleging trial court error. (See doc. 41, p. 34, n.10.) The footnote states "[t]o the extent that prior counsel failed adequately to litigate and/or make timely objections with regard to the above-described claims, or to raise them adequately . . . counsel rendered prejudicially deficient performance." [9] (Id.) Rivera did not include elsewhere within the Amended Petition a substantive, separate claim of

---

[9] Such a cursory inclusion by footnote hinders proper briefing of issues and fails to allow the Court to fully consider the merits of claims alleged. See Torres v. Goddard, 2008 WL 1817994, at *1 (D. Ariz. Apr. 22, 2008) (striking footnote and holding "[i]f an allegation bears an essential or important relationship to the claim for relief, it warrants inclusion in the body of the pleading")

ineffective assistance of counsel based on trial counsels' failure to object to trial court impropriety. (See generally doc. 41.)

When filing a petition pursuant to § 2254, "[h]abeas petitioners must meet heightened pleading requirements." McFarland v. Scott, 512 U.S. 849, 856, (1994) (citing Rules Governing Section 2254, Rule 2(c)). Accordingly, "generalized allegations are insufficient in habeas cases." Hittson v. GDCP Warden, 759 F.3d 1210, 1265 (11th Cir. 2014). Instead, petitioners are required to "specify all the grounds for relief available to the petitioner" and "state the facts supporting each ground" in their petition. Rules Governing Section 2254, Rule 2(c); see also 28 U.S.C. § 2254. Petitioners must assert their grounds for relief by substantially following the form appended to the Rules Governing Section 2254 cases or a form prescribed by a local district rule. Rules Governing Section 2254, Rule 2(d). In other words, habeas petitions must contain "'fact pleading' as opposed to 'notice pleading.'" Borden v. Allen, 646 F.3d 785, 810 (11th Cir. 2011); see also Arrington v. Warden, GDCP, 2017 WL 4079405, at *1 (S.D. Ga. Sept. 14, 2017) (quoting Hittson, 759 F.3d at 1265 (same); Fed. R. Civ. Proc. 8(a) (authorizing factual pleadings under §§ 2254 and 2255). Finally, as is often repeated by this Court, "those who seek habeas relief cannot simply laundry-list their claims and hope that the court will develop . . . them on their behalf." Jeffcoat v. Brown, 2014 WL 1319369, at *8 (S.D. Ga. Mar.

27, 2014) (citing Holmes v. United States, 876 F.2d 1545, 1553 (11th Cir. 1989)).

Here, Petitioner's claims were insufficiently pled. Specifically, Rivera's speculative allegation (that trial counsel was ineffective for failing to object to the trial court's involvement) in his Amended Petition was conditional and vague, (i.e., "to the extent that trial counsel failed to object . . ."), and it was not laid out as a separate ground in compliance with Rule 2(c) but was instead buried within a footnote among a 59-page petition. (Doc. 41, p. 27). Therefore, it does not state any facts supporting the ground and barely "specifies" the ground for relief he seeks at all. Accordingly, this claim is insufficient, based on the heightened pleading requirements of 28 U.S.C. § 2254 Rule 2(c) and based on the Eleventh Circuit's interpretation of Rule 2(c) in Hittson. 759 F.3d at 1265.

In addition, Rivera's argument, even as insufficiently articulated in the petition, fails because it is unexhausted and no state court opinion is available to which the Court might defer. See Gaylor v. Harrelson, 962 F. Supp. 1498, 1499 (N.D. Ga. 1997) ("When read in conjunction with the exhaustion requirement contained in § 2254(b)(1) and the waiver requirement contained in § 2254(b)(3), § 2254(b)(2) creates a confusing statutory framework within which courts must consider habeas petitions containing nonexhausted claims."). Rivera claims Respondent

waived its exhaustion argument but Respondent did not list this claim within the section of his Answer entitled "Claims Properly Before This Court for Review." (See doc. 42, pp. 15-24.) Therefore, there is no argument Respondent expressly waived the exhaustion requirement of this claim. 28 U.S.C. § 2254(b)(3).

Yet the Court nonetheless considers the merits. See 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.") In his argument supporting his ineffective assistance claim, except for his title sentence to the section pertaining to this argument, (see doc. 142, p. 179), Rivera omits argument relevant to ineffective assistance. (See id. at 179-85.) He relies on facts supporting the underlying trial court error, asserting several instances of trial court impropriety. He claims the trial court: directed Rivera's sister-in-law to testify as to hearsay, undertook its own examination of witnesses, interrupted defense counsel to insinuate the anticipation of a penalty phase, improperly questioned experts indicating the court's disdain for the questions posed by defense counsel, chastised counsel for failing to ask experts questions about issues it deemed important, and asked follow-up questions which clearly indicated the judge's own "biased" opinion of Rivera. (Doc. 142, p. 179 (citing docs. 29-27, pp. 162, 163; 29-28, pp. 149, 151-52; 29-29, pp. 12-13, 20-

21, 25-26, 28-29, 39, 44-45, 49, 50, 52-53, 56, 67, 83, 108; 29-30, pp. 61, 64, 68, 80, 90, 135, 136; 30-3, p. 62, 71, 112).).

Rivera claims this behavior indicated the court was patently "not neutral" and likewise asserts the error is "structural in nature and inherently prejudicial." (See doc. 142, p. 184.) Whether the trial court's intervention was "inherently prejudicial" is not the issue of concern on this ineffective assistance claim. Instead, the relevant *ineffective assistance* question at federal habeas review is whether trial counsels' failure to object to the allegedly improper intervention constituted prejudicially deficient performance. It is perfectly clear Rivera has failed to state even a colorable claim on that front. See Granberry, 481 U.S. at 134-35 (holding that, when deciding whether court may deny an unexhausted petition on merits, pursuant to § 2254 (b)(2), test is whether it is "perfectly clear" petitioner has failed to state "even a colorable" claim.)[10]; 28 U.S.C. § 2254(b)(2).

Petitioners must *argue* their claims. Fils v. City of Aventura, 647 F.3d 1272, 1284 (11th Cir.2011) ("district courts cannot concoct or resurrect arguments neither made nor advanced by parties."). Overlooking Rivera's oversight in articulating this claim is inappropriate, and for good reason. On Strickland's

---

[10] But see 28 U.S.C. § 2254 (b)(3), overruling Granberry to the extent that the State no longer may be deemed to impliedly waive the exhaustion requirement. Passage quoted remains binding as incorporated into § 2254 (b)(2).

performance prong, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Strickland, 466 U.S. at 689 (citing Michel v. Louisiana, 350 U.S. 91, 101 (1955); accord Williams v. Head, 185 F.3d at 1227-28 (presuming counsel rendered effective assistance). "Counsel's competence . . . is presumed, and the [petitioner] must rebut this presumption by *proving* that his attorney's representation was unreasonable under prevailing professional norms and that the challenged action was not sound strategy." Kimmelman v. Morrison, 477 U.S. 365 (1986) (emphasis added) (citations omitted). Here, because Rivera has failed to articulate his ineffective assistance claim, there is no direction to the record provided from which the Court may assess the propriety of counsel's failure to object to the trial judge's statements. "An ambiguous or silent record is not sufficient to disprove the strong and continuing presumption." Chandler, 218 F.3d at 1314-15 n.15.

Furthermore, even if some attorneys may have pushed back on the judge's alleged behavior, hindsight is not permitted here. See Strickland, 466 U.S. at 689. There are a multitude of reasons why trial counsel might have withheld objections at every comment and choosing not to object and fight the trial judge at every turn,

as objecting risks jury umbrage and judicial impatience. Moreover, because the record is incomplete or unclear about trial counsel's reasons for failing to object, the Court must presume trial counsel exercised reasonable professional judgment in not making some overarching objection which would have sought curation in a holistic way. <u>Williams v. Head</u>, 185 F.3d at 1228. Trial counsel's decision not to object is not a choice no competent counsel would have made but instead falls within "the wide range of professionally competent assistance [passing] constitutional muster." <u>Philmore v. McNeil</u>, 575 F.3d 1251, 1260 (11th Cir. 2009); <u>Brewster v. Hetzel</u>, 913 F.3d 1042, 1057 (11th Cir. 2019) ("The failure to make every valid objection . . . will not necessarily take counsel's performance 'outside the wide range of professionally competent assistance,' which is the scope of permissible performance.")

Similarly, the Court finds no reason to assume Rivera was prejudiced by his counsel's failure to object to the trial judge's comments. Rivera cannot and did not show any objection would have been successful. Moreover, Rivera has directed the Court to no instances when the trial judge's comments and behavior led to evidence, impressions of witnesses, or information regarding the penalty phase being admitted where it would not have been otherwise. Specifically, as to his claim the judge improperly insinuated a penalty phase would ensue, given Rivera's confessions

125

and guilty-but-mentally-ill defense, a penalty phase portion was assumed. Additionally, even conceding hearsay was elicited on the trial judge's insistence, or that the jury noticed any supposed disdain for questions and strategy posed by defense counsel or supposed bias against Rivera, considering the avalanche of evidence against Rivera which had nothing to do with the trial judge's behavior, Rivera simply cannot show he was prejudiced by his counsel's failure to object to the trial judge.[11]

Therefore, the Court **DENIES** relief to him on Claim 1(d) because it is insufficiently pled, unexhausted, and on the merits, it lacks factual support.

> *iii. Claim 1(e) Is Not Exhausted, and to the Extent It Was Properly Pleaded, It Fails on the Merits.*

Next, in Claim 1(e), Rivera argues trial counsel failed to object to the prosecution's improper comments, made both in the guilt and sentencing phase of the trial. During the guilt phase, the prosecutor suggested Rivera entered Marni Glista's home covertly and not after convincing her to pose for explicit photos, citing untrue descriptions of evidence such as the location of lingerie found at the scene. (Doc. 142 at 186-88 (citing doc. 30-4, pp. 186-87).) Rivera contends the prosecutor made a similar

---

[11] To the extent Rivera sought to allege trial court error on the basis of the trial judge's "excessive involvement," he has not shown error that had "a substantial and injurious effect or influence in determining the jury's verdict." <u>Brecht</u>, 507 U.S. 619 at 623 (quotation marks and citations omitted). Thus that claim fails as well.

argument regarding Tiffaney Wilson, baselessly telling the jury it was unlikely Wilson would have wanted to pose for photos after having so recently given birth. (Id. (citing doc. 30-4, p. 182).) Rivera also claims the prosecution "simply made up" a story Rivera was seen chasing Wilson near the Welcome Center where Wilson's baby was found. (Id. at 188 (citing doc. 30-4, p. 183).). Rivera next alleges the prosecutor improperly enlisted the community's interest in seeing Rivera convicted and misstated the law as to burdens of proof. (Id., p. 190 (citing 30-4, pp. 188 & 196).)

Regarding the choice of penalty, the prosecutor made other allegedly inappropriate comments, telling jurors "[a]s you speak for the people of this community . . . let your verdict say this, this is a case for the ultimate punishment of death." (Doc. 142, p. 190-191 (citing Doc. 30-7, p. 8).) Rivera claims the prosecutor also argued the jury was not responsible for the death penalty by encouraging them to "not be distracted by some suggestion that the responsibility for the punishment for this defendant's crimes lies entirely and solely on anyone other than the killer." (Doc. 142, p. 191.) The prosecutor compared their role to that of a soldier storming Normandy during World War II, (doc. 30-7, pp. 11-12), he warned Rivera would kill again, (id. at 13), and he suggested only the jury could prevent future murders by sentencing Rivera to death, (id. at 21). Rivera asserts trial counsel's failure to object to these statements constituted deficient performance. As

to prejudice, Rivera claims "considering the length of time Mr. Rivera's jury deliberated, there is a reasonable likelihood that Mr. Rivera would not have received the death penalty had counsel objected to the prosecutor's improper remarks and sought curative action by the trial court." (Doc. 142, p. 196.)

Respondent initially countered only that Rivera failed to exhaust this claim, and Rivera again replied that Respondent waived its failure to exhaust argument. After the Court ordered additional briefing, Respondent focused on the non-exhaustion argument but also argued the merits failed under *de novo* review.

Relevant to this claim, Rivera asserted the following grounds in his amended state habeas petition:

> * Counsel failed to make adequate or timely objections to the prosecutor's injection of prejudicial hearsay into cross-examination questions and in closing argument, including but not limited to testimony procured in violation of the federal and Georgia constitutions; and failed to object to improper and prejudicial comments and mischaracterization of evidence at closing argument at the guilt-innocence and sentencing phases of trial;
>
> * Counsel failed to adequately object to the prosecutor's use of impermissible inferences during closing argument and failed to adequately argue any motion for a mistrial.

(Doc. 31-4, p. 8.) However, while Rivera briefed the underlying prosecutorial misconduct claim in his state habeas post-hearing brief, he did not include mention of the parallel ineffectiveness claim in his post hearing brief. (See generally doc. 37-8.) It

was not adjudicated on the merits or otherwise by the state habeas court. (See generally doc. 37-16.) As well, excepting his "catch-all" footnote discussed above, Rivera failed to fully brief this claim on CPC appeal to the Georgia Supreme Court after the state habeas court issued its opinion, as noted in Respondent's brief. (Doc. 159, p. 4; see also doc. 37-21.) In his amended federal petition, Rivera mimicked the language from grounds he had asserted in his state petition, (see doc. 41, pp. 14-15), but the brief expounds on this claim immensely. (See, e.g., doc. 142, p. 186-96.)

Respondent argues the allegations contained in both the state and federal petitions are generalized and do not provide factual foundation, whereas the claims, as articulated in the federal habeas briefing, are so specific and detailed as to constitute distinct new claims altogether. (Doc. 159, pp. 4-7.) As the current articulation is brought for the first time in briefing, Respondent argues they are not only unexhausted but improperly asserted. (Id.) Rivera does not address the discrepancy from the petition to the brief, but places blame on Respondent for the lack of state court disposition because Respondent drafted the state habeas court opinion. (Doc. 160, p. 5.) Rivera also counters that, to the extent the Court finds a lack of exhaustion, his state habeas counsel was ineffective in failing to properly exhaust this claim and thus cause exists to excuse the failure to exhaust.

(Doc. 158, pp. 11-16.)

Rivera bore the burden to articulate this claim, *i.e.*, exhaust it, and his efforts to blame Respondent for his own failure fall flat, notwithstanding its omission from the adopted order. The Court finds it most notable that Rivera did not brief this claim at the state habeas court post hearing briefing stage, meaning this claim, for all intents and purposes, likely appeared abandoned when the state habeas court ruled. Because of its omission from the briefing, the state habeas court never had the opportunity to address it as articulated herein, but only reviewed its simplistic articulation in the state petition. See Jones v. Campbell, 436 F.3d 1285, 1304 (11th Cir. 2006) (explaining petitioner does not fairly present claim to state courts by mentioning briefly in filings, "noted the allegations in his introductory and conclusory portions of his state appellate brief" but "d[oes] not raise it as a discrete claim," and where "there is absolutely no discussion by any state court of the allegation."). In other words, Respondent's drafting of the state habeas order did not impede Rivera's ability to exhaust this claim.

Likewise, its omission from the final order was not appealed. Given the lack of state court discussion, and further, the lack of appeal on that apparent neglect, the claim is unexhausted. See O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999) (holding § 2254(c) requires state prisoner to present claims to state's highest court,

even if review is discretionary); see also Pope, 358 F.3d at 854 (holding Boerckel mandates Georgia petitioner fails to exhaust state remedies by failing to petition Georgia Supreme Court for certificate of probable cause to appeal denial of state habeas petition); Cf., Johnson v. Alabama, 256 F.3d 1156, 1170 (11th Cir. 2001)(citing Hart v. Estelle, 634 F.2d 987, 989 (5th Cir. 1981) (exhaustion of state remedies requirement not satisfied where petitioner "technically asserted the same constitutional deficiency and the same facts" in federal proceeding, but did so "in support of a different legal theory")).

In addition, even if the Court were to allow Rivera to constructively amend his allegations to vastly broaden the scope of this claim, it fails.[12] See Kelley, 377 F.3d 1317. Petitioner must establish his counsels' failure to object resulted in prejudice. Strickland, 466 U.S. at 687. The record shows Rivera made his frustration about the misrepresentation of evidence known, and his complaint was effectively overruled by the court. (Doc. 30-5, pp. 11-16.) The trial court advised Rivera he would have his own turn to correct the factual details of his actions to

---

[12] Respondent's supplemental brief, (doc. 159), offers additional support for this finding as to the specific claim. Respondent appears to concede it did not dispute the exhaustion efforts in its Answer/Response in compliance with Rule 5, but he is careful to explain the reasoning and to distinguish the claim asserted from the one briefed. (See doc. 159, p. 4 ("Because these general subclaims were raised in Rivera's state habeas petition and denied by the state habeas court, Respondent had no choice but to state the general subclaims were before this Court on the merits in his answer.") (citing doc. 42-18, p. 19).) Even after being given notice, (doc. 157) Rivera has failed to direct the Court to his exhaustion of the specific claim before the Court.

the jury if he wished.  (Id. at 14-15.)  As to the penalty phase statements, at sentencing, trial counsel objected to many of the statements now claimed to be improper by Rivera.  (Doc. 30-7, pp. 14-15.)  Specifically, after asking to confer outside the presence of the jury, Johnson argued the prosecutor did not have evidence suggesting future danger, and it was improper to suggest "there will be no conditions of incarceration that will guarantee the safety of those individuals who have the responsibility of guarding him."  (Id. at 15.)  Johnson complained the prosecutor asked the jury to "imagine a scenario that is not before them as evidence." (Id.)  After some discussion, the judge held the prosecutor was required to restrict his argument to future danger to young women, given Rivera's own testimony he would kill young women like his victims again.  (Id. at 16.)  In particular, Rivera's testimony had been that:

> My ultimate purpose is to ask the jury to impose the penalty of death so that I never have the slightest chance, the slightest chance of ever being free again, because I couldn't stop before and I still can't stop. I just still fantasize about, about hurting people. I fantasize about, I fantasize about still hurting the same girls that I killed. That's how disturbing it is. I have fantasies about still killing them, not killing them, but still doing things to them. It doesn't stop.

Rivera, 647 S.E. at 78.

Johnson found the limitation insufficient and requested a mistrial, but Rivera vehemently disagreed and revoked the motion. (Doc. 30-7, p. 19.)  The court then reminded trial counsel of his

duty to observe and comply with Rivera's "wishes and his control of the case," and therefore denied the motion. (Id. at 19-20.) Even still, trial counsel was adamant, arguing Rivera had been "denied his right to a fundamentally fair trial," an objection which the court found to be merely a suggestion and not the position Rivera wished to take, and again denied. (Id. at 20.) Hawk requested a curative instruction which was denied. (Id.) The jury re-entered the courtroom and was confronted with the question from the prosecutor of "whose daughter will it be next time?" (Id. at 21.)

Finally, though his ineffective assistance claim was not squarely presented in the state court system, Rivera did appeal the underlying claim that the prosecutor made improper arguments. Rivera, 647 S.E. 2d at 79. The Georgia Supreme Court did not find the prosecutor's statements improper, and further, it found that even if they were, there would be no reversible error because there was no reasonable probability that it changed the result of the trial. Id. at 79. It specifically noted Rivera's own testimony that he would not be able to stop killing. Id.

Therefore, Rivera's claim fails for several reasons. First, he has not given the state courts a fair opportunity to review this claim. To the extent it was properly pleaded here, it was unexhausted, and any attempt to return to the state court to review it would result in a procedural default. See McNair, 416 F.3d at

1305 ("It is well established that when a petitioner has failed to exhaust his claim by failing to fairly present it to the state courts and the state court remedy is no longer available, the failure also constitutes a procedural bar."). Second, and as is specifically addressed below in Section VII pertaining to effectiveness of habeas counsel, considering the denial of the direct appeal on the underlying prosecutorial misconduct claim, his habeas counsel could not have been deficient in failing to argue a baseless claim that trial counsel failed to object to the prosecutor. Therefore, habeas counsel's allegedly deficient performance cannot constitute cause to excuse the default. Third, the Georgia Supreme Court finding there was no impropriety in the prosecutorial statements means that even if he could excuse the default, Rivera simply cannot prove he was prejudicially harmed by any failure to object to statements which were not improper in the first place. Rivera, 647 S.E.2d at 78-79. Fourth, his allegation that no objection was made and had an objection been made, things would have been different, is incorrect because objections were made. See Zakrzewski v. McDonough, 455 F.3d 1254, 1260 (11th Cir. 2006) (Where attorney was "responsive to the identified prosecutorial comments and objected and moved for a mistrial in response to other closing argument," movant failed to show deficient performance). Finally, as the Georgia Supreme Court held, Petitioner has failed to establish a reasonable probability

the outcome would have been different in the absence of the allegedly improper statements by the prosecutor.  For all of these reasons, the Court **DENIES** relief to Rivera on Claim 1(e).

> iv.  *The Court Defers to the State Habeas Court on Claim 1(f).*

Rivera next asserts his attorneys were on notice he likely suffered from bipolar disorder and were aware that treatment with an anti-depressant medication alone could exacerbate his illness and impact his trial.  (Doc. 142, pp. 196-203.)  Further, Rivera argues the fact that he was incorrectly medicated for depression, when he actually suffered from bipolar disorder, endangered his life on two occasions when he was incarcerated at the Richmond County Jail.  Rivera also complains about the cessation of all medication for diagnostic purposes, which he alleges caused similar problems.  (Id. at 198.)  Rivera ties these issues into an ineffective assistance claim, arguing the lack of proper medication negatively affected his state of mind and demeanor in the courtroom, causing him to behave in a manner which led to his conviction and sentence.  (Id. at 197.)  Rivera claims that at trial, the prosecution cited a jail fight as evidence of future dangerousness, (id. (citing doc. 30-7, p. 16)), that he became unpredictable when questioned in Court and even attempted to sabotage his defense (id. (citing docs. 31-32, p. 129; 30-5, p. 86-92)); and that, because of his medication, he was incompetent

135

to make decisions regarding his representation, (id. at 200 (citing doc. 30-5, pp. 97-98)).   As support for claiming his attorneys were on notice of a need for bipolar medication, Rivera cites to Geral Blanchard's report which warned that "if indeed the diagnosis of Bipolar Disorder is correct," his "manic episodes of hypersexuality" would be triggered by a medication regimen lacking a mood stabilizer.   (See doc. 32-10, p. 112.)

The state habeas court's reasoning on this issue was Rivera *voluntarily* stopped taking his medication even though he was warned of the side effects and he *voluntarily* hoarded pills to commit self-harm.   (Doc. 37-16, p. 31.)   It therefore found Rivera failed to prove how his own voluntary actions were evidence of deficient performance.   (Doc. 37-16, pp. 31-32.)   As also argued by Respondent, the state habeas court next found Rivera was being medicated for his *diagnosed* mental health disorder, which, at that time, was depression, and thus his attorneys were not deficient in failing to change the medication.   (Doc. 37-16, pp. 30-31.)   This Court agrees and notes Rivera's own assertion Blanchard was merely a "'licensed counselor' who lacked the qualifications to diagnose or to prescribe medication," such that counsel was ineffective in relying on him to "prove diagnoses he was not professionally competent to make."   (Doc. 142, p. 143, n.76.)   In other words, Rivera on one hand argues reliance upon Blanchard was ineffective but on the other hand insists failing to rely on him was

ineffective.  For these reasons, the Court holds the state habeas court's finding Rivera failed to show deficient performance to be a reasonable interpretation of facts and application of law.  See 28 U.S.C. § 2254(d).

The state habeas court secondly found Rivera failed to establish prejudice.  According to the state habeas court record, Rivera exhibited similar behavior during the trial, when he was not treated for bipolarism, as he did in the state habeas hearing, when he was medicated.  For example, the primary issue on remand from the grant of CPC was to conduct a hearing on Rivera's motions to dismiss his counsel, proceed *pro se*, dismiss his habeas petition, and waive future appeals.  (Doc. 38-5, p. 1.)  Even though significant effort was made to ensure his competence, he eventually withdrew his motion to waive his appeals and to proceed *pro se*, suggesting his continued ambivalence even on "proper" medication.  (Doc. 38-16.)  Accordingly, it appears that, with or without what Rivera currently considers "effective" assistance in the form of ensuring proper medication, Rivera's ambivalent courthouse behavior is unchanged, and he thus cannot establish prejudice on this argument.

As to the application of law regarding the prejudice issue, the state habeas court found the precedent relied upon by Rivera, Head v. Taylor, distinguishable.  538 S.E.2d 416 (Ga. 2000) (overruled on other grounds).  (Doc. 37-16, p. 32.)  In Taylor,

the attorney failed to ensure his paranoid schizophrenic client was medicated at all, and this failure resulted in the client becoming delusional and uncooperative. Taylor, 538 S.E.2d at 424-25. Those facts are indeed distinguishable for this very reason. There is nothing in the record suggesting Rivera's attorneys omitted consideration of Rivera's medication completely. Accordingly, the Court does not find the state habeas court's decision to be an unreasonable application of clearly established law and by deferring to that decision, **DENIES** relief on Claim 1(f).

> v.   *The Court Defers to the State Habeas Court on Claim 1(g).*

After extensive hearings, the trial Court admitted statements by Rivera confessing to the crimes charged and similar transactions. (See, e.g., Docs. 35-7; 35-8; 36-1; 36-2; 36-3.) Rivera argues that had trial counsel properly briefed and argued this claim to the trial court, his statements would have been suppressed. (Doc. 142, p. 203-205.) Moreover, he argues trial counsel's duty to investigate and argue a motion to suppress is heightened where the defendant's statements are the "only" evidence of guilt. (See id.) His argument challenging the lawfulness of the admission of the custodial statements was rejected on appeal to the Georgia Supreme Court. Rivera, 647 S.E.2d at 75. The state habeas court held the underlying claim that the trial court erred in admitting the statements was barred

from review by *res judicata*, (doc. 37-16, p. 3), and further found trial counsel was not ineffective in their challenge of the admissibility of Rivera's statements. (Doc. 37-16, pp. 29–30.)

Given the Georgia Supreme Court's decision on the underlying claim, the state habeas court's holding as to the relevant ineffective assistance claim is not an unreasonable application of law. First, Rivera's contention that counsel was "aware of numerous constitutional problems with how law enforcement extracted inculpatory information from Rivera," (doc. 142, pp. 203-204), such as records from Rivera's hospitalization prior to his October 12th confession, (id. at 204), does not alone establish deficient performance. To be clear, Rivera's attorneys made the argument; the allegedly inculpatory information extracted on October 12th was, in fact, suppressed on trial counsel's insistence. (See doc. 29-14, pp. 182-186.) As to the other custodial statements, Rivera appears primarily to lament trial counsel's failure to file any brief to accompany the hearing or formally file a motion for suppression. (Doc. 142, pp. 46-47, 204-205.) However, trial counsel repeatedly objected and even requested a mistrial after the October 26th recording was played to the jury. (Doc. 29-30, pp. 224-25, 255 (Johnson restating his objection that October 14th statement "was – by that initial conversation . . .").) Rivera cites no case holding that failing to file a brief accompanying oral argument in Georgia criminal

139

courts constitutes deficient performance.  Therefore, the state habeas court's finding Rivera failed to show his attorneys performed deficiently was reasonable.

As to prejudice, Rivera asserts that "because there is a reasonable probability that the trial court would have excluded the statements had counsel briefed and argued the issue, the State would have been unable to pursue the death penalty," but this claim is unsupported.  (Doc. 142, p. 205.)  Again, though they did not apparently brief the argument,[13] trial counsel did not fail to argue for suppression.  Moreover, as the state habeas court found, the Georgia Supreme Court held the trial court committed no error in failing to suppress the later confessions.  This holding mandated the state habeas court finding Rivera could not show prejudice as to his trial attorneys' failure to object to those statements being introduced because they were lawfully admitted. (See doc. 37-16, p. 30 (relying upon Rivera, 647 S.E.2d at 75-77).)  The Court does not find the state habeas court's rejection of this ineffective assistance claim on this basis to be an unreasonable application of clearly established law.  Therefore, the Court defers to the state habeas court's ruling and denies relief as to Claim 1(g).  Consequently, as all subclaims fail,

---

[13] According to transcripts from the hearings on the admissibility of the October 20th statement, Johnson requested and was given twenty days to file a brief regarding the admittance of similar transaction evidence, but it is unclear whether it was filed as ordered.  (See doc. 36-3, p. 78.)

Rivera's ineffective assistance claim, **Claim One is DENIED.**

## V.   Rivera's Custodial Statements

Rivera's next several grounds for relief (Claims 2(a), 2(b), and Claim 4(a)) involve the same facts.   (Doc. 41, p. 23; Doc. 142, pp. 205-206.)   Rivera claims investigators extracted an involuntary statement from him on October 12th while he was semi-conscious and then exploited the evidence gained by that extraction to obtain subsequent "fruit of the poisonous tree" evidence in the form of additional inculpatory statements which were unlawfully admitted at trial. (Doc. 142, p. 206.)   Thereafter, investigators falsely testified they had not recorded the October 12th statement and about his ability to comprehend waiving his rights on October 12th.   According to Rivera, the recording of the October 12th conversation, found years later, proves the perjurious testimony was prejudicial because it proved the October 12th statement was obtained unlawfully, and therefore should have been disclosed. (Id. at 239.)   To summarize the issue, Rivera argues the recording constitutes Brady material which could have proven his Miranda rights were violated, which would have led to suppression of subsequent statements, and he claims there was perjurious testimony and therefore his trial was fundamentally flawed.

A. Procedural History of Custodial Statements Claim

The trial court suppressed testimony about Rivera's October 12th statement because it was taken several hours after he

attempted suicide and while he was heavily sedated.  (Doc. 29-14, pp. 182-86.)  The recording of this statement was unknown to the Court and defense counsel at that time.  A recording of Rivera's inculpatory statements made the next day, on October 13th, was presented at trial to establish Rivera's guilt for the rape and murder of Marni Glista, the crime for which he received the death penalty.  (Docs. 29-29, pp. 148, 154, 175-85; doc. 35-8, p. 132; see also doc. 29-9, pp. 28-29.)  He also made recorded inculpatory statements on October 14th, 20th, and 26th primarily concerning other attacks.  (Docs. 36-3, pp. 43-74 (hearing on admissibility of October 20th statement); 29-30, pp. 167-225 (October 26, at trial); 256-77 (October 14, in part at trial); but see doc. 29-30, p. 251.)  Some of the recordings were used at trial for the purposes of establishing evidence of similar transactions.

   i.   The Testimony at Issue

   Before trial, the trial court held hearings to determine whether Rivera's custodial statements were admissible, including whether to admit the investigators' testimony about the details of the October 12th interview, as it was not known then that a recording existed.  (Doc. 29-13.)  Detective Bunton testified that when he first spoke with Rivera on October 12th, he did not appear confused, and claimed that though he was "somewhat groggy," he knew where he was and why.  (Doc. 29-13, pp. 189-90.)  He testified that, though the investigators did not ask Rivera to sign anything,

they advised him of his Miranda rights by reading them to him. (Doc. 29-13, pp. 190-91.) He said Rivera acknowledged he understood his rights. (Id.)

After the judge expressed some confusion regarding the dates of events, the prosecuting attorney clarified that "[t]his conversation, the first one, was not memorialized on tape." (Id. at 194.) Bunton did not disagree or correct her. (Id.) Bunton testified Rivera asked whether Chrisilee Barton had died, and then described, in detail, the attacks on Barton and Marni Glista. (Id. at 195.) Bunton testified that, at some point, Rivera said Barton "put up a fight, not like Marni." (Id., p. 195.) Bunton said Rivera then confessed to murdering "a female by the name of Tiffany," as well as a "Melissa." (Id.) According to Bunton, Rivera was not coerced, he was not given any hope of benefit, and it was his impression Rivera spoke voluntarily. (Id. at 198.) After approximately 30 minutes, Rivera claimed he was tired, and the interview was concluded. (Id. at 199.) Later, notwithstanding his prior testimony about "Tiffany" and "Melissa," Bunton specified that until October 13th, Barton and Glista were the only two victims that he and Roundtree were aware of in the state of Georgia. (Id. at 202.) The pretrial hearing was continued because the judge was unable to hear the October 13th recording and was

therefore unable to determine whether it was admissible.  (Id. at 214-15.)

Later, in the continued pretrial hearing, Rivera's ER doctor testified extensively as to his treatment and the "half-life" of the medications received.  (See, e.g. id. at 18.)  She testified she told Bunton that Rivera "didn't appear to be sedated or confused" prior to their conversation with him on the 13th, and confirmed Rivera was not forced to speak with them.  (Doc. 29-14, p. 31.)  Bunton then provided more context to the October 12th interview, saying on that date and during the "oral interview that Investigator Roundtree and [he] conducted,"[14] Rivera "made a comment, because he didn't want her to live because Marni had lived so long.  And that was [their] first true correlation between the homicide of Marni Glista and the attack on Chrislee Barton."  (Doc. 29-14, p. 167.)

Defense counsel, Johnson, then asked Bunton on cross, "[t]ell me about the oral interview, how long did it last?"  (Id.)  Bunton responded, "thirty to maybe forty minutes," and he said Rivera was "obviously somewhat medicated."  (Id.)  Johnson asked, "[y]ou did not obtain a written waiver on the 12th?"  (Id. at 168.)  Bunton responded, "no, sir. We did not."  (Id.)  When asked, "[a]nd

_____

[14] Because the other interviews had multiple additional investigators present and were not believed to have been recorded, Bunton distinguished the October 12th interview from the others by noting that he and Roundtree were the only ones present and references it as the "oral" interview.

there's no effort made to memorialize the conversation," Bunton answered, "[n]otes were made from that—handwritten notes were made from the conversation on the 12th." (Id.) Bunton also said the "details" Rivera gave regarding the Marni Glista's attack were divulged in the October 13th interview, but the "first reference was on the 12th and it was very slight reference only the use of the name and the one statement about how she had lived so long." (Id.) Based on the testimony of Bunton and Rivera's treating physician, the Court ruled the details regarding the October 12th statement were not admissible but the other recordings were. (Id. at 182-86.)

Detective Roundtree testified at trial instead of Bunton. Roundtree agreed he and Officer Bunton spoke with Rivera for the first time the afternoon of October 12th. (Doc. 29-29, p. 129.) He testified he attempted to confirm Rivera was medically sound by speaking with his doctors who "cleared" Rivera to speak with him. (Id. at 130-31.) The Court then excused the jury so Johnson could reiterate his objection to custodial statements being entered. And though the questioning before the break referenced the October 12th interview, when questioning resumed, the topic moved quickly and without explicit transition to the October 13th discussion. (Id. at 138.) Specifically, Roundtree testified "before having any conversation with the defendant in the hospital" he advised him of his rights. (Id.) Then, evidence in the form of a "waiver

of counsel form" from October 13th was submitted as an exhibit in support of Rivera's waiver of those rights.  (<u>See</u> doc. 30-11, p. 70; <u>see also</u> doc. 30-12, p. 20.)  It does not appear the jury heard further testimony regarding the October 12th interview, but his October 13th interview was then played to the jury.  (Doc. 29-29, pp. 148-200.)

The parties disagree what the October 12th recording proves. Rivera quotes the transcript of the recording, which begins with the question "[t]ell me about the other girl before Chris, Ray. What was her name."  (Doc. 142, pp. 213-19 (quoting Doc. 32-1, p. 166).)  Because it starts mid-conversation, the officers obviously began recording after the interview had begun; there is no dispute about that.  No party attacks the investigators' testimony about whether Rivera was <u>Mirandized</u> based upon the content of the recording.  Instead, Rivera points to specific instances in the discussion to argue he was coerced and/or waived his rights involuntarily.  He argues he was "highly impaired," and points to instances when Rivera could not answer questions effectively. (Doc. 142, p. 212 (citing <u>e.g.</u>, doc. 32-1, p. 166 (Rivera repeatedly saying, "I'm trying to think right now") and p. 173 (Rivera answering a question about a location with "it was a holiday")).)  To support his coercion theory, Rivera also argues he was highly suggestable, pointing to his confirmation the "other girl before Chris" was named "Marni" only after suggestion by the

investigators, (id. at 215 (citing doc. 32-1, p. 168), and the investigators' repeated corrections of Rivera's statements, (id. (citing doc. 32-1, pp. 171-73, 188)).   He also points out discrepancies between the testimony about what details were shared in the interview as compared to the contents of the recording. (Doc. 142, pp. 213-19.)

Respondent counters the recording supports the doctor's testimony Rivera was coherent. (Doc. 145, pp. 236-37.) Respondent also argues "it does not read as if law enforcement were feeding him answers. Rivera provided details about Glista that only the attacker could have known—e.g. that her mattress was on the floor and her husband was deployed to Kuwait." (Id. at 237.) In any event, the recording ends with Rivera stating, "I had sex with her," in response to the investigator's question of "[t]ell me what you did with this Marni, Ray." (Doc. 32-1, p. 188.) Then Rivera said, "I took her life" when the investigator asked, "what else . . .." (Id. at 189.) Whether the interview concluded in this manner is not in dispute, and given this final statement, the Court need not wade into whose interpretation is correct and likewise does not make the associated credibility determination regarding the investigator's testimony. That issue is unnecessary

to the more relevant inquiry of whether the recording constitutes Brady material, as explained below.

 ii.  *The State Court Holdings*

On direct appeal to the Georgia Supreme Court, Rivera argued the trial court erred in admitting into evidence the October 13th statements, contending Rivera was still too incapacitated to waive his Miranda rights on October 13th given his suicidal overdose on October 12th and the resultant sedation.  (Doc. 30-15, pp. 36-37.) The Georgia Supreme Court rejected this argument.  Rivera, 647 S.E.2d at 75.  In the state habeas proceedings, Rivera's petition generally asserted in Claim Four "[t]he trial court erred in admitting Petitioner's unconstitutionally obtained statements to police," but it did not limit the claim to specific statements. (Doc. 31-4, p. 18.)  At state habeas briefing, Rivera made specific claims of prosecutorial and "other state agent" misconduct regarding failure to disclose the newly discovered October 12th audiotape and the resultant constitutional concerns.  (Doc. 37-8, pp. 113-41.)  First, Rivera asserted the state failed to disclose the recording in violation of Brady v. Maryland, 373 U.S. 83 (1963).  (Id. at 113-26.)  Second, Rivera contended the subsequent October 13th, 14th, and 26th custodial statements should have been suppressed pursuant to Wong Sun v. United States, as "fruit of the poisonous tree" because they constituted evidence gained by exploiting unlawfully obtained evidence.  371 U.S. 471, 487-88

(1963).  (See id. at 126-39.)  Third, he claimed investigators committed perjury in denying existence of the October 12th recording and the knowing use of perjury resulted in a conviction that was fundamentally unfair.  (Doc. 37-8, pp. 123, 140 (citing, inter alia, Napue, 360 U.S. at 269 and Giglio v. United States, 405 U.S. 150, 153 (1972)); see also doc. 36-1, p. 184.)  As noted, these are the claims Rivera asserts here.  He does not reassert his direct appeal claim that the October 13th statement was obtained and then admitted unlawfully on the theory of continued incapacitation.

The state habeas court first held that, as to the portions of "Claim Four, wherein Petitioner allege[d] that the trial court erred in admitting Petitioner's statements to the police," Rivera was barred from relitigating them by res judicata.  (Doc. 37-16, p. 3 (Section entitled "Claims that are Res Judicata" (citing Rivera, 647 S.E.2d at 75-76).)[15]  Separately, the state habeas court also found Rivera's Brady claims, Napue claims, and Wong-Sun allegations relevant to the "fruit of the poisonous tree" claim were procedurally defaulted because Rivera had not raised those

---

[15] Until now, the parties and the courts have not precisely identified the statements.  However, the Georgia Supreme Court's direct appeal analysis was obviously related to the October 13th statements and possibly the October 14th statements.  Given the direct appeal argument hinged on Rivera's sedation, it could not have applied to the October 26th statement, and the October 12th recording had not yet been found by the filing of the direct appeal.  The October 20th recording appears to not have been presented to the jury.  Consequently, the state habeas court's res judicata holding appears relevant to the October 13th and 14th statements only.

claims on direct appeal.  (Doc. 37-16, pp. 7-13 (Section entitled "Claims that are Procedurally Defaulted.").)   The procedural default was likewise not excusable because Rivera failed to show actual prejudice, *i.e.*, he failed to prove that the October 12th statement was involuntary or illegally obtained, and even if he had, "every subsequent confession was properly obtained and voluntary, thus they were properly admitted." (Id. at 10.)  While making its prejudice determination, the state habeas court repeated its prior finding that the Georgia Supreme Court had already specifically held the October 13th statements were voluntarily made and thus, *res judicata* applied to limit its review of the admission of those statements.  (See id. (The state habeas court holding it was "barred from reviewing a substantive claim surrounding ['particularly the October 13'] statement under the doctrine of *res judicata*."); (see also doc. 142, pp. 226-27 (citing docs 30-15, pp. 36-40 and 37-8, pp. 132-39).)

 B. The State Procedural Bar Was Adequate but Not Independent.

 The state habeas court held that the claims asserted herein related to admission of the so-called "subsequent statements," *i.e.*, those statements Rivera argued were tainted, were procedurally defaulted.  (Doc. 37-16, p. 10.)  When a state law default prevents the state court from reaching the merits of a federal claim, that claim ordinarily cannot be reviewed in federal court.  Wainwright v. Sykes, 433 U.S. 72, 87-88 (1977); Murray v.

Carrier, 477 U.S. 478, 485-492 (1986).  Consequently, the federal
court's review is barred where "the state court correctly applie[d]
a procedural default principle of state law to arrive at the
conclusion that the petitioner's federal claims [were] barred" in
state court.  Owen v. Sec'y, Dept. of Corr., 568 F.3d 894, 908
(11th Cir. 2009) (quoting Bailey v. Nagle, 172 F.3d 1299, 1302
(11th Cir. 1999).  The state law ground must be "independent of
the federal question and adequate to support the judgment." Id.
(citing Jennings v. McDonough, 490 F.3d 1230, 1247-48 (11th Cir.
2007)).

The Eleventh Circuit has "established a three-part test to
determine when a state court's procedural ruling constitutes an
independent and adequate state rule of decision." Ward v. Hall,
592 F.3d 1144, 1156-57 (11th Cir. 2010) (quoting Judd v. Haley,
250 F.3d 1308, 1313 (11th Cir. 2001)).  "First, the last state
court rendering a judgment in the case must clearly and expressly
state that it is relying on state procedural rules to resolve the
federal claim without reaching the merits of that claim." Id.
Second, the state court's decision must rest entirely on state law
grounds and not be intertwined with an interpretation of federal
law. Id.  Third, the state procedural rule must be adequate, i.e.,
firmly established and regularly followed and not applied "in an
arbitrary or unprecedented fashion." Id.; see also Lynd v. Terry,
470 F.3d 1308, 1313 n.4 (11th Cir. 2006).

Rivera contends the state habeas court's holding that he procedurally defaulted his claims relevant to the custodial statements was based on a ground that is not adequate to bar federal review because it conflated the claim made on direct appeal with the one asserted on collateral appeal. (Doc. 142, pp. 226-27.) Thus, he seeks *de novo* review. (Id. at 227.) Contrary to his assertions, however, the state habeas court merely mentioned its previous *res judicata* holding on the October 13th Miranda issue when it explained there was no prejudice to excuse procedural default of the Brady, Napue, and newly asserted Fifth Amendment claims concerning the subsequent custodial statements. (Doc. 37-16, p. 10.) Thus, the state habeas court appropriately and clearly held the subsequent statements claim was procedurally defaulted. Ward, 592 F.3d at 1156-57. Therefore, the Court straightforwardly addresses whether Georgia's procedural default rule constitutes an adequate state law ground, and then determines whether the state habeas court's decision was independent of federal law, *i.e.,* whether it intertwined its holding "with an interpretation of federal law." Id.; Judd, 250 F.3d at 1313.

   i.   *The State Procedural Bar Was Adequate.*

Georgia's procedural default rule has been firmly established and consistently followed for years. Black v. Hardin, 366 S.E.2d 754, 755 (Ga. 1985) (holding defendant procedurally barred in habeas from raising "*any* alleged error or deficiency" not timely

objected to at trial or raised on appeal unless defendant can show cause and actual prejudice to overcome default, or miscarriage of justice would result if error not considered).   Absent a showing of cause and prejudice or a miscarriage of justice, habeas corpus relief shall not be granted in connection with any claim not timely raised in accordance with Georgia procedural rules.   O.C.G.A. § 9-14-48(d); O.C.G.A. § 9-14-40; Chatman v. Mancill, 626 S.E.2d 102, 105 (Ga. 2006) (holding claim procedurally defaulted and cannot be considered on merits if, as here, petitioner fails to raise it on direct appeal).   Thus, the state habeas decision employed an adequate state procedural ground to deny Rivera's habeas claim. See Ward, 592 F.3d at 1175-76; O.C.G.A. § 9-14-48(d); Lynd, 470 F.3d at 1313-14 (concluding Georgia's procedural default rule, as stated in Black v. Hardin, provides adequate and independent state law ground for denial of claim).

> ii.   *State Holding Did Not Rest on Independent Grounds.*

However, the determination a state court judgment rested on an "adequate" ground only resolves half the issue.   The next question is whether the decision rested on an "independent" ground. A state court's finding is considered independent if it is separate and distinct from federal law.   Ake v. Oklahoma, 470 U.S. 68, 75 (1985) ("[W]hen resolution of the state procedural law question depends on a federal constitutional ruling, the state-law prong of the court's holding is not independent of federal law, and our

jurisdiction is not precluded."); Enterprise Irrigation District v. Farmers Mutual Canal Co., 243 U.S. 157, 164 (1917) ("But where the non-Federal ground is so interwoven with the other as not to be an independent matter, or is not of sufficient breadth to sustain the judgment without any decision of the other, our jurisdiction is plain."). Here, the state habeas court not only found the claims were procedurally defaulted; it also found Rivera could not show cause and prejudice to overcome default. The state habeas court examined the prejudice question within the same context as Brady's materiality element. (See doc. 37-16, p. 7 ("The analysis of whether there is sufficient prejudice to overcome procedural default parallels the issue of Brady 'materiality' . . .") (citing Strickler v. Greene, 527 U.S. 263, 282 (1999)).) Indeed, conducting the prejudice analysis necessarily considers the merits of materiality. See, e.g., Rossell v. Macon SP Warden, 2023 WL 34103, at *4 (11th Cir. Jan. 4, 2023) (unpublished); Banks v. Dretke, 540 U.S. 668, 691 (2004) (quoting Strickler, 527 U.S. at 281-282 ("[C]ause and prejudice" in this case "parallel two of the three components of the alleged Brady violation itself."). Thus, in this manner, the state habeas court's decision did not rest entirely on state law grounds and was necessarily intertwined with an interpretation of federal law. Ward, 592 F.3d at 1156-57. (See doc. 37-16, pp. 10-13).

To that end, the state habeas court's analysis was applied in

a manner questioned by the Georgia Supreme Court on CPC. (Doc. 38-26.) The Georgia Supreme Court held the state habeas court erred in analyzing Rivera's Napue claim. (Id. (citing Trepal v. Sec'y, Fla. Dep't of Corr., 684 F.3d 1088, 1108 (11th Cir. 2012).) It found the state habeas court misapplied the "coextensive" analysis when considering the requisite prejudice to excuse the procedural default of Rivera's Napue claim. (See doc. 38-26 (citing Schofield v. Palmer, 621 S.E.2d 726, 730 (Ga. 2005)) (holding materiality and prejudice analyses for Brady constitutional claims are "co-extensive") and Trepal, 684 F.3d at 1108 (holding materiality hurdle is lower for Giglio claims than Brady claims).) However, after applying the "correct legal principle," the Georgia Supreme Court concluded "the false testimony could not in any reasonable likelihood have affected the judgment of the jury." (Id. (citing Napue, 360 U.S. at 271).)

The petitioner in Trepal, relied upon by the Georgia Supreme Court, sought § 2254 relief under Giglio v. United States, 405 U.S. 150 (1972), based on false testimony against him at trial. Giglio, discussed in detail below, held that, where undisclosed evidence reveals the prosecution knowingly made false statements or introduced or allowed trial testimony that it knew or should have known was false, the "due process requirements enunciated in Napue and other cases" may require a new trial. Giglio, 405 U.S. at 154. Accordingly, Trepal considered many of the Supreme Court

cases implicated by Rivera's custodial statements.  See Trepal, 684 3d. 1088 (discussing Napue, 360 U.S. at 271, Brady v. Maryland, 373 U.S. 83 (1963), and Giglio, 405 U.S. 150).  The Georgia Supreme Court, in relying in part upon Trepal, thus also intertwined its holding with federal law.

The holding of both state courts—that Rivera failed to show cause and prejudice to excuse default of his constitutional claims—depended on those courts' federal law rulings regarding "materiality" and consequently do not present an independent state ground for the decisions rendered.  Both state courts' state law holdings were undoubtedly "intertwined" with federal law, and thus the Court is not barred from reviewing those claims.  See, e.g., Rossell, 2023 WL 34103, at *4; see also  Ake, 470 U.S. at 75 (explaining where federal law holding is integral to state court's disposition, federal ruling on issue "is in no respect advisory.") Moreover, after the Georgia Supreme Court denied the CPC, the Eleventh Circuit expounded upon certain distinctions relevant to Giglio and Brady in the § 2254 context.  See United States v. Laines, 69 F.4th 1221, 1232 (11th Cir. 2023) relying on Smith v. Sec'y, Dep't of Corr., 572 F.3d 1327, 1342 n.9 (11th Cir. 2009) (expressing doubt "that Brady applies outside the realm of exculpatory evidence and extends to evidence useful to the defense in a fruit-of-the-poisonous-tree quest").

The Eleventh Circuit has deferred considering whether a

156

finding of a procedural default on a <u>Brady</u> claim constitutes an "adjudication" on the merits of that claim for AEDPA deference purposes in the § 2254 scenario. <u>See</u> <u>Rossell</u>, 2023 WL 34103, at *4) (declining to answer whether *consideration* of Brady claim in process of adjudicating procedural default question necessitates AEDPA review). This presents a "complicated" procedural question. <u>See</u> <u>Bass v. Dixon</u>, 2024 WL 168300 (N.D. Fla. Jan. 16, 2024) (noting thorny procedural default issues presented by "intertwined" claim.) To abbreviate the issue, the Court reviews the individual custodial statement claims to determine whether the merits of those claims fail, which necessarily also considers whether Rivera can show cause and prejudice to excuse the procedural default of those claims. <u>Banks</u>, 540 U.S. at 698; <u>Dallas v. Warden</u>, 964 F.3d 1285, 1307 n.4 (11th Cir. 2020) (holding the court may "skip over the difficult procedural default questions and cut to the heart of the matter" where a claim "would fail on the merits in any event.")

C.  <u>Admission of Subsequent Custodial Statements Was Proper</u>
    <u>Under Oregon v. Elstad, and Claim 4(a) Fails.</u>

The Court first examines whether the unsuppressed "subsequent" statements from October 13th, 14th, and 26th were introduced in violation of <u>Miranda</u>'s exclusionary rule as "fruit of the poisonous tree" because most of the remaining prejudice prong/materiality arguments asserted in Claims 2(a) and (b) hinge on the legality of admitting these statements. (<u>See</u> doc. 142, pp.

240-43 (generally arguing that had court heard October 12th recording, subsequent statements would have been suppressed and investigators' testimony could have been impeached.).)   Even though the investigators testified Rivera's October 12th confession was warned, Rivera asserts it was coerced given his incapacity, and the unlawfully obtained statement tainted the subsequent statements.   (Doc. 142, pp. 230, 234.)

There are two inquiries relevant to determining whether the October 12th statement was obtained lawfully under Miranda:   (1) Rivera's Miranda rights must have been voluntarily waived in the sense it was induced without coercion; and (2) the statement must have been made with full awareness both of the nature of the rights being abandoned and the consequences of the decision to abandon it.   Moran v. Burbine, 475 U.S. 412, 421 (1986); Johnson v. Zerbst, 304 U.S. 458, 464 (1938).   Rivera argues the officers "questioned first and warned later," (doc. 142, p. 223), without straightforwardly disputing the investigators' testimony they warned Rivera in compliance with Miranda.   Instead, Rivera argues his first statement was "coerced," and therefore "unwarned," (doc. 142, pp. 228-30), because he was incapable of waiving his Miranda rights on October 12th due to medical sedation.   Thus, more appropriately, the facts alleged indicate an issue with the second prong, which implicates Rivera's awareness of the rights being waived.   See Edwards v. Arizona, 451 U.S. 477, 484 (1981)

("[V]oluntariness of . . . an admission on the one hand, and a knowing and intelligent waiver on the other, are discrete inquiries."); Tague v. Louisiana, 444 U.S. 469 (1980) (where confession was admitted without evidence defendant had knowingly waived his rights, reversal); see also Miller v. Dugger, 838 F.2d 1530, 1539 (11th Cir. 1988) (discussing Supreme Court recognition certain defendants may not make intelligent waiver, such as juveniles, schizophrenics, and intellectually disabled). Therefore, by arguing only that he was incapacitated, Rivera does not support his contention he was "coerced" as understood by the first prong. See United States v. Barbour, 70 F.3d 580, 585 (11th Cir. 1995) ("The fact that a defendant suffers a mental disability does not, by itself, render a waiver involuntary; there must be coercion by an official actor."). And he does not show he was unwarned simply because he was sedated.

Rivera does not acknowledge the distinction between the two Zerbst prongs or the incongruence with asserting that incapacity is the same as unwarned. Consequently, none of the precedent Rivera relies upon considers the effects of violating the "full awareness" prong of a Miranda waiver, see Moran, 475 U.S. at 421, upon a subsequent custodial statement. (See doc. 142, p. 228 (distinguishing Elstad v. Oregon, 470 U.S. 298, 310 (1985) from Missouri v. Seibert, 542 U.S. 600 (2004).) Indeed, while incapacity may result in finding a waiver was invalid, this is

different than finding Rivera was unwarned.  Elstad, 470 U.S. at 310 ("The failure of police to administer Miranda warnings does not mean that the statements received have actually been coerced, but only that courts will presume the privilege against compulsory self-incrimination has not been intelligently exercised."); Miller, 838 F.2d at 1540 (reversing where "the trial court, without giving Miller's counsel the opportunity to argue that Miller's Miranda waiver was invalid, apparently assumed that voluntariness and waiver constituted the same issue.").

However, the Court assumes the initial conversation was unwarned despite evidence to the contrary, including the officers' uncontroverted testimony that on October 12th, they warned first, interviewed Rivera for 20 to 30 minutes, and quit when Rivera told them he was getting tired, and despite Rivera's conflation of the terms. (Doc. 29-13, pp. 194-99).  Even assuming he was unwarned, Rivera's argument fails for the reasons explained by the state habeas court.

In Oregon v. Elstad, 40 U.S. 298, officers served a warrant for burglary on Elstad in the home where he lived with his parents. Id. at 300.  While sitting in the family living room, one of the officers suggested Elstad was involved in the burglary, and Elstad responded he was "there." Id. at 301.  Elstad was then transported to the sheriff's headquarters where he was advised of his Miranda rights for the first time.  Id.  Elstad waived those rights and

confessed.   Id. at 302.   The Supreme Court considered the admissibility of Elstad's statements made subsequent to his unwarned admission at home, first distinguishing the protections guarded by the Fourth Amendment "fruits" doctrine from those protected by the Fifth Amendment and, by extension Miranda.   470 U.S. 298 (1985); see also United States v. Street, 472 F.3d 1298 (11th Cir. 2006).   The Court then set out the general rule that existence of a pre-warning statement does not require suppression of a post-warning statement that was knowingly and voluntarily made.   Elstad, 470 U.S. at 309.   Absent deliberately coercive tactics in obtaining the initial statement, courts are not to presume existence of the earlier unwarned statement compelled the defendant to give another one.   Id. at 314.   Instead, a "subsequent administration of Miranda warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement."   Id. at 314.

Rivera argues the exception contained in Missouri v. Seibert, 542 U.S. 600 (2004) applies.   Seibert's exception considers a now-defunct police tactic to withhold Miranda warnings until after the interrogation succeeds in eliciting a confession.   Id. at 613. The Supreme Court admonished this practice because it undermines Miranda by design, and the Court established a multi-factor test to determine the effectiveness of Miranda warnings.   Other than

providing the relevant multi-factor test, Seibert's holding is inapposite. Id. at 617. Key to Seibert's holding was the police practice of using a defendant's own unwarned incriminating statements to pressure repetition of those statements in a warned segment of an interrogation. United States v. Gonzalez-Lauzan, 437 F.3d 1128, 1137-38 (11th Cir. 2006). The Seibert interview was continuous, "systematic, exhaustive, and managed with psychological skill." Seibert, 542 U.S. at 616.

Contrarily, in Elstad, the second phase, in-custody questioning was seen as a distinct experience from a prior short conversation at home, and thus the Miranda warnings "could have made sense as presenting a genuine choice whether to follow up on the earlier admission." Id. Rivera's interviews are clearly more like the Elstad interviews. See Gonzalez-Lauzan, 437 F.3d at 1138. Although the intervening circumstances do not exactly resemble those in Elstad, they are no less impactful. Here, before the officers approached Rivera again, they waited for Rivera's sedation to wane, see Barbour, 70 F.3d at 585 (holding defendant was not impaired to understand Miranda rights despite use of Lithium and Ativan), and after approaching him a second time, they allowed him more time to consider the decision to confess. (Docs. 29-13, pp. 199-203; 29-29, pp. 141, 154-200.) Only after he called his wife and then *sought their presence again* (docs. 29-13, pp. 204-205; 29-29, p. 158), did the officers interview him on October

13th, after Mirandizing him a second time that day, (see doc. 29-29, pp. 160-163).  See United States v. Rivers, 2021 WL 3864582, at *12 (N.D. Ga. Aug. 10, 2021), report and recommendation adopted, 2021 WL 3861226 (N.D. Ga. Aug. 30, 2021)(attenuation between surgical procedure and Miranda waiver undermines argument physical ailments necessarily prevented voluntary statements).  His October 13th interview provided separate incriminating facts.  Gonzalez-Lauren, 437 F.3d at 1138 (considering degree to which defendant's prewarning and post-warning statements overlapped or were continuous).  His third and fourth interviews were even more attenuated in terms of sedation and distinctive from the first.

Rivera's claims the initial statement was a "gateway" for law enforcement to procure more statements fall flat.  United States v. Bayer, 331 U.S. 532, 540-41 (1947) ("[T]his Court has never gone so far as to hold that making a confession under circumstances which preclude its use, perpetually disables the confessor from making a usable one after those conditions have been removed.").  Even if the first statement was coerced or unintelligent, or even unwarned, it was properly suppressed.  Moreover, whether that initial statement was made with full comprehension or not, Rivera's October 13th confession was "knowingly and voluntarily made."  Elstad, 470 U.S. at 309.  Specifically, by twice giving proper Miranda warnings on October 13th, and by allowing Rivera to make personal phone calls and alert the officers he was ready to

confess, the officers "remove[d] the effect of any conditions requiring suppression of the unwarned statement." Id. at 314. The remaining subsequent statements were also voluntarily provided after considerable intervening circumstances, and thus were also properly admitted under Elstad.

"[T]he Fifth Amendment privilege is not concerned 'with moral and psychological pressures to confess emanating from sources other than official coercion,'" such as Rivera's repeated expressions of faith-based contrition. Connelly, 479 U.S. at 170 (quoting Elstad, 470 U.S. at 305). Therefore, Rivera's argument regarding admission of his subsequent statements fails because the subsequent statements were legally admitted under Elstad.[16]

D. Undisclosed Evidence & Perjury Claims Asserted in Claims 2(a) and (b) Fail.

Rivera's next argument relevant to the custodial statements also concerns the October 12th recording, which Rivera argues constitutes newly discovered Brady material. The recording was

---

[16] To the extent a procedural default issue is implicated, belated discovery of the tape does not impact Rivera's "fruit of the poisonous tree" argument, the facts of which were not only available at trial but were asserted therein. (See doc. 29-14, p. 177 (Johnson arguing Rivera was sedated on October 12th and stating, "now if we treat these interviews as they appear to be, as a continuation of one following the other then if there is a problem with the initial interview, then does not that problem infect the other conversations . . .?"); see also doc. 29-30, p. 255 (restating his objection).) Whether the October 12th statement had been recorded or not, whether there was perjury or not, the information that an attempt at an interview was made but terminated due to incapacitation after some information was obtained, was known. (Id.) Therefore, Rivera cannot show cause to excuse procedural default of this claim. Moreover, the finding his claim is meritless precludes a prejudice argument.

discovered in 2008 in Officer Roundtree's home.  (Doc. 32-19, pp. 11-15.)  Because Officer Bunton testified the only memorialization of this interview consisted of handwritten notes, Rivera argues the pretrial hearing on admissibility of similar transaction evidence—obtained and recorded via later interviews—was greatly impacted.  He also argues the failure to disclose existence of the tape violated Rivera's due process rights and deprived him of a fair trial.  (Doc. 142, p. 233.)  Rivera did not bring this claim on his direct appeal, but he did bring it at the state habeas court upon the tape's discovery.  (Id. at 237.)  After he sought a CPC on the state habeas court's finding this claim was procedurally defaulted, the Georgia Supreme Court held the "false testimony" at issue "could not in any reasonable likelihood have affected the judgment of the jury," and thus Rivera failed to establish the requisite prejudice to establish his claim and to excuse procedural default.  (Doc. 38-26, p. 1 (citing Napue, 360 U.S. at 271).)

As the Georgia Supreme Court acknowledged, there are two categories of Brady violations, each with its own standard for determining whether undisclosed evidence is material and merits a new trial.  Id.  The first category, a Giglio claim,[17] occurs where undisclosed evidence reveals the prosecution knowingly made false statements or introduced or allowed trial testimony it knew or

---

[17] Although the parties and state courts refer to this claim as a "Napue claim," it is properly analyzed under Giglio, 405 U.S. 150

should have known was false.  United States v. Agurs, 427 U.S. 97,
103-04 (1976); Giglio, 405 U.S. at 153 (noting same rule applies
when "the State, although not soliciting false evidence, allows it
to go uncorrected when it appears.") (internal quotation marks
omitted); United States v. Alzate, 47 F.3d 1103, 1110 (11th Cir.
1995) (Giglio rule applies to "explicit factual representations by
the prosecutor at a side bar and implicit factual representations
to the jury" while questioning a witness).  Under this category of
Brady violations, the defendant is entitled to a new trial "if
there is any reasonable likelihood that the false testimony could
have affected the judgment of the jury."  Agurs, 427 U.S. at 103.
A Giglio claim is "an aggravated type of Brady violation" in which
the failure to disclose evidence enabled the state to solicit or
fail to correct false evidence.  Ford v. Hall, 546 F.3d 1326, 1332
(11th Cir. 2008).

The other category of Brady violations occurs when the
government conceals evidence favorable to the defense, although
the evidence does not involve false testimony or false statements
by the prosecution.  The defendant is entitled to a new trial if
he establishes "there is a reasonable probability that, had the
evidence been disclosed to the defense, the result of the
proceeding would have been different."  Bagley, 473 U.S. at 682
(internal quotation marks omitted); see also Kyles v. Whitley, 514
U.S. 419, 433 (1995).  The materiality burden is lower where a

movant attempts to establish a Giglio violation than a Brady one. See Trepal, 684 F.3d at 1108 ("The Brady materiality standard requiring a reasonable probability of a different result "is substantially more difficult for a defendant to meet than the 'could have affected' standard" under Giglio) (citing Alzate, 47 F.3d at 1109-10). "A 'reasonable probability' of a different result exists when the government's evidentiary suppressions, viewed cumulatively, undermine confidence in the guilty verdict." See Smith v. Sec'y, Dep't of Corr., 572 F.3d 1327, 1334 (11th Cir. 2009) (citing Kyles, 514 U.S. at 434, 436-37 n.10). Because of this distinction, the Court will review these claims individually.

First, allegations relevant to the difference between the content of the recording and the testimony from trial falsely describing that recording (and denying its existence) implicate a Giglio claim. Second, Rivera's allegations that the very existence of the recording violated his right to a fair trial consist of a straightforward Brady violation, sometimes referred to as Bagley violations or Brady/Bagley violations, after United States v. Bagley, 473 U.S. 667 (1985).

Importantly, the Court's prior holding on admissibility of the subsequent statements mandates Rivera may not use the impact of the admission of these statements to prove Brady materiality or prejudice to overcome his default of any claim. As explained below, this conclusion dispels his first argument regarding the

pretrial hearing on admissibility of similar transaction evidence. However, Rivera also argues the mere existence of undisclosed evidence mandates a new trial. (See doc. 142, p. 231.) Therefore, the Court must also determine whether the Giglio violation was meaningful in terms of impeachment evidence—not only because it would have provided argument as to the subsequent statements but also because it would have diminished the investigator's credibility and therefore weakened the state's case overall. (See doc. 142, p. 243 ("Bunton and Roundtree's false testimony would have undermined their credibility as witnesses.").)   It is a question unaddressed by the state courts.

     *i.*   *Rivera's Brady/Bagley Claim 2(a) Fails.*

The state habeas court previously found Rivera could not show prejudice on his Brady claim because he did not prove the mere fact that a recording of the October 12th statement existed was exculpatory or material. (Doc. 37-16, p. 8).  Under Brady, 373 U.S. at 87, "the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment."  A Brady violation has three components: "(1) The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) that evidence must have been suppressed by the State, either willfully or inadvertently; and (3) prejudice must have ensued." Strickler, 527 U.S. at 281-82.

(internal quotation marks omitted); see also Kyles, 514 U.S. at 433.  As noted above, courts determine materiality by asking whether "the government's evidentiary suppressions, viewed cumulatively, undermine confidence in the guilty verdict." Smith, 572 F.3d at 1334 (citing Kyles, 514 U.S. at 434, 436-37 n. 10)

First, the recording does not constitute exculpatory evidence.  The recording does not appear to encompass the entire conversation between investigators and Rivera, but the recording clearly ends with Rivera saying, "I took her life," and is therefore inculpatory.  (Doc. 32-1, p. 189.)  Rivera is not claiming the verdict would have been different had the jury known there was a recording, or if they had heard the recording.  Instead, Rivera is arguing he was denied the opportunity to seek exclusion of custodial statements, based on "fruit of the poisonous tree quest." Smith v. Sec'y, Dep't of Corr., 572 F.3d 1327, 1342 n.9 (11th Cir. 2009).  However, consistent with the Eleventh Circuit's direction, the Court concludes Brady does not apply "outside the realm of exculpatory evidence and extends to evidence useful to the defense in a fruit-of-the-poisonous-tree quest." Id.; see also Laines, 69 F. 4th at 1232.  Even though the tape is arguably favorable as impeachment evidence, this issue is properly examined under Giglio or for the purposes of a cumulative materiality review. Smith, 572 F.3d at 1345 (considering evidence which it deemed "somewhat favorable" to the defense only in the

cumulative materiality analysis).

Second, the next Brady element, whether the state failed to disclose the evidence, is undeniable: this recording was removed from evidence by Roundtree on October 16, 2000, provided to someone at the Sheriff's Office, returned to Roundtree, and then it disappeared for years. (Doc. 32-19, pp. 11-12.)  It was not disclosed until 2008.

As to the third element, prejudice, Rivera attempts to route all his prejudice arguments back to introduction of his subsequent confessions, (see, e.g., doc. 142, p. 230 ("[S]ubsequent statements should have been suppressed as "fruits of the poisonous tree."); see also id. at 241 ("[T]he false testimony was material because it likely affected the trial judge's decision concerning the admissibility of Mr. Rivera's statements."); doc. 150, p. 66). However, since the subsequent statements were properly admitted, they cannot constitute the factual basis for Rivera's Brady prejudice prong argument.  Even if this were a possible argument, "such evidence is not 'material either to guilt or to punishment' as required under Brady." Laines, 69 F.4th at 1232 (quoting Brady, 373 U.S. at 87).  Even if the recording proved the investigator lied about the details of the October 12th conversation, there is nothing about the recording which negates the case against Rivera. See Sawyer v. Whitley, 505 U.S. 333, 349 (1992) ("[L]atter-day [Brady] evidence brought forward to impeach a prosecution witness

will seldom, if ever, make a clear and convincing showing that no reasonable juror would have believed the heart of [the witness's] account of petitioner's actions.").

Considering these truths, the Court finds no prejudice or materiality as to the stand-alone Brady claim. The mere existence of a concealed recording containing an unadmitted conversation which was not exculpatory does not create a reasonable probability Rivera would not have been convicted or received the death penalty. Furthermore, to the extent Rivera was required to show cause and prejudice at this stage under the procedural default rules, his claims fail.

> ii.   *Rivera's Giglio & Perjury Allegations, Claim 2(b),*
> *Fail Under Brecht Standard of Review.*

Under Giglio, due process requires a new trial where "the false testimony could in any reasonable likelihood have affected the judgment of the jury." 405 U.S. at 154. (ellipsis omitted); see also Trepal, 684 F.3d at 1106. Rivera claims the materiality bar is easily met because the recording "would have created doubt about the voluntariness and reliability of Mr. Rivera's subsequent statements to law enforcement, which would have in turn affected the jury's verdict." (Doc. 142, p. 241.) He also complains "exposure of Bunton and Rountree's false testimony would have undermined their credibility." (Id. at 243.)

The Court recognizes an investigator's testimony is important

in any criminal case, and when determining whether false testimony could have affected the judgment of the jury under the lower Giglio bar, the impact is usually meaningful. Napue, 360 U.S. at 269 ("The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend."). However, even accepting Rivera's interpretation of how the content of the recording contradicts the investigator's testimony, the impact of false testimony is meager in light of Rivera's other legally admitted confessions. Thus, in light of other evidence presented, there is no reasonable likelihood that exposing every discrepancy between the October 12th recording and the investigator's description of that conversation could have affected the judgment of the jury.

Additionally, Rivera cannot overcome his burden under Brecht v. Abrahamson, to obtain relief. 507 U.S. 619. Because of the "[s]tates' interest in finality," the states' "sovereignty over criminal matters," and the limitation of habeas relief to those "grievously wronged," the Supreme Court set forth in Brecht a standard that is more favorable to and "less onerous" on the state, and thus less favorable to the defendant, than that which applies on direct review. Id. at 637; accord Fry v. Pliler, 551 U.S. 112, 117 (2007). A Giglio error constitutes a trial error and is not

172

"structural" for purposes of habeas review, and thus is subject to a harmless error analysis. Ventura v. Att'y Gen., Fla., 419 F.3d 1269, 1278, n.3 (11th Cir. 2005); see also Brecht, 507 U.S. at 629 ("Trial error occurs during the presentation of the case to the jury, and is amenable to harmless-error analysis because it may . . . be quantitatively assessed in the context of other evidence presented in order to determine the effect it had on the trial.") (quotation marks omitted). Therefore, even if the Court finds Rivera successfully established a Giglio violation, the Court may grant relief only if the error alleged had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 637; Trepal, 684 F.3d at 1113 (considering interplay between Brecht, Brady, and Giglio materiality standards and noting Giglio's more lenient materiality standard "leaves room for the possibility that perjured testimony may be material under Giglio but still harmless under Brecht); see also Davenport, 596 U.S. at 125 (same).

"To show prejudice under Brecht, there must be more than a reasonable possibility that the error contributed to the conviction or sentence." Mansfield, 679 F.3d at 1313 (quoting Mason v. Allen, 605 F.3d 1114, 1123 (11th Cir. 2010)). Indeed, the violation "is likely to be harmless under the Brecht standard where there is significant corroborating evidence" . . . "or where other evidence of guilt is overwhelming." Mansfield, 679 F.3d at

1313 (citations omitted).  To determine the effect on the verdict of a constitutional error, the Court must consider the error "in relation to all else that happened" at trial.  Kotteakos v. United States, 328 U.S. 750, 764 (1946); see id. at 764-65 (The question turns on whether the Court can "say, with fair assurance," that the verdict "was not substantially swayed by the error."); see also Al-Amin v. Warden Georgia Dep't of Corr., 932 F.3d 1291, 1298-99 (11th Cir. 2019) ("Under Brecht, we cannot grant habeas relief unless we have 'grave doubt' that the constitutional error 'had substantial and injurious effect or influence in determining the jury's verdict.'").

Because he has not shown "substantial and injurious effect or influence in determining the jury's verdict," Rivera cannot satisfy the Brecht prejudice standard.  Brecht, 507 U.S. at 637.  The extensive details of Rivera's crimes were repeatedly admitted by Rivera.  Those details were set out above to accentuate the overwhelming evidence presented to the jury and to acknowledge the difficult and likely unsettling work that underscored their service.  Given his own descriptions of his approach to women, his properly admitted custodial statements, his promise to the jury of future harm, victim testimony, and the other circumstantial evidence at play (such as, inter alia, his wrestling and physical prowess, pseudo-criminal background, the psychological analyses, the suspicion of him by loved ones and a coworker, and the

174

resemblance to the sketch artist's rendering), the Court cannot hold that the jury's evaluation of the reliability of the investigator was in any way determinative of or even influential to, Rivera's "life or liberty." Napue, 360 U.S. at 269. In addition, when considering the effect of this potential violation "in relation to all else that happened" at trial, Kotteakos, 328 U.S. at 764, the Court holds that exposing discrepancies in the investigator's description of the October 12th interview could not have had a "substantial and injurious effect or influence in determining the jury's verdict" under Brecht's more strenuous standard. Al-Amin, 932 F.3d at 1298. Rivera simply has not met this threshold and thus, even if he has established a Giglio violation, this Court may not grant relief to him on this claim.[18] Rivera's prosecutorial and other state agent conduct Claims 2(a) and (b), as well as Claim 4(a), relevant to trial court error regarding admission of custodial statements, are thus **DENIED**.

## VI. Right to Counsel at Trial

In Claim 4(b) Rivera contends he is entitled to a new trial because the trial court "permitted him to effectively waive his right to counsel without the court first ensuring that his waiver

---

[18] For this reason, there is likewise no basis for finding a miscarriage of justice. See Smith v. Murray, 477 U.S. 527, 538 (1986) (emphasizing miscarriage of justice exception is concerned with actual as compared to legal innocence and holding habeas petitioner failed to show actual innocence of death penalty because "alleged constitutional error neither precluded the development of true facts nor resulted in the admission of false ones").

was knowing, voluntary, and intelligent" in violation of his rights to due process and effective assistance of counsel. (Doc. 142, pp. 245-59.) The briefing summarizes two years of supposed conflict between Rivera and his trial counsel, during which time counsel expressed doubts as to Rivera's competence given the "inhumane jail conditions, combined with interruptions and changes to Rivera's psychotropic medications." (Id. at 247.) According to Rivera, the friction culminated when Rivera attempted to use his testimony as an opportunity to present argument to the jury, (doc. 30-3, pp. 135-36), refused to allow his attorney to move for a mistrial, (doc. 30-7, p. 17), and sought to limit the mitigation evidence, (doc. 30-6, p. 10-11). (See Doc. 142, pp. 248-252.) On each occasion, Rivera told the court he did not wish to act as his own counsel, but the judge required trial counsel to proceed under Rivera's direction against trial counsel's objection. (Id.) Rivera now claims such directives "exceeded that of an involved and engaged client exercising his right to participate in his own defense," (doc. 142, p. 252), and thus resulted in him becoming a pro se plaintiff without receiving the benefit of a Faretta hearing. See Faretta v. California, 422 U.S. 806, 819 (1975).

On direct appeal, Rivera argued this self-representation claim, asserting the trial court abused its discretion by sua sponte forcing upon him "a form of hybrid representation in which he represented himself as co-counsel" without making any inquiry

as to whether he was competent to control his defense.  <u>Rivera</u>,
647 S.E.2d at 77.  In state habeas court, Rivera asserted his self-
representation claim again, (doc. 31-4, p. 19), but separately
claimed the trial court erred by failing to ensure a complete
transcript of the proceedings was transmitted to the Georgia
Supreme Court for direct appeal, (doc. 31-4, p. 20).  The missing
record includes an exchange between Rivera and the trial judge
regarding Rivera's decision not to submit mitigation evidence, and
his later "agreement" with his attorneys regarding the mitigation
phase.  (<u>See</u> docs. 36-5, pp. 101-102; 30-6, pp. 7-8.)

 As to transmission of the record, the state habeas court held
Rivera's argument was procedurally defaulted.  (Doc. 37-16, p. 6.)
It then determined it was either barred from reviewing the merits
of the self-representation claim by <i>res judicata</i>, or, even assuming
it was improperly considered because of the omitted portion of the
transcript, the self-representation claim was also procedurally
defaulted.  (Doc. 37-16, pp. 14-17.)  To come to its procedural
default holding on the self-representation claim, the state habeas
court reviewed the missing portions of the transcript and
determined Rivera could not show prejudice to excuse the default.
It found the missing portions simply reflected Rivera's colloquy
with the trial judge wherein he affirmatively stated he did not
wish to proceed <i>pro se</i> or serve as co-counsel and the trial judge
reminded Rivera he was in charge of his defense.  (Doc. 37-16, p.

15 (quoting doc. 36-5, pp. 99-100, 104-105).)   Thus, the state habeas court held, "Petitioner failed to prove prejudice to overcome this default as Petitioner failed to prove that he would now prevail on his claim with the admission of the omitted transcript." (Id. at 14.)   It further held the "missing portion of the transcript serve[d] to reaffirm the Georgia Supreme Court's ruling by making clear that Petitioner was competent and did not wish to represent himself . . . ." (Id. at 17.)

Presently, in Claim 4(b), Rivera argues his self-representation claim, that his Sixth and Fourteenth Amendment rights were violated because his waiver of his right to counsel was "unknowing" and "involuntary." (Doc. 142, p. 245.)   Rivera argues the trial court's failure to conduct a Faretta inquiry prior to "permitting Mr. Rivera to make legal decisions reserved for counsel—namely, the decision on whether to move for a mistrial based on egregious prosecutorial misconduct—resulted in a violation of Mr. Rivera's right to counsel, and warrants reversal." (Doc. 142, p. 255.)   He also separately argues that because a portion of the record was missing on direct appeal, the Georgia Supreme Court's decision on his self-representation claim—that Rivera was both competent to control his own defense and no *sua sponte* inquiry into his competency was required—was an unreasonable determination of the facts.   (Doc. 142, p. 258.) Thus, he asks the Court to reject AEDPA deference on the claim.

178

(Id. at 256.)  In Claim 4(c), Rivera argues the trial court failed to ensure a complete transcript of the proceedings was transmitted to the Georgia Supreme Court for direct appeal, resulting in the Georgia Supreme Court reviewing an incomplete record.  Respondent retorts the missing portion does not support Rivera's self-representation claim and fails to show the state court made an unreasonable decision.  (Doc. 145, pp. 252-261 (citing docs. 30-5, p. 86; 36-5, pp. 101-102, 107-09; 30-6, pp. 7-8, 13-15).)

While claim 4(c) regarding the transcript is easily dispelled, the Court is faced with two incongruent holdings from the state habeas court on the self-representation claim: procedural default and *res judicata*.  Nevertheless, the Court addresses both holdings on that claim in its review.  The Court's review of the state habeas court's procedural default holding implicates the analysis of whether the procedural bar was independent and adequate to bar federal review, but the *res judicata* holding requires the Court to determine whether deference is owed to the Georgia Supreme Court "on its merits" determination. Compare Owen, 568 F.3d 894 at 907-08 with 28 U.S.C. § 2254(d). Moreover, Rivera's argument that the Georgia Supreme Court unreasonably interpreted the facts because of the transcript omission, and the state habeas court accepted those same facts, can only be effective in disputing the state habeas court's *res judicata* holding.  Its other holding, that the argument was

procedurally defaulted, is unaffected by his complaints regarding the missing record at direct appeal because the state habeas court made this holding based upon the entire record.

A. Deference is Due to the State Supreme Court's Res Judicata Holding

To the extent the state habeas court's holding on the self-representation claim was on a *res judicata* premise, the Court must "look through that decision to the last state-court adjudication on the merits." Sears v. Warden GDCP, 73 F.4th 1269, 1286 (11th Cir. 2023) (quoting Cone, 556 U.S. at 466–67). Because the Georgia Supreme Court adjudicated this claim on the merits, this Court can grant relief only if Rivera can satisfy § 2254(d). That standard requires the Court defer to the Georgia Supreme Court's decision unless it "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). However, review of factual determinations under § 2254(d)(2) is expressly limited to "the evidence presented in the State court proceeding." Shoop v. Twyford, 596 U.S. 811, 819 (2022). And "review of legal claims under § 2254(d)(1) is also "limited to the record that was before the state court." Id. (quoting Cullen v. Pinholster, 563 U.S. 170,

181 (2011).

Accordingly, precedent requires the Court to defer to the Georgia Supreme Court's factual determinations even on the "incomplete" factual record before it. Sears, 73 F.4th at 1286 n. 11. Those determinations are "presumed to be correct," and Rivera has the burden of proving otherwise "by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); Pye, 50 F.4th at 1035. Rivera relies on the transcript omission to argue "clear and convincing evidence." (Doc. 142, p. 256.) Indeed, the Eleventh Circuit recently held in Sears v. Warden GDCP that a state court's "failure to consider the full record result[s] in an unreasonable determination of the facts." 73 F.4th at 1289-90 (collecting cases). However, in Sears, the Eleventh Circuit described how when "a state court's decision did not align with the record," or when the record "belied" the Supreme Court of Georgia's descriptions of an attorney's testimony, the Court did not owe the state court's finding deference under AEDPA. Id. at 1290 (citing Ward v. Hall, 583 F.3d 1144, 1173 (11th Cir. 2010) and Jones v. Walker, 540 F.3d 1277, 1288 & n.5 (11th Cir. 2008). In the cases referenced in Sears, the state courts had mischaracterized testimony or faulted a party for failing to argue a claim when they did argue that claim. Id. Here, however, there was a missing portion of the record which was virtually inconsequential and thus those cases are inapposite. Indeed, the missing parts of Rivera's

direct appeal record only serve to bolster the Georgia Supreme Court's conclusions; they do not mischaracterize or belie the record. Thus, unlike the cases relied upon in Sears, the Georgia Supreme Court's decision is supported — both by the record before it at the time and the full version.

The Georgia Supreme Court relied on Georgia case law to find that, because Rivera never asked the trial court to allow him to proceed *pro se*, there was never any need to confirm his competence. Rivera, 647 S.E.2d at 77. It held that, "[b]y ensuring that counsel respected Rivera's wishes, the trial court did not transform counsel into *co*-counsel, rather, it ensured that counsel served as *Rivera's* counsel." Id. (emphasis in original). It then held that "to the extent Rivera contends that the trial court erred in not ensuring that he was competent to control his own defense . . .," nothing indicated "that Rivera was incompetent to stand trial nor is there anything in the record that should have indicated to the trial court that a sua sponte inquiry into competency was required." Id. at 77-78. Indeed, Rivera's demands that his counsel proceed in the manner he desired simply do not indicate a waiver of the right to counsel necessitating a Sixth Amendment inquiry under Faretta. Applying deference under AEDPA, the Court finds that the Georgia Supreme Court's decision did not involve an unreasonable determination of the facts or application of law. See 28 U.S.C. § 2254(d)(1). Moreover, even in the absence

182

of any AEDPA deference, the Court agrees fully with the Georgia Supreme Court's rejection of this claim and supporting analysis.

Specifically as to Rivera's argument he was improperly allowed to direct the decision not to move for a mistrial, (doc. 142, p. 255), the trial court conducted a colloquy with Rivera regarding his desire not to pursue a mistrial and correctly relied on applicable U.S. Supreme Court precedent that the attorney is bound by the client's wishes. He then denied the secondary request for a curative instruction. (Doc. 30-7, p. 20.) Given the flat denial of the lesser request, a motion for mistrial based on the same arguments was destined to fail. Moreover, there is no U.S. Supreme Court precedent concerning whether the Sixth Amendment is violated when a defendant requires (and the judge allows) his attorneys to revoke a motion for mistrial or to limit a mitigation defense in contravention of the attorney's strategic plans. This conclusion does not work to Rivera's advantage. The dearth of caselaw specifically on point is fatal to Rivera's claim. 28 U.S.C. § 2254 (d)(1) (habeas corpus shall not be granted unless adjudication of the claim resulted in a decision that was contrary to, or involved an unreasonable application of clearly established Federal Law); Williams v. Taylor, 529 U.S. at 412 (clearly established federal law "refers to the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision").

Additionally, the missing portions of the transcript do not indicate that an "important" factual error has been made. Pye, 50 F.4th at 1035.    On the contrary, as the state habeas court concluded, the missing portions actually bolster the Georgia Supreme Court's findings and conclusions.    It therefore may properly defer to the Georgia Supreme Court's reasonable, and indeed correct, determination of the facts and application of the law despite the incomplete record under § 2254(d)(1).    To the extent the Court must review, *de novo*, the complete record to ascertain this conclusion, as argued by Rivera, the Court finds the complete record reveals the merits of Rivera's claim fail for the reasons explained below in Section VI(C).

> B. <u>State Habeas Court's Holding that Rivera Procedurally Defaulted Self Representation Claim is Inadequate to Bar Federal Review.</u>

The state habeas court's alternative finding on the self-representation claim is "Petitioner failed to prove prejudice to overcome [procedural] default as Petitioner failed to prove that he would now prevail on his claim with the admission of the omitted transcript."    (Doc. 37-16, p. 14.)    In this Court's view, the procedural default holding conflated two separate claims.    On the one hand there is the transcript omission—at once a mere theory for seeking *de novo* review, as well as a separate claim at state habeas in its own right (see doc. 31-4, p. 20)—and on the other

hand is the self-representation claim itself (id. at 19).  The

first claim, wherein Rivera argued at state habeas that he was

wronged by the trial court's omission of the record on appeal,

should have and could have been brought by Rivera pursuant to the

avenues available to him under Georgia appellate procedure at his

direct appeal, and therefore *that* argument is procedurally

defaulted.  If Rivera had wished to rely upon a portion of the

transcript to make the self-representation argument to the Georgia

Supreme Court, it was incumbent upon him to ensure all relevant

pages of the transcript were included in the record and

*specifically presented to* the Georgia Supreme Court.[19]  In failing

to do so, Rivera did not comply with all "independent and adequate"

state procedures, and thus that claim is unexhausted and therefore

continues to be procedurally defaulted in federal court as well.

Id. (quoting Wainwright, 433 U.S. at 86-87; Bailey, 172 F.3d at

1302-03; 28 U.S.C. § § 2254(b),(c)); see also Mason, 605 F.3d at

1119 ("That is, to properly exhaust a claim, the petitioner must

'fairly present' every issue raised in his federal petition to the

state's highest court, either on direct appeal or on collateral

---

[19] See, e.g., O.C.G.A. § 5-6-42 (Where there is a transcript of evidence and
proceedings to be included in the record on appeal, the appellant shall cause
the transcript to be prepared and filed as provided by Code Section 5-6-41);
O.C.G.A. § 5-6-41 ("If anything material to either party is omitted from the
record on appeal or is misstated therein, the parties by stipulation, or the
trial court, either before or after the record is transmitted to the appellate
court, on a proper suggestion or of its own initiative, may direct that the
omission or misstatement shall be corrected and, if necessary, that a
supplemental record shall be certified and transmitted by the clerk of the trial
court.")

review.")(quoting Castille v. Peoples, 489 U.S. 346, 351 (1989)).
Because it is unexhausted, Claim 4(c) is **DENIED**.

However, as to the self-representation claim itself, although
Rivera failed to "properly present[] his claims" regarding the
omitted transcript to the Georgia Supreme Court, he attempted to
use the transcript to support the discrete self-representation
claim.  The state habeas court found the self-representation claim
was procedurally defaulted even though it had been brought to the
Georgia Supreme Court, which was confirmed by the state habeas
court's *res judicata* holding.  (Doc. 37-16, pp. 14-17.)  The Court
is unable to definitively hold that Rivera did not fairly present
the self-representation claim to *any* state court given the state
habeas court's *res judicata* holding.  Nor is it clear whether any
state court decided the self-representation claim on the merits
given the state habeas court's procedural default holding.  See
Mason, 605 F.3d at 1119 ("When, however, a claim is properly
presented to the state court, but the state court does not
adjudicate it on the merits, we review *de novo*.") (citing Cone,
556 U.S. at 472).  Additionally, because the state habeas court
determined the self-representation claim was procedurally
defaulted based upon the separate issue of Rivera's failure to
argue on direct appeal that the transcript was not complete, and
then considered the omitted transcript when discussing the merits,
its procedural default holding is "inadequate" to bar federal

review.  Judd, 250 F.3d at 1313 (holding "the last state court
rendering a judgment in the case must clearly and expressly state
that it is relying on state procedural rules to resolve the federal
claim without reaching the merits of that claim," or the decision
does not bar federal review). The Court reviews the merits of this
claim for the sake of clarity and finality.

C. Rivera's Self-Representation Claim Fails on the Merits.

The Court agrees with the Georgia Supreme Court's findings
that Rivera's competency to make important decisions about the
objectives of his defense was not in issue, and that his
involvement in his defense did not exceed some threshold mandating
a Faretta inquiry.  Furthermore, unlike cases where clients either
unequivocally refuse to accept representation from their attorney
whether by "express, affirmative request for self-representation"
or, at times, by virtue of generally uncooperative conduct, United
States v. Garey, 540 F.3d 1253, 1264 (11th Cir. 2008), neither
existed here.  After the Court and Rivera reviewed the precedent,
they discussed the limitations of Rivera's authority to direct his
case.  (Doc. 30-6, pp. 5-6.)  They then took a recess.  (Id. 9-
10.)  Afterwards, Rivera unequivocally stated he did not wish to
proceed pro se, and he wished to continue being represented by his
trial counsel.  (Id. at 11.)  He even complimented their efforts.
(Id. at 12 ("my lawyers are -- are extremely good.").)

Well after the state habeas court's decision, the Supreme

Court grappled with the autonomy given to criminal defendants to control their defense. McCoy v. Louisiana, 584 U.S. 414 (2018). The Court made clear that a distinction exists between trial management and those decisions which are properly reserved for the client, including the autonomy to decide the objective of the defense. Id. The McCoy case did not further define these roles but specifically held that "it is the defendant's prerogative, not counsel's to . . . admit guilt in the hope of gaining mercy at the sentencing stage." Id. at 417-18. Rivera's briefing assumes the decision whether to motion for mistrial or to offer a mitigation defense constitute "trial management" tasks reserved for the attorney, but the Supreme Court has never stated thus. Indeed, while McCoy considered whether an attorney may override his client's protests of innocence by strategically admitting guilt, id. at 422, it reiterated Faretta's guidance that a defendant need not surrender control entirely to counsel to gain assistance. Id. at 421-22 (citing Faretta, 422 U.S., at 819-20) ("[G]rant[ing] to the accused personally the right to make his defense, . . . speaks of the 'assistance' of counsel, and an assistant, however expert, is still an assistant.")

The Court is guided by McCoy's dicta, which notes that a defendant might *reasonably* consider "life in prison not worth living and prefer to risk death for any hope, however small, of exoneration." McCoy, 584 U.S. at 423 (quoting Hashimoto,

Resurrecting Autonomy: The Criminal Defendant's Right to Control the Case, 90 B.U. L. REV. 1147, 1178 (2010); and Jae Lee v. United States, 582 U.S. 357, 371 (2017) (recognizing a defendant might reject a plea and prefer "taking a chance at trial" despite "[a]lmost certai[n]" conviction (emphasis deleted)). The McCoy Court has thereby accepted the exact type of behavior which Rivera exuded may be rational. (See doc. 32-15, p. 69 (Hawk testifying it was important to Rivera for his children to believe he was mentally ill, even if illness in question was psychopathy and unlikely to meet legal standard for insanity).) Even if it is not, in the attorney's opinion, "best suited to avoiding the death penalty," it is not necessarily violative of a defendant's right to counsel for him to choose that course. McCoy, 584 U.S. at 422-23.

In other words, a defendant may direct his defense without becoming a *pro se* party in any *de facto* sense because his autonomy is guaranteed by the Sixth Amendment. See id. at 417 (noting Sixth Amendment guarantees defendant right "to have the *Assistance* of Counsel for *his* defence") (emphasis in original). Therefore, the fact that Rivera did so in this case did not render any need for a Faretta hearing. While "[n]umerous choices affecting conduct of the trial" do not require client consent, including "the objections to make, the witnesses to call, and the arguments to advance" (doc. 142, p. 254 (citing Gonzalez v. United States, 553 U.S. 242, 249

(2008))), there is simply no Supreme Court rule that, because these decisions do not require client permission, they *must* be made by the attorney.  And even if an attorney's failure to prudently make those decisions might constitute ineffective assistance, whether a client-directed decision on those choices creates a Sixth Amendment violation in the manner Rivera proposes, is, at best, not clearly established.  The Court defers to the Georgia Supreme Court's holding, but to the extent it must consider the record omissions to provide finality on this review given the contrary procedural default holding, it holds Rivera's self-representation claim fails on the merits as well.  Thus, Rivera's Claim 4(b) is **DENIED.**

## VII. Ineffective Assistance of Habeas Counsel

Rivera's next argument is familiar.  Although the Court already denied this claim, he reasserts his state habeas counsel was ineffective in failing to argue that trial counsel ignored reliable and critical evidence suggesting actual innocence or that he falsely confessed to the Glista and Wilson murders.  (See, doc. 142, pp. 260-64; see also, e.g., doc. 78 pp. 3, 13-51; 158, pp. 10-11.)  The Court previously denied this claim because it is time-barred and procedurally defaulted.  (Doc. 96, pp. 16-24.)  Rivera contests this Court's finding of procedural default, but he ignores the initial and alternative holding that it is time barred.  (Id. at 10-14)  Thus, to the extent he *again* seeks reconsideration of

this Court's December 6th, 2017, Order denying this claim, his request is, yet again, denied. (Docs. 78 (Motion); 96 (Order Denying); 98 (Motion for Reconsideration); 107 (Order Denying Reconsideration).) Arthur v. Thomas, 739 F.3d 611, 630 (11th Cir. 2014)("[T]he Martinez rule explicitly relates to excusing a procedural default of ineffective-trial-counsel claims and does not apply to AEDPA's statute of limitations or the tolling of that period."). Given that Rivera separately and most recently seeks to assert this argument to excuse his procedural default of other claims, including his ineffective assistance claim relevant to prosecutorial misconduct, the Court clarifies its prior holding. (See, e.g., doc. 158, p. 14 ("Assuming state habeas counsel's failure to brief the prosecutorial-misconduct IAC subclaim rendered the claim unexhausted and procedurally defaulted, state habeas counsel were deficient in failing to adequately preserve a substantial IATC claim.").)

By way of brief review, Rivera takes issue with the Court's reliance upon Garland v. State, 657 S.E.2d 842, 843-44 (Ga. 2008), in holding that, because Rivera could have made his ineffective assistance of trial counsel claims on direct appeal, before he filed his collateral petition in state court, the Supreme Court's Trevino exception does not apply to excuse the default of certain ineffective assistance of trial counsel claims. (See, e.g., docs. 142, pp. 260-64 (regarding habeas counsel failure to argue trial

counsel "ignored" evidence of actual innocence); 158, pp. 14-16 (regarding habeas counsel failure to assert ineffective assistance on prosecutorial misconduct claim)). Trevino expanded a preexisting exception established by the Supreme Court in Martinez v. Ryan, 566 U.S. 1. Martinez allowed a petitioner to rely on errors made by their state collateral counsel to establish cause to excuse procedural default of an ineffective trial counsel claim when (1) "a State requires a prisoner to raise an ineffective-assistance-of-trial-counsel claim in a collateral proceeding," as opposed to on direct appeal; (2) "appointed counsel in the initial-review collateral proceeding, where the claim should have been raised, was ineffective under the standards of Strickland;" and (3) "the underlying ineffective-assistance-of-trial-counsel claim is a substantial one." 556 U.S. at 14 (citations omitted).

Trevino broadened the exception to allow such allegations to constitute cause when the state "effectively" prohibited the defendant from raising that ineffective assistance of trial counsel claim on direct appeal. Trevino v. Thaler, 569 U.S. 413, 429 (2013) ("[W]here, as here, state procedural framework, by reason of its design and operation, makes it highly unlikely in a typical case that a defendant will have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal, our holding in Martinez applies."). Thus, while Georgia technically allows a defendant to raise ineffective

assistance of trial counsel claims on direct appeal, under Trevino, if Georgia procedure makes it "virtually impossible" for appellate counsel to adequately present an ineffective assistance claim on direct review, "[Georgia] courts in effect have directed defendants to raise claims of ineffective assistance of trial counsel on collateral, rather than on direct, review." Trevino, 569 U.S. at 423-26. This Court's prior Order found this threshold was not met as to the claim regarding trial counsel's "ignoring" evidence of actual innocence. (Doc. 96, pp. 16-24.) Still, Rivera argues the threshold is met as to this claim as well as to the claim trial counsel failed to object to prosecutorial misconduct.

The Texas law at issue in Trevino prevented meaningful review in a different manner than allegedly at issue in Georgia. In Texas, a criminal defendant was permitted to move for a new trial to develop the record for establishing ineffective trial counsel on appeal, but the "vehicle [was] often inadequate because of time constraints and because the trial record has generally not been transcribed at that point." Trevino, 569 U.S. at 424, (quoting Ex parte Torres, 943 S.W.2d 469, 475 (1997)). Here, the issue is relevant to appointed trial counsel's continued representation from trial to appeal, (see O.C.G.A. § 17-12-12(d)) and the inherent conflict arising and then restricting that counsel to argue their own trial ineffectiveness on direct appeal. As noted in this Court's prior order, Georgia procedure allows counsel to seek

removal from representation so the defendant may request conflict-free counsel be appointed to prove ineffective assistance. Garland, 657 S.E.2d at 843-44.   Or, as Respondent notes, a defendant may request a new trial, and though the motion is similarly temporally restrictive to that which exists in Texas, an amendment may be filed at any time after the transcript is filed (transcripts due within 45 days from sentencing) to include such a claim. (See doc. 76 (Citing Ga. Unif. R. Super. Ct. 34, Unif. App. P. 1V(A)(1).).   Rivera has provided no precedent suggesting the Supreme Court, the Eleventh Circuit, or the State of Georgia itself deems Georgia procedure to affirmatively or even "effectively" require criminal defendants to wait to raise ineffective assistance claims until collateral review by adopting this procedural framework.   Thus, in the absence of precedent suggesting otherwise, the Court sustains its ruling and applies it to Rivera's new prosecutorial misconduct claims.

However, even if there was no "meaningful opportunity" for Rivera to litigate his ineffective assistance of trial counsel claim on direct appeal, thus qualifying for the Trevino exception, Rivera failed to establish the other two elements under Martinez: that "appointed counsel in the initial-review collateral proceeding, where the claim should have been raised, was

ineffective under the standards of Strickland,"[20] or that "the underlying ineffective-assistance-of-trial-counsel claim is a substantial one." Martinez, 566 U.S. at 14. Rivera argued he is unable to prove the first element, ineffective assistance of collateral counsel, because of the inherent conflict arising from the continued presence of the same counsel in federal court, which is why he sought supplemental counsel.[21]   (Doc. 78, p. 57.) Therefore, Rivera's briefing on this matter concerned primarily the failures of trial counsel, who purportedly failed to raise evidence of actual innocence. (Doc. 78, p. 52.)  However, that ineffective assistance of trial counsel claim fails; given the standards for establishing actual innocence are so high – and indeed, not met- the Court finds that collateral counsel was not ineffective whether they failed to brief the issue of actual innocence due to strategy or negligence.  It likewise sustains its decision on rejecting Rivera's request for supplemental counsel. (Doc. 96.)

As to his present cause-to-excuse-default argument, Rivera claims any default of the claim that trial counsel was ineffective

---

[20] Rivera disputed that he failed to exhaust these claims, arguing he was not required to brief them in order to preserve them.  The Court need not review Georgia's Rule 22 and O.C.G.A. § 9-14-52(b) to hold these claims are meritless. Even if he had exhausted them, they fail.

[21] In part because the stand-alone claim of ineffective assistance of habeas counsel is time barred, the Court previously denied Rivera's request, (doc. 78), for supplemental counsel to investigate this allegation to prove it. (Doc. 96).

for failing to object to prosecutorial misconduct is due to habeas counsel's failure to properly brief the claim.   However, Rivera cannot meet the high Strickland prejudice burden regarding his state habeas counsel's alleged failure to brief a meritless claim. As described above, trial counsel did object to the alleged prosecutorial misconduct.   (Docs. 30-5, pp. 11-16; 30-7, pp. 14-15.)   Also, as described above, when Rivera appealed the underlying claim that the prosecutor made improper arguments, the comments were not deemed improper.   Rivera, 647 S.E.2d at 79.   As there was no prosecutorial misconduct, there is no trial counsel ineffectiveness in failing to object, and therefore no habeas counsel ineffectiveness in failing to argue it was deficient performance to fail to object.   See Card v. Dugger, 911 F.2d 1494, 1520 (11th Cir. 1990) ("Counsel cannot be labeled ineffective for failing to raise issues which have no merit."); see also United States v. Winfield, 960 F.2d 970, 974 (11th Cir. 1992) ("[A] lawyer's failure to preserve a meritless issue plainly cannot prejudice a client.").   Thus, because there was no misconduct, there was also no "substantial" trial counsel ineffectiveness. Therefore, Rivera may not pursue the Martinez-Trevino exception to prove cause and prejudice to excuse the default of the claim that trial counsel was ineffective in failing to object to prosecutorial misconduct.

## VIII.   Cumulative Error

Rivera's Claim Six argues that even if the "many errors" he asserts did not individually prejudice him, the cumulative impact of those errors "rendered his death sentence unreliable and requires the grant of a new sentencing hearing." (See doc. no. 142, pp. 264-65.)   Under the cumulative-error doctrine, "a sufficient agglomeration of otherwise harmless or nonreversible errors can warrant reversal if their aggregate effect is to deprive the defendant of a fair trial." Insignares v. Sec'y, Fla. Dep't of Corr., 755 F.3d 1273, 1284 (11th Cir. 2014)(citing Morris v. Sec'y, Dep't of Corr., 677 F.3d 1117, 1132 (11th Cir. 2012)); see also United States v. Baker, 432 F.3d 1189, 1223 (11th Cir. 2005), abrogated on other grounds by Davis v. Washington, 547 U.S. 813 (2006).  It is unclear whether such a claim is cognizable in § 2254 cases in the Eleventh Circuit.  Compare Sims v. Singletary, 155 F.3d 1297, 1314 (11th Cir. 1998) (considering but reversing district court's holding that alleged errors cumulatively resulted in prejudice during sentencing phase which mandated vacating his death sentence) with Morris v. Secretary, Fla. Dep't of Corr., 677 F.3d 1117, 1132 n.3 (11th Cir. 2012) ("We need not determine whether, under the current state of Supreme Court precedent, cumulative error claims reviewed through the lens of the AEDPA can ever succeed in showing that the state court's decision on the

merits was contrary to or an unreasonable application of clearly established law.")

The Eleventh Circuit has instead avoided the determination of whether, under current Supreme Court precedent, cumulative error could ever succeed under AEDPA. See Hill v. Secretary, Fla. Dep't of Corr., 578 F. App'x 805, 810 (11th Cir. 2014) ("[W]e need not decide [whether a cumulative error claim would be cognizable in habeas corpus] here because, even assuming a claim of cumulative error is cognizable in federal habeas proceedings, Hill would not be able to satisfy that standard."); Morris, 677 F.3d at 1132 ("For our purposes, it is enough to say that Morris's cumulative error claim clearly fails in light of the absence of any individual errors to accumulate."). In those cases, where "there is no error in any of the trial court's rulings, the argument that cumulative trial error requires that this Court reverse the defendant's convictions [was] without merit.'" Insignares, 755 F.3d at 1284 (quoting United States v. Taylor, 417 F.3d 1176, 1182 (11th Cir. 2005) (citations and quotations removed) (alterations in original).

Assuming this claim is cognizable and that it is not defaulted, it fails. As demonstrated above, Rivera asserts only one ground which plausibly implicates constitutional principles: his Giglio claim. It too failed because its review is ultimately guided by the Brecht standard in this Court, not the materiality

standard set forth in the Giglio case itself.  Moreover, the Court has considered every allegation raised by Rivera and finds that there is no other error, harmless, prejudicial, constitutional, or otherwise, to accumulate with it which would indicate that Rivera was so prejudiced by the errors as to mandate the extreme remedy of reversing the state court sentence.  Accordingly, pretermitting whether "cumulative error" is a claim cognizable in § 2254 cases, Rivera has not demonstrated that he is entitled to relief in connection with Ground Six.  Morris, 677 F.3d at 1132 (11th Cir. 2012); see also United States v. Waldon, 363 F.3d 1103, 1110 (11th Cir. 2004).  Thus, Claim Six is **DENIED**.

## IX.  Certificate of Appealability

Federal Rule of Appellate Procedure 22(b)(1) states in part: "In a habeas corpus proceeding in which the detention complained of arises from process issued by a state court, . . . the applicant cannot take an appeal unless a circuit justice or a circuit or district judge issues a certificate of appealability under 28 U.S.C. § 2253(c)."  Pursuant to 28 U.S.C. § 2253(c)(2), a district judge should issue a COA "only if the applicant has made a substantial showing of the denial of a constitutional right."  The United States Supreme Court has stated that "[t]he COA inquiry . . . is not coextensive with a merits analysis." Buck v. Davis, 580 U.S. 100, 115 (2017).  Rather, "[a]t the COA stage, the only question is whether the applicant has shown that 'jurists of reason

could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" Id. (quoting Miller-El v. Cockrell, 537 U.S. 322, 327 (2003)).

Rivera has failed to make a substantial showing of the denial of a constitutional right with respect to any of his claims. The Court finds no jurists could disagree with the Court's conclusions on the issues presented in any of the claims Rivera properly raised. Accordingly, Rivera is **DENIED** a COA for any of his claims.

## X.   Conclusion

Because Rivera is not entitled to habeas relief on any of the claims raised in his Amended Petition and preserved in his Amended Brief on Exhaustion and Procedural Defenses and in Support of his Petition for Writ of Habeas Corpus, his Petition is **DENIED.** His Request for evidentiary hearing is also **DENIED.** The Clerk is directed to **CLOSE** this case.

**ORDER ENTERED** at Augusta, Georgia, this 13th day of September 2024.

HONORABLE J. RANDAL HALL
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA