IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

| | | |
|---|---|---|
| REINALDO JAVIER RIVERA, | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | Case No. 1:13-cv-161 (JRH) |
| | ) | |
| GDCP WARDEN, | ) | **CAPITAL CASE** |
| Respondent. | ) | |

## PETITIONER'S MOTION TO ALTER OR AMEND THE JUDGMENT

Petitioner Reinaldo Javier Rivera, by and through undersigned counsel and pursuant to Rule 59(e) of the Federal Rules of Civil Procedure and 28 U.S.C. § 2253(c), respectfully requests that this Court alter and amend the judgment entered on September 13, 2024, denying Mr. Rivera's Amended Petition for Writ of Habeas Corpus, D.161; D.162, and that it reconsider its denial of a certificate of appealability ("COA"). In support of this motion, Mr. Rivera shows the following:

**I.    The Court Erred In Applying An Unduly Burdensome Standard For Determining Whether Mr. Rivera Was Diligent In Seeking To Present The Testimony Of Critical Fact And Expert Witness David Lisak, Ph.D.**

The state habeas court rejected Mr. Rivera's ineffective assistance of counsel ("IAC") claim without hearing critical fact and expert testimony from David Lisak, Ph.D., a psychologist renowned for his research into the long-term impact of

childhood sexual and physical abuse in men. *See generally* D. 57; D.142:44-45, 109-10. Dr. Lisak had initially been retained by trial counsel but never used, and accordingly could have provided relevant historical evidence regarding counsel's deficient performance in opting to proceed with a highly aggravating presentation at sentencing. *See* D.37-8:159-76. Moreover, he would have provided critical evidence in mitigation of punishment, evidence needed to show the prejudice caused by trial counsel's deficient representation. *Id.* Given his importance, Mr. Rivera's lawyers went to great lengths to persuade the state habeas court to permit his live testimony after he became unavailable to testify at the scheduled hearing—an effort that could hardly be described as lacking in diligence, regardless of Mr. Rivera's lack of success in presenting the evidence. *See*, *e.g.*, D.31-10, 31-12, 31-13, 31-14, 31-16, 31-18, 31-24, 31-25, 31-76, 37-1. Reconsideration under Rule 59(e) is appropriate because this Court made numerous errors of law and fact in determining that Mr. Rivera lacked diligence under 28 U.S.C. § 2254(e)(2).

This Court determined that it could not second-guess the state habeas court's denial of a continuance to allow Dr. Lisak's testimony "[b]ecause the state court's docket management decisions do not implicate federal law." D.161:39. But this misconstrues both Mr. Rivera's argument and the law.

First, Mr. Rivera has not argued that he is entitled to habeas relief because the habeas court would not afford him the opportunity to present Dr. Lisak's testimony.

Rather, his claim is that, because the state habeas court erected unfair roadblocks to the full and fair presentation of Mr. Rivera's evidence, and thus denied the IAC claim on an incomplete record, this Court should have granted Mr. Rivera's request for an evidentiary hearing so that Dr. Lisak's testimony could be fairly considered in adjudicating Mr. Rivera's IAC claim. *See, e.g.*, *Williams v. Taylor*, 529 U.S. 420, 440-44 (2000) (petitioner entitled to federal evidentiary hearing where prosecutor and juror hid their relationship); *Hammon v. Ward*, 466 F.3d 919, 927 (10th Cir. 2006) (remanding for evidentiary hearing where petitioner "not only aggressively sought an evidentiary hearing, [but] also put on some evidence in support of his allegation of his counsel's conflict of interest"); *see also Parker v. Scott*, 394 F.3d 1302, 1324-25 (10th Cir. 2005) ("A habeas petitioner acts diligently where he 'sought to develop the factual basis underlying his habeas petition . . . but a state court prevented him from doing so.'") (quoting *Smallwood v. Gibson*, 191 F.3d 1257, 1266 (10th Cir. 1999). Here, the state habeas court's rulings erected unreasonable obstacles to Mr. Rivera's presentation of Dr. Lisak's critical testimony.

Moreover, it is simply not accurate to say that a court's "docket management" does not implicate federal law. Both the United States and Georgia Supreme Courts have recognized that time may be a critical component of due process. "[A] myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defense with counsel an empty formality." *Ungar v. Sarafite*, 376

U.S. 575, 589 (1964) (noting that "a denial of a continuance [may be] so arbitrary as to violate due process"). *See, e.g.*, *Hardwick v. Gooding*, 233 Ga. 322, 323-24 (1974) (trial court abused its discretion in denying continuance where the state's actions "had the cumulative effect of depriving Hardwick of a realistic opportunity to prepare for the hearing"); *Davis v. Thomas*, 266 Ga. 835, 837-38 (2007) (given loss of funding and dramatic cuts to staffing, petitioner should have been granted a continuance as "the Resource Center simply could not provide adequate representation without a continuance" and "[t]he interests of justice require that the Resource Center be given a realistic opportunity to adequately prepare for the hearing"); *see also Panetti v. Davis*, 863 F.3d 366, 378 (5th Cir. 2017) (finding that petitioner was entitled to an evidentiary hearing in federal court because state's procedures, including excessively short time afforded petitioner to prove his incompetence, denied him a fair and adequate opportunity to prove his case, and noting that "[t]runcated hearings and exacting strictures can squeeze the life from due process, while perversely creating years of delay, all for a refusal to give a few days of time").

As in federal court, a habeas petitioner in Georgia typically gets only one opportunity to raise challenges to his conviction and sentence. *See* O.C.G.A. § 9-14-51 (requiring that all grounds for relief should be raised in the initial or amended habeas petition and that any other ground will be waived unless the state or federal

4

constitution requires its consideration or the habeas court, "on considering a subsequent petition, finds [its] grounds for relief . . . could not reasonably have been raised in the original or amended petition"). As a result, it is a routine practice in state habeas proceedings for evidentiary hearings to be held open to allow the testimony of a witness who was not available to testify at the initial hearing. *See, e.g.*, D.37-24:9 in *O'Kelley v. Warden*, No. 4:15-cv-00104 (S.D. Ga.) (court agrees to hold open state habeas hearing because a critical mental health expert could not attend the originally scheduled hearing); D.19-3:25 in *Heidler v.Warden*, No. 6:11-cv-00109 (S.D. Ga.) (state habeas transcript showing that trial counsel was unavailable to testify, despite advance notice of the hearing date, and court agreed to reschedule his testimony for a later date); Transcript at 411-16 in *Martin v. Emmons*, No. 2017-SU-HC-0009 (Butts Cty. Super. Ct. Jan. 31, 2024) (continuing hearing to allow testimony from unavailable witnesses) (Ex. A); Transcript at 117-20 in *Esposito v. Caldwell*, No. 22-SU-HC-00003 (Butts Cty. Super. Ct. May 10, 2023) (continuing hearing to accommodate schedules of unavailable witnesses) (Ex. B).

And, in this case, any burden to the court from continuing the hearing to permit Dr. Lisak's testimony would have been *de minimus*. Unlike the vast majority of judges assigned to preside over capital habeas cases in Georgia, who are randomly

drawn from all over the State to sit in Butts County by appointment,[1] Judge Fears was in fact a Butts County judge and would not have been required to travel more than a few miles to the courthouse at the prison in Jackson, just a bit down the road from the county courthouse where he often presided. *See, e.g.*, D.57:31 (trial court's letterhead showing that he presides in the Towaliga Judicial Circuit, consisting of Butts, Lamar, and Monroe Counties).

The Court, moreover, applied an overly burdensome standard for assessing Mr. Rivera's diligence in seeking to present Dr. Lisak's live testimony. As reflected in a timeline of the relevant pleadings, *see* Ex. C (timeline of relevant events during state habeas), Mr. Rivera made vigorous efforts to persuade the habeas court to allow Dr. Lisak's live testimony by (1) promptly advising the court that Dr. Lisak had a conflict with the selected dates for the hearing;[2] (2) promptly filing a motion to allow

---

[1] *See* O.C.G.A. § 15-1-9.1(b)(3).

[2] This Court emphasized that Mr. Rivera had advised the habeas court that the chosen dates worked, *see* D.161:42, but the Court's criticism is unjustified. By letter dated December 14, 2009, the state habeas court identified seven possible days, spread out through the month of May 2010, for holding the hearing. D.57:31. Counsel for Mr. Rivera advised the court on or about December 15, 2009, that dates later in the month were acceptable, as she might still be on maternity leave earlier in May. D.57:33. The state habeas court then waited practically three months to schedule the hearing, during which time Dr. Lisak's availability unsurprisingly changed. *See* D.57:35 (scheduling order dated March 10, 2010); D.31:12:5 (letter from Dr. Lisak dated March 26, 2010, explaining why he "no longer ha[d] availability in April or May for either depositions or testimony").

Within two days of receiving the scheduling order, Mr. Rivera's attorneys promptly advised the habeas court, that "our primary mental health expert witness,

Dr. Lisak's testimony, D.31-10; (3) promptly seeking leave to appeal that ruling, D.31-13; and (4) promptly filing a petition to appeal the court's ruling as a collateral order when the habeas court did not certify the issue for appeal, D.31-18. All of these attempts were unsuccessful. But diligence under 28 U.S.C. § 2254(e)(2) is measured by effort, not success—it "depends upon whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue the claims in state court; it does not depend . . . upon whether those efforts could have been successful." *Williams*, 529 U.S. at 435. *See*, *e.g.*, *Williams v. Alabama*, 791 F.3d 1267, 1277 (11th Cir. 2015) (quoting *Williams*, 529 U.S. at 435). Mr. Rivera's dogged efforts to persuade the state habeas court to accommodate Dr. Lisak's schedule clearly evince his diligence in seeking to present the evidence.

Prior to the state habeas court's refusal to accommodate Dr. Lisak's testimony, Mr. Rivera had every reason to believe that he would be able to present Dr. Lisak's testimony from the witness stand. That was his right under Georgia law. *See* O.C.G.A. § 9-14-48(a) ("The Court may receive proof by . . . oral testimony . . . ."). That Georgia law allows additional forms of proof, *see id.*, does not suggest that a litigant has no choice in the method for presenting his proof. Mr. Rivera

---

Dr. David Lisak," was unavailable in May, but would be available to testify on certain dates in July and August 2010. D.57:37. The court, however, was unwilling to accommodate this critical witness's schedule.

explained why he strongly preferred to present Dr. Lisak's testimony live, *see* D.31-10, 31-12, 31-14, 31-16, 31-18, 31-22, an explanation consistent with the general preference for live testimony, which is the default form of evidence under the civil rules. *See* O.C.G.A. § 9-11-43(a); *cf.* Fed. R. Evid. 804, Notes of Advisory Committee (observing that "testimony given on the stand in person is preferred over hearsay").[3]

This Court also based its lack-of-diligence finding on the fact that Mr. Rivera "did not obtain and timely serve Dr. Lisak's affidavit." D.161:44. That is an unfair ground for finding that Mr. Rivera's persistent efforts to present Dr. Lisak's testimony did not establish diligence. First, at the time affidavits were due, ten days before the evidentiary hearing began, *i.e.*, by May 14, 1999,[4] Mr. Rivera was still litigating his right to present Dr. Lisak's live testimony in the Georgia Supreme Court, litigation that was not concluded until the Georgia Supreme Court dismissed his Petition to Appeal on May 24, 2010. D.31-24. Moreover, the Court's criticism

---

[3] Indeed, the Eleventh Circuit has expressed less-than-favorable views of affidavits, compared to live testimony. *See, e.g.*, *Fugate v. Head*, 261 F.3d 1206, 1239 (11th Cir. 2001) (noting the "common practice for petitioners attacking their death sentences to submit affidavits from witnesses who say they could have supplied additional mitigating circumstance evidence, had they been called," and stressing that "the existence of such affidavits, artfully drafted though they may be, usually proves little of significance") (citations omitted).

[4] *See* O.C.G.A. § 9-14-48(c) (requiring affidavits introduced as evidence in habeas proceedings to be provided to opposing counsel ten days before hearing).

does not take into account the difficulty of drafting a lengthy, detailed expert affidavit on short notice, particular in light of Dr. Lisak's busy schedule at the time. *See* D.31-12:5 (Lisak letter detailing professional obligations in the months of April and May 2010).

Once his schedule opened up, Dr. Lisak did write and sign a lengthy affidavit outlining what his testimony would have been, which Mr. Rivera attached as an exhibit to his post-hearing brief. *See* D.37-8:160-76. The habeas court disallowed it, too. D.134. While this Court has criticized Mr. Rivera for filing his post-hearing brief and attached affidavit roughly two weeks after it was due, this delay followed upon the habeas court's denial of a well-justified request for a two-week extension of time, which was prompted by the State's setting of an execution date for another client of Mr. Rivera's attorneys. *See* Ex. D (letter-request dated September 9, 2010, from counsel for Mr. Rivera, seeking extension based on the State's September 7, 2010, scheduling of Brandon Rhode's execution on September 21, 2010). Respondent promptly opposed the request, Ex. E, and the habeas court denied it, Ex. F (order dated Sept. 16, 2010, denying extension of time). Having no ability to draft the post-hearing brief while also working on late-stage litigation on behalf of Mr. Rhodes, including an emergency claim challenging his competence to be executed, Mr. Rivera's attorneys were unable to complete the post-hearing brief on time and

filed it on October 8, 2010, accompanied by a letter explaining the delay in completing it. Ex. G.[5]

The Court's reasons for finding that Mr. Rivera was not diligent in seeking to present Dr. Lisak's testimony are not consistent with the standard the Supreme Court has defined for determining diligence and ignore the many obstacles that Mr. Rivera vigorously sought to overcome to present Dr. Lisak's essential evidence. The failure of the state habeas court to allow the testimony of Dr. Lisak, and subsequent refusal to consider Dr. Lisak's affidavit, resulted in a state court proceeding that denied Mr. Rivera a full and fair opportunity to present his IAC claim. This Court should have accordingly permitted Mr. Rivera an opportunity to augment the incomplete state court record. Mr. Rivera respectfully asks the Court to reconsider its ruling.

## II.   The Court Erred By Failing To Examine "The Totality Of Circumstances" Surrounding Mr. Rivera's October 12 Statement To Police.

In Section VI of his merits brief, Mr. Rivera presented the Court with a suppression claim founded on multiple layers of police misconduct.[6] *See* D.142:210-229. The misconduct began in the late afternoon of October 12, 2000, when two

---

[5] Respondent appears to have inadvertently omitted the documents attached as Exhibits D-G when providing the state court record to this Court.

[6] Section VI of the brief corresponds to Claim II, ¶ 23 of Mr. Rivera's amended petition. D.41:23.

police investigators, Richard Roundtree and Wayne Bunton, appeared in Mr. Rivera's intensive care unit hospital room. The investigators' arrival came approximately twelve hours after Mr. Rivera had been found unresponsive in a hotel room following a suicide attempt by multiple means, including an overdose of Tylenol PM. D.29-13:185-86; D.30-6:137-46; D.31-31:93, 101, 103; D. 33-1:184. By the time Roundtree and Bunton appeared at Mr. Rivera's bedside, he had been intubated, placed on a respirator, given an IV with several sedating medications, and was coming out of a medically induced coma. D.29-14:8, 13, 15, 16, 18, 183; D.131-31:93-99. Notwithstanding Mr. Rivera's obvious physical and mental impairments—impairments that rendered him incapable of making a knowing, intelligent, and voluntary waiver of his *Miranda* rights[7] or a knowing and voluntary confession—the investigators interrogated Mr. Rivera and elicited several inculpatory statements that formed the basis for the State's capital murder

---

[7] The investigators claimed they advised Mr. Rivera of his *Miranda* rights before questioning him, but did not have him execute a formal written waiver because Mr. Rivera's wrists and arms were restrained to the hospital bed. *See* D.29-13:190-91. However, as discussed more below, the investigators' assertion that they Mirandized Mr. Rivera lacks any credibility because the investigators 1) lied under oath when they said they had not recorded the statement, 2) lied again when they mischaracterized the duration and content of the interview, and 3) deliberately hid the recording until it was inadvertently discovered several years after the trial. *See* D.142:229-30.

prosecution and Mr. Rivera's eventual death sentence. *See generally* D.32-1:165-90; RX 175 (audio recording).

But the misconduct did not stop there. Roundtree and Bunton made a partial audio recording of the October 12 interview, *see* D.32-1:165-90; RX 175 (audio recording), and then lied under oath when they testified that the interview had not been recorded. D.29-13:194; D.29-14:167. In addition to committing perjury to conceal the recording's existence, Roundtree took affirmative physical steps to hide the recording by checking it out of the sheriff's department evidence room and secreting it in his home, where it remained until it was inadvertently discovered by Roundtree's landlord several years after Mr. Rivera's trial. *See* D.33-5:173; D.32-19:11-12; D.32-2:19, 24; D.32-3:1.

Against this backdrop of misconduct, Mr. Rivera argued that his first statement to law enforcement was involuntary due to his impaired physical and mental state, *and* the investigators' coercive tactics, namely, their practice of leading Mr. Rivera and feeding him answers to highly inculpatory questions.[8] *See* D.142:210-20. Mr. Rivera further argued that, because the October 12 statement served as a gateway for investigators to procure additional inculpatory statements

---

[8] Within this argument, Mr. Rivera also made clear that he was "too impaired to make a knowing, voluntary, and intelligent waiver of his rights." D.142:215.

that served as the basis for the State's case, the trial court should have suppressed these statements as "fruit of the poisonous tree."[9] *See* D.142:220-25.

However, when the Court addressed Mr. Rivera's suppression claim, it committed a critical and manifest error by declining to make any determination as to whether the October 12 statement was voluntary. Instead, the Court ended its inquiry by making an assumption that the statement was "unwarned," and then proceeded to rule that the subsequent statements were not "fruit of the poisonous tree" under *Oregon v. Elstad*, 470 U.S. 298 (1985). *See* D.161:160-64. But this fell short of answering the primary and essential question of whether the first statement was voluntary under federal law, which requires a court to employ a "totality of circumstances" approach "to determine whether a confession has been 'made freely, voluntarily and without compulsion or inducement of any sort.'" *Withrow v. Wilson*, 507 U.S. 680, 689 (1993) (quoting *Haynes v. Washington*, 373 U.S. 503, 513 (1963)). *See also Arizona v. Fulminante*, 499 U.S. 279, 285-86 (1991). As the Supreme Court explained in *Withrow*, the totality of circumstances approach not only looks at whether the police failed to advise the accused or obtain a valid waiver, but to "the crucial element of police coercion, the length of the interrogation, its

---

[9] *Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963).

location, its continuity, the defendant's maturity, education, physical condition, and mental health." 507 U.S. at 693-94 (citations omitted).

Here, the Court did not look at the "totality of circumstances" to decide whether the October 12 statement was voluntary. Notably, the phrase "totality of circumstances" cannot be found anywhere in the Court's order. Even more significant is that the order never grappled with two key pieces of evidence from the record: 1) medical records showing that Mr. Rivera was under the influence of highly sedating medication and not deemed "alert" and capable of "clear speech" until several hours after the interrogation, D.31-32:15; and 2) the partial audio recording of the October 12 statement revealing Mr. Rivera's slurred and compromised speech, his inability to follow and understand questions, and the investigators' tactic of feeding Mr. Rivera the desired answers to their suggestive and leading questions. *See* D.32-1:165-90 (transcript of October 12 interview); RX 175 (audio recording). Indeed, the Court expressly declined to examine whether Mr. Rivera was coherent in the recording, and whether Bunton and Roundtree's account of the interview was credible. D.161:147. The Court's decision to refrain from fully examining the totality of circumstances of Mr. Rivera's October 12 statement was a manifest error of law that should be corrected in an altered or amended judgment.

Moreover, the Court's erroneous declination to examine the totality of circumstances surrounding the October 12 statement led the Court to commit another

error: aligning Mr. Rivera's case with the factually incongruous case of *Oregon v. Elstad*, 470 U.S. 298 (1985). *See* D.161:160-64.

In *Elstad*, the police committed a mere "procedural error" by failing to Mirandize the accused immediately upon entering his home to serve an arrest warrant, during which time Elstad made an incriminating statement to the police. *Elstad*, 470 U.S. at 301, 306. After the arrest, Elstad waived his *Miranda* rights and provided a more detailed confession at the police station, which he later moved to suppress, claiming it was tainted by the earlier failure to provide a *Miranda* warning and was thus "fruit of the poisonous tree." *Id.* at 301-02. The Supreme Court rejected this argument, holding that "[t]here is a vast difference between the direct consequences flowing from coercion of a confession by physical violence or other deliberate means calculated to break the suspect's will and the uncertain disclosure of a 'guilty secret' freely given in response to an unwarned but noncoercive question." *Id.* at 312. Because the first, unwarned statement had "none of the earmarks of coercion," the Supreme Court held that the second, Mirandized statement was admissible. *Id.* at 317-18.

That is a far cry from what happened here. Unlike *Elstad*, where the accused made an incriminating statement prior to his arrest and while he was seated comfortably in his living room, *id.* at 306, the police here extracted Mr. Rivera's inculpatory statements from him shortly after he regained consciousness and while

15

he was still heavily sedated and restrained to a hospital bed. Moreover, whereas Elstad's statement followed a single, "noncoercive question," *id.* at 312, Mr. Rivera's statements were the product of at least ninety minutes of aggressive interrogation that involved not just leading questions, but several instances of the police feeding Mr. Rivera the desired information. Given the gross factual disparities between the two cases, including the numerous "earmarks of coercion" present here, *Elstad* is not at all instructive on the ultimate issue: whether the October 12 statement was involuntary, and whether the subsequent statements should be suppressed as "fruit of the poisonous tree."

As Mr. Rivera explained in his brief, *Missouri v. Seibert*, 542 U.S. 606 (2004), is the proper analogue. *See* D.142:228. In *Seibert*, the police intentionally withheld *Miranda* warnings during an interrogation in order to extract incriminating information that could then be used to steer the accused into making a second, Mirandized statement that was admitted in court. *Seibert*, 542 U.S. at 604-06. The Supreme Court held that the second, warned statement must be suppressed because "[u]pon hearing warnings only in the aftermath of interrogation and just after making a confession, a suspect would hardly think he had a genuine right to remain silent, let alone persist in so believing once the police began to lead him over the same ground again." *Id.* at 613.

This is comparable to what happened here. Investigators Bunton and Roundtree took advantage of Mr. Rivera's barely conscious and highly-sedated state to lead him into a series of involuntary and incriminating statements. This was clearly designed to undermine the efficacy of any future *Miranda* warnings made when Mr. Rivera was fully conscious. Consequently, although Mr. Rivera was Mirandized prior to his subsequent statements, once he had given so much incriminating information to the police on October 12, he "would hardly think he had a genuine right to remain silent, let alone persist in so believing once the police began to lead him over the same ground again." *Seibert*, 542 U.S. at 613.

Given the importance the Supreme Court has placed on the voluntariness of the first statement in "fruit of the poisonous tree" cases, it was manifest error for this Court to decline to examine the totality of circumstances surrounding the October 12 statement, including the contents of the audio recording and the credibility of Bunton and Roundtree's testimony about the interrogation. Without examining the highly coercive circumstances of the October 12 statement, along with the investigators' efforts to cover it up, the Court could not (and did not) decide whether the first statement was voluntary, and thus could not accurately determine that the subsequent statements were not "fruit of the poisonous tree." The Court should accordingly grant Mr. Rivera's motion to alter or amend the judgment to correct this manifest error of law.

**III.    The Court Should Reconsider Its Denial Of A Certificate Of Appealability.**

In addition to denying Mr. Rivera relief on all his claims, the Court also determined that Mr. Rivera failed to "ma[k]e a substantial showing of the denial of a constitutional right," and was therefore not entitled to a certificate of appealability ("COA") on any of his claims. D.161:199-200 (citing 28 U.S.C. § 2253(c)). Mr. Rivera respectfully submits that the Court erred in this determination and should reconsider its blanket denial of a COA.

To be granted a COA, a petitioner need not show that the appeal will succeed. *Miller-El v. Cockrell*, 537 U.S. 322, 337 (2003). Rather, the district court should issue a COA when "reasonable jurists could debate" whether the petition "should have been resolved in a different manner *or* that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (emphasis added; internal quotation omitted). Indeed, "a claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail." *Miller-El*, 537 U.S. at 338.

Mr. Rivera presented this Court with numerous claims over which "reasonable jurists could debate" and that "deserve encouragement to proceed further." The

grounds for reconsideration presented in this motion are just two examples.[10] Another is the Court's denial of Mr. Rivera's motion to amend the petition, D.71, and motion to appoint supplemental counsel, D.72-1, both of which implicated complicated and unsettled questions concerning what constitutes "new" evidence to satisfy the actual-innocence gateway under *Schlup v. Delo*, 513 U.S. 298 (1995), and whether the Supreme Court's decision in *Trevino v. Thaler*, 569 U.S. 413 (2013), applies in Georgia. *See* D.96. Indeed, in denying the motion to amend, the Court acknowledged that the *Schlup* Court "did not [] clarify whether 'new evidence' meant merely evidence not presented at trial or evidence not presented at trial <u>that was also</u> not available to be presented at trial." D.96-26-27 (emphasis in original). The Court also acknowledged a circuit split on this question. D.96-27. And as Mr. Rivera pointed out in his motion asking the Court to reconsider its denial of his motion to amend, the circuit split weighs in Mr. Rivera's favor. D.98-7-13. It is therefore readily apparent that jurists of reason could (and are) debating these issues, and the Court erred in issuing a blanket denial of a COA.

This Court's rejection of Mr. Rivera's IAC claim, moreover, failed to take into account the highly aggravated nature of defense counsel's chosen defense—and counsel's awareness that their defense theory "is scary stuff because we could wind

---

[10] Mr. Rivera submits that all of his claims merit a COA, but chooses to discuss only a few examples here.

up killing Rey with our mitigation." D.34-1:63. It also erroneously deemed cumulative the state habeas evidence regarding Mr. Rivera's severe bipolar disorder simply because a defense trial expert, "licensed counselor" Gerard Blanchard, who was not qualified to diagnose major mental illnesses, observed in passing that some scores on psychological testing "include[ed] an elevation on the bipolar score." D.30-3:60. As detailed in the Corrected Merits Brief, the state habeas court's order was filled with unreasonably wrong findings of facts and determinations of law, warranting *de novo* review under 28 U.S.C. § 2254(d). Reasonable jurists could disagree with the Court's deference to the state habeas court's decision and its rejection of this claim.

## IV.   Conclusion.

The Court should alter or amend its judgment, reconsider its ruling, and grant a writ of habeas corpus. In the alternative, the Court should grant a certificate of appealability on Mr. Rivera's claims, or vacate its judgment to permit further proceedings.

This the 11th day of October, 2024.

Respectfully submitted,

Marcia A. Widder (Ga. 643407)
Vanessa Carroll (Ga. 993425)

20

Georgia Resource Center
104 Marietta St. NW, Suite 260
Atlanta, GA 30303
404-222-9202
Fax: (404) 301-3315
Email: grc@garesource.org

COUNSEL FOR PETITIONER

## <u>NOTICE OF ELECTRONIC FILING</u>

This is to certify that on October 11, 2024, I electronically filed the foregoing

with the Clerk of the Court using the CM/EMF system which will send notification

of such filing to the following:

> Sabrina Graham
> Senior Assistant Attorney General
> sgraham@law.ga.gov

_____
Marcia A. Widder